UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

REED GALIN,

       Plaintiff,                             Case No.

   -against-                        **COMPLAINT**

KUNITAKE HAMADA,             Plaintiff demands trial by jury of
                                               all claims so triable.
       Defendant.

-------------------------------------------------------x

      Plaintiff REED GALIN, by his attorneys, Law Office of Richard A. Altman, for his complaint against defendant, alleges as follows:

## PRELIMINARY STATEMENT

      1. This is an action to enforce plaintiff's right to recover the proceeds from the sale of a painting entitled "Ice Storm," by Andrew Wyeth ("the Painting").

      2. On May 21, 2015, the Painting was sold at auction by Christie's, Inc., the New York auction house, for the sum of $820,000.

      3. On information and belief, defendant Kunitake Hamada is a Tokyo-based art dealer, who purchased the Painting around two years ago and consigned it to Christie's for sale in March 2015.

      4. In so doing, he has warranted that he has full and unencumbered title to the Painting.

-1-

5. Said warranty is false and in violation of plaintiff's rights, inasmuch as the facts show that plaintiff has full title to the Painting.

6. By agreement between the parties, the proceeds from the sale are being held by Christie's pending the determination of the rights of the parties to this action.

7. The provenance of the Painting, and the facts set out below, disclose that at an earlier date, it was transferred fraudulently and criminally, in violation of plaintiff's rights.

8. As a consequence of that fraudulent and criminal transfer, defendant does not have title to the Painting, and it remains with the plaintiff.

9. Under New York law, plaintiff's rights subsist notwithstanding the transfer, and he is entitled to the proceeds of the sale wherever they may be found.

10. The proceeds are presently in the custody of Christie's, Inc., which has agreed to retain them pending the determination of this action, and to disburse them thereafter, pursuant to the order of this Court.

## THE PARTIES, JURISDICTION AND VENUE

11. Plaintiff Reed Galin is a citizen of the State of Tennessee.

12. Defendant Kumitake Hamada is, on information and belief, a citizen of Japan and resides there.

13. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(2), in that it is between a citizen of a State and a citizen or subject of a foreign state, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

14. This Court further has *in rem* jurisdiction over the person of the defendant, in that the property which is the subject of this action and over which defendant claims an interest, is located within this State.

15. Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district, in that a substantial part of the events or omissions giving rise to the claim occurred in this district, that the defendant is subject to personal jurisdiction in this district, and that the *res* which is the subject of this action is located within this district.

## FACTS

16. On May 23, 1989, Christie's, Inc., the auction house in New York City, entered into an agreement with one David Ramus, an art dealer, concerning a drybrush painting by Andrew Wyeth, entitled "Ice Storm" ("the Painting"), which was to be sold by Christie's at auction two days afterward.

17. The agreement with Ramus was essentially that, if he were the successful bidder for the Painting, he would be given extended payment terms.

18. The terms were that one-third of the final bid price plus the buyer's premium would be paid by June 23, 1989, one-third by July 24, 1989, and the remaining one-third by August 23, 1989.

19. Ramus was the successful bidder, and the purchase price was $319,000.

20. About a month later, on June 27, 1989, plaintiff Reed Galin entered into a written agreement to purchase a one-third interest in the Painting from Ramus. A copy of the agreement is annexed as Exhibit A.

21. Plaintiff and Ramus had been lifelong friends. They had attended elementary school together, they were college roommates together, and plaintiff was even named godfather to Ramus's child.

22. In short, this was not a typical arms' length dealer/consignor relation. Rather it was a fiduciary relation based upon trust and a long-standing friendship.

23. Pursuant to the terms of the agreement, the remaining one-third interests were to be sold to two other investors. Ramus agreed to seek to re-sell the Painting for at least $550,000, and plaintiff was to receive his original investment plus 25% of the net profits after the resale.

24. The parties also agreed that if Ramus decided to retain a one-third interest for himself, the plaintiff (and the third investor) would receive their original investment plus one-third of the net profits.

25. Furthermore, Ramus had assured plaintiff that he (Ramus) would remain a one-third investor, regardless of the contingency.

26. Ramus further agreed that neither the Painting, nor any interest in it, would be sold or transferred to anyone, without plaintiff's prior knowledge and consent.

27. Plaintiff agreed to pay Ramus the sum of $106,333.33 for that one-third interest. Plaintiff paid Ramus an initial sum of $97,500, and the parties agreed that the balance of $8,833.33 would be deducted from plaintiff's share when the Painting was re-sold.

28. However, plaintiff later paid the balance anyway, fully funding his one-third investment.

29. Ramus then sold an additional one-third interest to one Don Sentell, a resident of Georgia, with plaintiff's prior knowledge and consent.

30. On or about July 24, 1989, Ramus made his second payment to Christie's, using the plaintiff's money.

31. As a result of the acquisition of full title to the Painting, Ramus, Sentell and plaintiff became co-venturers with respect to it, as a matter of law.

32. Thereafter, plaintiff heard occasionally from Ramus that he was still trying to find an acceptable deal to sell the Painting. Around four years later, on April 10, 1993, in response to plaintiff's repeated inquiries regarding the status of the Painting, Ramus sent a letter to plaintiff (copy annexed as Exhibit B), in which he said that he had not yet sold the Painting.

33. The letter states in part, "I shall do my very best to sell the Wyeth for a profit and will keep you informed of my progress...It is unfortunate that the art market has fallen so drastically but I will do my best to conclude a sale."

34.  However, plaintiff had no idea that Ramus's business problems and fraudulent activities were beginning to catch up with him.

35.  The statements in this letter, as plaintiff later learned from papers seized from Ramus during court proceedings, were bald-faced lies.

36.  In fact, before the end of 1989, Ramus had purported to transfer title to the Painting to the Coe-Kerr Gallery in New York City, as part of a deal in which he acquired a more valuable painting, "Children in the Wood," by Frank Weston Benson, in exchange for the Painting plus some cash.

37.  Ramus thereafter immediately sent that Benson painting to another art dealer in Texas as partial payment for a portion of a pre-existing debt which Ramus had to that dealer.

38.  Plaintiff did not learn of this fraudulent transaction until 1996.

39.  Because of the fraudulent nature of the transaction, the Painting was never actually sold to Coe-Kerr, and in fact Coe-Kerr committed its own fraud in the transaction, by failing to investigate either the provenance or plaintiff's contractual rights.

40.  Apparently, as plaintiff later learned, Ramus had been selling off valuable paintings in his possession without the knowledge of, or payment to, their owners.

41.  Plaintiff was one of several dozen victims of Ramus's criminal misconduct.

42. Ramus was eventually indicted and tried by the U.S. Attorney in Atlanta, Georgia for fraud and conversion, arising out of his activities as an art dealer. He was convicted and sentenced to federal prison in 1996.

43. The criminal complaint against him (Exhibit C is a copy of the first three pages) describes his activities as completely consistent with what he did with respect to the Painting at issue here. It states in pertinent part, "[f]rom March 1988 through March 1993, David Ramus devised a scheme and artifice to defraud owners of valuable artworks and to obtain money and property by false and fraudulent pretenses, representations, and promises," that he "converted to his own use paintings in his possession that were owned by others," that he "did not own and have good and marketable title to said paintings, and that he "lied to owners and clients about not having been paid, when in truth and fact, he had already been paid and converted the funds to his own use."

44. Plaintiff was officially designated by the U.S. Attorney as a victim of Ramus's crimes (Exhibit D).

45. The story of Ramus's rise and fall was major news in the art world at that time, and was widely reported. As a result of the extensive publicity (see Exhibit E), many valuable artworks, or the proceeds from their sales, were eventually recovered and clawed back to their rightful owners. But Ice Storm was not one of them.

46. Around this time, amazingly enough, Ramus wrote a novel about the art world, and received an advance from its publisher of $1 million. See http://alturl.com/wv6kz (accessed September 3, 2015). It was about a criminal art dealer.

47. On information and belief, Ramus also received at least another half-million dollars for foreign rights to the novel.

48. Despite this flow of money to a convicted criminal, plaintiff never received a dime of it, except for a token payment of $359, which Ramus paid plaintiff to demonstrate his supposed sincerity and good faith.

49. On information and belief, Ramus made other similar token payments to other creditors, before both his bankruptcy and his indictment.

50. But his true motivation was to try to get his creditors to work with him, instead of their continuing to pressure the U.S. Attorney in Georgia to prosecute him.

51. Then, while he was in prison, he wrote another book, and a third one after he was released. Prior to his release, the U.S. Department of Justice notified plaintiff of his impending release, as they apparently do with victims of crimes who request such notification (Exhibit F).

52. Then, he was also twice a Chapter 7 debtor in the U.S. Bankruptcy Court for the Central District of Georgia in 1997 and 1998. The proceeds from his books added considerably to his bankruptcy estate, but were still insufficient to cover his debts.

53. Plaintiff was a creditor in that proceeding, and was a member of the unsecured creditor's committee.

54. Many aspects of the bankruptcy were settled by agreement, but plaintiff was one of the "non-Settling Creditors" and did not waive his rights.

55. Although Ramus's debt to plaintiff was extinguished, the Painting was not property of his estate, and therefore plaintiff's interest in it was not extinguished.

56. Ramus's one-third interest in the Painting was extinguished by the bankruptcy proceeding, not to mention his criminal conviction with respect to it.

57. As for Sentel, the owner of the other one-third, his interest was extinguished in the bankruptcy proceeding, because he was a "Settling Creditor," and agreed to forego that interest.

58. As a result of Ramus's criminal acts and thievery with respect to the Painting, he could not pass good title to Coe-Kerr Gallery, and did not do so.

59. On information and belief, Coe-Kerr Gallery was not a good-faith purchaser for value.

60. Coe-Kerr Gallery went out of business around 1991, and plaintiff does not know the provenance of the Painting after that date.

61. Nonetheless, in New York, a thief cannot convey good and clear title to stolen property.

62. Therefore, by virtue of the (a) fraud and conversion of Ramus, (b) the extinguishment in the bankruptcy of any claims on behalf of both Ramus and Sentel, it necessarily follows that plaintiff is the sole owner of the Painting, and is entitled to the proceeds of its sale.

63. For about twenty years, from 1995 until May 2015, plaintiff sought to learn the whereabouts of the Painting, without success. From time to time, plaintiff periodically inquired of art dealers, and searched for it, especially when the internet became a valuable resource in later years.

64. Plaintiff had no success in his search until around May 12, 2015, when he suddenly learned that the Painting was being offered at auction in New York City by Christie's, and that the auction sale was to take place on May 21, 2015.

65. Plaintiff immediately communicated with Christie's and asserted his ownership interest in the Painting. Copies of email exchanges are annexed as Exhibit G.

66. Christie's insisted that it had the right to sell the Painting notwithstanding plaintiff's claim, and plaintiff insisted that Christie's was on notice of the defects in title, and that he would seek to prevent the sale of the Painting.

67. Christie's had sold the Painting in 1989 to Ramus, and thus was on notice of its questionable provenance, and the questionable title of its consignor.

68. The criminal activities of Ramus were common knowledge in both the mainstream press and the art world during that time, and should have placed any good-faith purchaser on notice.

69. In fact, the provenance of the Painting, as described by Christie's in the auction catalog, demonstrates its awareness of his activities. It reads as follows (see Exhibit H):

> The artist.
> Coe Kerr Gallery, New York.
> Mr. Frederic C. Church, Boston, Massachusetts, 1971.
> Christie's, New York, 25 May 1989, lot 407.
> David S. Ramus, Ltd., Atlanta, Georgia, acquired from the above.
> Acquired by the present owner by 1995.

70. In fact, although the provenance states that the defendant acquired the Painting in 1995, Christie's told plaintiff around the time of sale that defendant had only owned it for about two years.

71. On information and belief, defendant is an art dealer, and therefore had an obligation of due diligence before purchasing and consigning the Painting, especially because of Ramus's name in the provenance, and that Ramus's criminal activities had been widely known in the art world at that time.

72. On information and belief, defendant did not comply with that obligation and failed to conduct an investigation which was appropriate under the circumstances.

73. Plaintiff initially determined to seek to enjoin the sale of the Painting to prevent its sale at the auction.

74. This proved to be unnecessary after Christie's reviewed plaintiff's claim, and the parties then agreed to relinquish any claim to title of the Painting, and to pursue the proceeds of its sale.

75. After retaining counsel, plaintiff, Christie's and the defendant all agreed to allow the Painting to be sold, and to refrain from seeking to enjoin the sale and to recover possession of it.

76. The parties further agreed to assert their respective rights to the proceeds from the sale only.

77. All parties were concerned that litigation over the Painting itself, and its likely withdrawal from sale, would damage its market value, and plaintiff agreed to permit the sale to proceed, reserving all of his other rights.

78. On May 21, 2015, the Painting was sold at auction for $820,000 (hammer price), and the total with the buyer's premium was $989,000.

79. The parties further agreed that the proceeds from the sale would be held by Christie's as a stakeholder pending the outcome of this action, that the parties would litigate their rights to the *res,* and that the proceeds would be disbursed solely pursuant to order of this Court.

80. Christie's has informed the parties that the net proceeds from the sale are $803,600, after deduction of its commission and sale expenses, that it is in possession and control of those proceeds ,will retain them pending the determination of this action, and will

disburse them thereafter, pursuant to the order of this Court.

## FIRST CAUSE OF ACTION
### (Equitable Lien)

81. Plaintiff re-alleges paragraphs 1 through 80.

82. Because of plaintiff's title to the Painting, he has the right to assert an equitable lien over the proceeds of the sale wherever they may be found.

83. The proceeds of the sale are specifically identifiable and traceable funds, in possession and control of Christie's, and have been set aside and preserved by agreement of the parties, to be disbursed in accordance with the judgment of this Court.

84. Plaintiff is entitled to the imposition of an equitable lien over the proceeds, and to an order directing that the proceeds be transferred to him.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment; Constructive Trust)

85. Plaintiff re-alleges paragraphs 1 through 80.

86. Defendant's sale of the Painting by Christie's was in violation of plaintiff's exclusive rights to ownership of the Painting.

87. Defendant would be unjustly enriched if he were to be allowed to retain the proceeds from the sale of the Painting, which proceeds rightfully belong to the plaintiff.

88. Those proceeds were acquired in such circumstances that the defendant should not be permitted to retain the beneficial interest thereof.

89. Plaintiff is entitled to the imposition of a constructive trust on the proceeds of the sale, to prevent such unjust enrichment.

WHEREFORE, plaintiff demands judgment in his favor:  (1) declaring that he has an equitable lien on the proceeds of the sale of the Painting, (2) imposing a constructive trust over the proceeds of the sale of the Painting; (3) directing Christie's to make such payment to plaintiff and relieving and discharging them of further obligation or liability to plaintiff or defendant thereafter, (4) awarding him the costs and disbursements of this action, and (5) such other relief as may be just.

Dated:  September 3, 2015

*Richard A. Altman*

LAW OFFICE OF RICHARD A. ALTMAN
Attorneys for Plaintiff
285 West Fourth Street
New York, New York 10014
212.633.0123
altmanlaw@earthlink.net
artesq@earthlink.net