UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REED GALIN,

                *Plaintiff*,

        -against-

KUNITAKE HAMADA,

                *Defendant*.

ECF CASE

15-CV-6992 (JMF)


**MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**


Dated: September 25, 2015


**CAHILL PARTNERS** LLP

John R. Cahill
Ronald W. Adelman
Paul S. Cossu
70 West 40th Street
New York, NY 10018
(212) 719 – 4400

*Attorneys for Defendant*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................................... 3

ARGUMENT ................................................................................................................................... 7

    I.      THE 1989 SALE TO THE COE KERR
           GALLERY VALIDLY TRANSFERRED TITLE TO
           THE PAINTING UNDER THE UNIFORM COMMERCIAL CODE ........................ 9

           A.      Galin Entrusted the Painting to Ramus ............................................................ 10

           B.      Ramus's Unlawful Conduct Does Not Defeat the Fact of Entrustment .......... 11

           C.      The Complaint Fails to Allege Any Plausible "Red Flags" that
                   Would Have Alerted the Coe Kerr Gallery About Ramus or the Painting ..... 12

    II.     THERE IS NO BASIS IN
          BANKRUPTCY LAW FOR PLAINTIFF'S CLAIMS ............................................... 14

    III.    NEITHER CAUSE OF ACTION
          ASSERTED BY PLAINTIFF HAS ANY MERIT ..................................................... 16

           A.      Equitable Lien .................................................................................................. 17

           B.      Unjust Enrichment ........................................................................................... 17

CONCLUSION ............................................................................................................................. 18

**TABLE OF AUTHORITIES**

**Cases**

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................ 7,8

*Brown v. Mitchell-Innes & Nash, Inc.*,
No. 06 Civ. 7871 (PAC), 2009 WL 1108526 (S.D.N.Y. Apr. 24, 2009) .................. 11, 12, 13, 14

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ........................................................................................ 8

*Creggin Group, Ltd v. Crown Diversified Indus. Corp.*,
682 N.E.2d 692 (Ohio App. 1996) ............................................................................... 9

*Davis v. Carroll*,
937 F. Supp. 2d 390 (S.D.N.Y. 2013) ........................................................................ 14

*Frelinghuysen Morris Foundation v. AXA Art Ins. Corp.*,
Index No. 603015/09 (Sup. Ct. N.Y. County Oct. 18, 2013) ..................................... 12

*Gebhardt v. Allspect, Inc.*,
96 F.Supp.2d 331 (S.D.N.Y. 2000) ............................................................................... 8

*Graffman v. Espel*,
No. 96 Civ. 8247, 1998 WL 55371 (S.D.N.Y. Feb. 11, 1998) ..................................... 11

*Interested Lloyd's Underwriters v. Ross*,
No. 04 Civ. 4381, 2005 WL 2840330 (S.D.N.Y. Oct. 28, 2005) ................................ 11

*Iqbal v. Hasty*,
490 F.3d 143 (2d Cir. 2007) ........................................................................................ 8

*Joseph P. Carroll Ltd. v. Baker*,
889 F. Supp.2d 593 (S.D.N.Y. 2012) .................................................................... 12, 13

*Johns v. Town of East Hampton*,
942 F. Supp. 99 (E.D.N.Y. 1996) ................................................................................. 8

*Kassner v. 2nd Ave. Delicatessen, Inc.*,
496 F.3d 229 (2d Cir. 2007) ........................................................................................ 7

*Labajo v. Best Buy Stores, L.P.*,
478 F. Supp. 2d 523 (S.D.N.Y. 2007) ........................................................................... 8

*Mandarin Trading Ltd. v Wildenstein*,
16 N.Y.3d 173 (2011) ........................................................................................... 16, 17

*In re One Times Square Assocs. L.P.*,
159 B.R. 693 (Bankr. S.D.N.Y. 1993) ....................................................................... 15

*Pagliai v. Del Re*,
No. 99 Civ. 9030, 2001 WL 220013 (S.D.N.Y. Mar.7, 2001),
*aff'd as modified*, 34 Fed. Appx. 36, 2002 WL 1000129 (2d Cir. May 16, 2002) .................... 6, 7

*Porter v. Wertz*,
421 N.E.2d 500 (N.Y. 1981) ................................................................................. 10, 11

*In re Salander-O'Reilly Galleries*,
453 B.R. 106 (Bankr. S.D.N.Y. 2011), *aff'd*, 475 B.R. 9 (S.D.N.Y. 2012) ................................ 15

*Schwartz v. Washington Mutual, Inc.*,
No. 06 Civ. 1162, 2007 WL 1288070 (E.D.N.Y. May 1, 2007) ...................................... 8

*Scivoletti v. Marsala*,
61 N.Y.2d 806 (1984) ............................................................................................ 16

*Security Pac. Mortgage & Real Estate Servs., Inc. v. Republic of Philippines*,
962 F.2d 204 (2d Cir. 1992)................................................................................... 16

*Zaretsky v. William Goldberg Diamond Corp.*,
69 F. Supp. 3d 386 (S.D.N.Y. 2014)....................................................................... 13

**Statutes & Rules**

Fed. R. Civ. P. 12 ................................................................................................. 1, 7

N.Y. U.C.C. § 2-403 ....................................................................................... *passim*

Defendant Kunitake Hamada ("Hamada" or "Defendant") respectfully submits this Memorandum of Law in support of his motion, pursuant to Fed. R. Civ. P. 12(b), to dismiss the Complaint of Plaintiff Reed Galin ("Galin" or "Plaintiff").[1]

## PRELIMINARY STATEMENT

For purposes of this motion, Defendant does not dispute that Galin's claim that he was swindled by his childhood friend, David Ramus ("Ramus") in connection with his investment in a painting by Andrew Wyeth, titled *Ice Storm* (the "Painting"). Indeed, it appears, based on the limited documentation that has been furnished to Defendant, that Galin was in fact victimized by Ramus. However, the allegations in the Complaint fail, as a matter of law, to state a claim ***against Hamada***, who innocently purchased the Painting years later.

The Complaint alleges that Galin, Ramus and another man each had a one-third interest in the Painting, and that the Painting was entrusted to Ramus for sale. Ramus duly sold the Painting to the Coe Kerr Gallery in 1989 in exchange for another, more valuable, Painting. Ramus then sold the other Painting, but kept all of the proceeds of that sale, including the money owed to Galin. The factual allegations place the transaction firmly within the scope of the "entrustment" rule codified in Section 2-403 of the Uniform Commercial Code ("UCC"), which, as detailed below, provides that a dealer in Ramus's position can pass good title to a third-party with respect to goods entrusted by a seller in Galin's position, even if the dealer acts with larcenous intent toward the seller.[2]

---

[1] The Complaint is annexed as **Exhibit A** to the accompanying Declaration of John R. Cahill ("Cahill Decl."), dated September 25, 2015.

[2] Galin, of course, owned only one-third of the Painting (as did Ramus), but the statute makes no distinction between the seller of a fractional interest as opposed to the entire Painting.

In a clear attempt to escape the consequences of Section 2-403, Galin alleges that the Coe Kerr Gallery did not act in good faith when it acquired the Painting in 1989. But that allegation is plainly conclusory, lacks any claimed factual basis, and is implausible. It does not allege that **anyone**, let alone the Coe Kerr Gallery, was aware of Ramus's nefarious scheme in 1989, or at any time prior to 1995 at the earliest—Galin himself claims to have been unaware of Ramus's wrongdoing until 1996 was openly supportive of Ramus in the media in late 1995. Moreover, the Complaint itself acknowledges that the Coe Kerr Gallery gave Ramus a **more-**valuable painting in exchange for the Painting (and "some cash"). Those are not the actions of an unscrupulous buyer looking to buy an unlawfully obtained painting at a bargain-basement price, but rather the actions of a reputable gallery dealing at arm's-length with a dealer with no known reputation for shady dealing.

Galin's attempt to claim that Hamada acted in bad faith when he purchased the Painting in Japan in 2013 is even more far-fetched. There is no factual basis for that conclusory assertion. He does not even allege that Hamada actually knew of Ramus's connection, let alone that Hamada could have ascertained anything about Ramus's unlawful activity. Moreover, any inquiry would have revealed that Ramus passed good title to the Coe Kerr Gallery in 1989, even though he was determined many years later to have been a swindler.

It is an unfortunate fact that there are a significant number of dishonest art dealers. In 2010, one of the most notorious in New York, Lawrence Salander, was sentenced to between six and 18 years in prison for conduct quite similar to Ramus's, albeit on a larger scale. *See* http://www.nytimes.com/2010/08/04/nyregion/04salander.html?_r=0. But even in that notorious case, sales by Salander to purchasers who paid fair-market market value and were unaware of the scheme in the years before it was exposed were deemed valid, despite the fact that the sellers

who entrusted those Paintings to Salander received none of the sale proceeds to which they were entitled. Some of the relevant opinions are explained below.

While the entrustment doctrine is the principal reason that the Complaint warrants dismissal, it is not the only reason. As discussed below, neither of the causes of action asserted in the Complaint, (1) equitable lien and (2) unjust enrichment/constructive trust, are legally viable based on the alleged facts or any that could conceivably be alleged. Moreover, Galin provides no competent basis for his remarkable claim that, even though he only ever purchased a one-third interest in the Painting, he now somehow owns 100% percent. Ultimately, though, these points are moot, because whatever interest Galin had in the Painting was extinguished by the sale to the Coe Kerr Gallery in 1989.

**FACTUAL BACKGROUND[3]**

1.      **The Acquisition and Sale of Galin's Interest in the Painting**

Ramus acquired the Painting at an auction dated May 23, 1989 for $319,000. (Complaint ¶ 19.) Full payment was made no later than August 23, 1989. (*Id.* ¶¶ 18, 31.) On June 27, 1989, Ramus and Galin entered into a written agreement pursuant to which Galin purchased a one-third interest in the Painting for $106,333.33. (*Id.* ¶¶ 20, 27 and Ex. A.) Galin and Ramus had been lifelong friends. They had attended elementary school together, they were college roommates together, and Galin was even named godfather to Ramus's child. (*Id.* ¶ 21.)

---

[3] In accordance with Rule 12(b)(6), the factual background is drawn primarily from the Complaint (except where otherwise noted), with all well-pleaded factual allegations (but not conclusory allegations or legal assertions) assumed to be true for purposes of this motion.

The agreement contemplated that Ramus would either sell the two remaining one-third interests to two other persons or sell only one such interest and retain the other. (*Id.*, Ex. A.)[4] It provided that Ramus would retain possession of the Painting and pursue its resale at a hoped-for price of $550,000. (*Id.* ¶¶ 23 and Ex. A.) Ramus promised that, after the resale, Galin would receive the return of his original investment of $106,333.33, plus 25% of the net profit in excess of the original purchase price of $319,000. (*Id.*)

On an unknown date, but before the end of 1989, Ramus sold the Painting to the Coe Kerr Gallery in New York City, as part of a deal in which he acquired a more valuable painting, *Children in the Wood*, by Frank Weston Benson, in exchange for the Painting "plus some cash." (*Id.* ¶ 36.) It appears that Ramus then sent the Benson Painting to an art dealer in Texas partial payment for a portion of a pre-existing debt which Ramus had to that dealer (*id.* ¶ 37), but in any event Galin alleges that neither he nor Sentell received anything from the transaction.

2.     **Ramus's Fraud and Subsequent
        Prosecution and Galin's Pursuit of Relief from Ramus**

Ramus allegedly never informed Galin about the sale of the Painting to the Coe Kerr Gallery. In 1993, Galin asked Ramus about the status of the Painting. On April 10, 1993, Ramus informed Galin in writing that there had been no sale and that "I shall do my very best to sell the Wyeth for a profit and will keep you informed of my progress." (Complaint ¶¶ 32-33 and Ex. B.) Galin claims without explanation that he did not learn about the transaction until 1996. (*Id.* ¶ 38.) However, it is clear that he learned no later than June 1995 that he had been identified as victim of Ramus's alleged criminal activity, as he received a "victim letter" from the United States Attorney for the Northern District of Georgia, dated June 9, 1995, informing him that Ramus had

_____

[4] In fact, Ramus retained a one-third interest in the Painting and sold the remaining interest to a man named Don Sentell ("Sentell"). (*Id.* ¶¶ 29, 31.)

been indicted on May 12, 1995 on charges relating directly to the type of fraud he had perpetrated against Galin and Sentell. (*Id.*, Ex. D.) The Complaint alleges that there were "several dozen" other victims (*id.* ¶ 41), and Ramus was duly convicted on or about November 8, 1995. (*Id.*, Ex. E.)[5]

The Complaint states that Galin received a "token" payment from Ramus of $359.00 (*id.* ¶ 48), but does not state when or under what circumstances the payment was made. The Complaint alleges that Ramus was the debtor in two Chapter 7 cases in the United States Bankruptcy Court for the Northern District of Georgia, in 1997 and 1998 respectively, and that Galin was an unsecured creditor "in the proceedings." (*Id.* ¶ 41.) It then asserts that "[a]lthough Ramus's debt to plaintiff was extinguished" by the bankruptcy, "the Painting was not property of his estate, and therefore plaintiff's interest in it was not extinguished." (*Id.* ¶ 55.) This allegation is a conclusion of bankruptcy law (an incorrect one, as addressed in Section II below), and therefore is entitled to no weight. It also fails to grasp that the ownership interests of Galin, Ramus and Sentell in the Painting itself had ended long before, when it was sold in 1989 to a good faith buyer for a "more valuable painting." Thereafter, the only related interests were Sentell's and Galin's claims against Ramus for money damages.[6] Galin does not allege or attempt to explain how he could be both a 100% owner of the Painting and have money damages equal to its value.

---

[5] Curiously, even after the conviction, Galin asserted that, even though he had "lost $125,000" as a result of Ramus's misconduct, "I don't for a second think David did anything criminal." *See* William Plummer, *Force of Habit*, PEOPLE, Dec. 11, 1995, http://www.people.com/people/archive/article/0,,20102347,00.html

[6] The basis for the allegation that "Ramus's debt to plaintiff was extinguished" by the bankruptcy (*id.* at ¶ 55) is unclear, but is not germane to this motion.

Remarkably, Galin claims that he now owns 100% of the Painting, even though he only purchased a one-third interest and never provided any additional money for the additional interests. The Complaint alleges that "by virtue of the (a) fraud and conversion of Ramus, (b) the extinguishment in the bankruptcy of any claims on behalf of both Ramus and Sentel [*sic*], it necessarily follows that plaintiff is the sole owner of the Painting, and is entitled to the proceeds of its sale." (*Id.* ¶ 62.) No basis in law or fact is provided for this "necessary" conclusion, a *non sequitur*, and it, too, is entitled to no weight. In addition, as with the allegation concerning the status of the interest that he did purchase, it is mooted by the fact that all ownership interests were extinguished by the 1989 sale to the Coe Kerr Gallery.

### 3.    The Status of the Painting Since 1989

The Complaint (at ¶ 60) alleges that "Coe-Kerr Gallery [sic] went out of business around 1991, and plaintiff does not know the provenance of the Painting after that date.[7] Significantly, although the Complaint alleges that Galin "sought to learn the whereabouts of the Painting, without success" through periodic inquiries to art dealers "[f]rom time to time" and searched for it "especially when the internet became a valuable resource in later years" (*id.* ¶ 63), he apparently never reviewed Ramus's records to identify the buyer of the Painting from Ramus or searched the records of that buyer (the Coe Kerr Gallery), which were apparently available at The Frick Collection. Neither did he take any affirmative steps to publicly declare his claimed interests. Such steps could have included (a) filing a UCC-1 Statement at the time it was entrusted to Ramus for sale and subsequently (once he realized that he could not determine its whereabouts), (b) registering the Painting with the Art Loss Register, "which determines if any

---

[7] In fact, the Coe Kerr Gallery did not close until 1993. http://research.frick.org/directoryweb/browserecord.php?-action=browse&-recid=6344. The Gallery's records were donated to The Frick Collection in New York.

of the property offered for sale has been registered as lost or stolen," *Pagliai v. Del Re*, No. 99 Civ. 9030, 2001 WL 220013, *2 (S.D.N.Y. Mar.7, 2001), *aff'd as modified*, 34 Fed. Appx. 36, 2002 WL 1000129 (2d Cir. May 16, 2002), and reviews the auction catalogues of all of the major auction houses before Paintings are offered for sale, (c) notifying Interpol, which also maintains a database, of his claim to the art, and (d) maintaining a web page stating his claim to own the Painting.

Galin nonetheless alleges that he first learned about the location of the Painting on or about May 12, 2015, when he learned that it would be offered for sale at auction by Christie's in New York on May 21, 2015. (Complaint ¶ 64.) The transaction to which he refers is documented in the invoice annexed to the Cahill Declaration (with a certified translation) as **Exhibit B**. The invoice demonstrates that Hamada first acquired it on December 15, 2013 from K.K. Shinoda Bijutsu in Tokyo. He paid 68 million Japanese Yen, which, at the then-prevailing exchange rate was about $656,232. (*See* Cahill Declaration, **Exhibit C** (converting 68,000,000 Japanese Yen to United States Dollars as of December 15, 2013).) Clearly, therefore, the Painting had changed hands at least once since the Coe Kerr Gallery had purchased it in 1989. There is nothing in the invoice or anywhere else, that would have raised a red flag about Ramus, let alone that the 1989 sale to the Coe Kerr Gallery (almost six years before anyone knew that Ramus was a swindler) raised any red flags.

### ARGUMENT

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court "is to accept as true all facts alleged in the complaint." *Kassner v. 2nd Ave. Delicatessen, Inc.,* 496 F.3d 229, 237 (2d Cir. 2007). But mere "formulaic recitation of the elements of a cause of action" will not suffice; instead, "[f]actual allegations must be enough to raise a right to relief

above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, courts require "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570; *see also Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (a plaintiff must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim ***plausible.***") (emphasis added). Further, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Gebhardt v. Allspect, Inc.*, 96 F.Supp.2d 331, 333 (S.D.N.Y. 2000) (citation omitted).

For purposes of a Rule 12 motion, the complaint is deemed to include documents that are attached or incorporated by reference, as well as matters that are subject to judicial notice. *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 528 (S.D.N.Y. 2007). In addition, "the court may consider . . . 'documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit.'" *Schwartz v. Washington Mutual, Inc.*, No. 06 Civ. 1162, 2007 WL 1288070, *2 (E.D.N.Y. May 1, 2007) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). The Court is not required to accept allegations in the complaint that are contradicted by such documents. *Labajo*, 478 F. Supp. 2d at 528. The complaint's failure to quote or annex a particular document in this category does not prevent the Court's consideration of it on a motion to dismiss: "It is well established that when a 'plaintiff fails to introduce a pertinent document as part of his pleading, [a] defendant may introduce the exhibit as part of his motion attacking the pleading.'" *Johns v. Town of East Hampton*, 942 F. Supp. 99, 104 (E.D.N.Y. 1996) (quoting 5 Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1327, at 762-63 (2d ed.1990)).

## I.  THE 1989 SALE TO THE COE KERR GALLERY VALIDLY TRANSFERRED TITLE TO THE PAINTING UNDER THE UNIFORM COMMERCIAL CODE

The Complaint's assertion that "[u]nder New York law, plaintiff's rights subsist notwithstanding the transfer, and he is entitled to the proceeds of the sale wherever they may be found" (Complaint ¶ 9) simply ignores the law that governs in New York (and in every other jurisdiction that follows the Uniform Commercial Code).[8]

As with virtually all goods, the sale of the Painting was governed by the Uniform Commercial Code ("UCC"). The key transaction was the sale by Ramus to the Coe Kerr Gallery in 1989. If title passed at that time, all subsequent sales are likewise valid, "with the consequence that the original seller cannot recover the goods from the subsequent purchaser." 3A ANDERSON U.C.C. § 2-403:56 (3d ed. 2014) (citing *Creggin Group, Ltd v. Crown Diversified Indus. Corp.*, 682 N.E.2d 692 (Ohio App. 1996)).

UCC § 2-403 states:

(1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though

(a) the transferor was deceived as to the identity of the purchaser, or

(b) the delivery was in exchange for a check which is later dishonored, or

(c) it was agreed that the transaction was to be a "cash sale", or

(d) the delivery was procured through fraud punishable as larcenous under the criminal law.

---

[8] For purposes of this motion, Hamada will not dispute that Galin's claims are governed by New York law even though (a) Hamada purchased the Painting in Japan and (b) Japanese law would bar all of Galin's claims. Galin's complaint focuses on the 1989 sale to the Coe Kerr Gallery, which was located in New York City. Ramus purported to be doing business in New York, as well as in Atlanta, Georgia, and maintained a New York business telephone number. (*See* Complaint, Ex. A.) For purposes of this motion and in any event, UCC § 2-403 in Georgia and New York are identical *verbatim*.

(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.

(3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods has been such as to be larcenous under the criminal law.

UCC § 2-403(1)-(3).

### A.      Galin Entrusted the Painting to Ramus

UCC § 2-403(2) provides that "[a]ny entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in the ordinary course of business." There is no conceivable dispute that the Painting was within the definition of "goods" and that Ramus, a noted art dealer, was a "merchant who deals in goods of that kind." UCC § 2-403(2).

"Entrusting" is defined in Section 2-403(3) as "*any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence* and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods has been such as to be larcenous under the criminal law." (emphasis added). Pursuant to their agreement (Complaint, Ex. A), Galin entrusted the Painting to Ramus and continued to acquiesce in Ramus's possession through the sale date. He therefore "entrusted" the Painting to Ramus, notwithstanding the conditions expressed in the Consignment Agreement regarding the ultimate sale of the Painting.

The New York Court of Appeals discussed the significance of the "entrustment doctrine" in the seminal art-purchase case *Porter v. Wertz*, 421 N.E.2d 500, 500-01 (N.Y. 1981). The court stated that:

> [t]he 'entruster provision' of the Uniform Commercial Code is designed to enhance the reliability of commercial sales by merchants (who deal with the kind of goods sold on a regular basis) while shifting the risk of loss through fraudulent transfer to the owner of the goods, who can select the merchant to whom he entrusts his property.

*See also Graffman v. Espel*, No. 96 Civ. 8247, 1998 WL 55371, at *3 (S.D.N.Y. Feb. 11, 1998) ("Under this provision, a buyer in the ordinary course of business will prevail over the claim of an owner who entrusted such items to the merchant."). "The theory behind the UCC's entrustment provision is that a person who knowingly delivers his property to a merchant dealing in goods of that kind "assumes the risk of the merchant's acting unscrupulously by selling the property to an innocent purchaser." *Brown v. Mitchell-Innes & Nash, Inc.*, No. 06 Civ. 7671, 2009 WL 1108526, *4 (S.D.N.Y. Apr. 24, 2009) (quoting *Graffman*, 1998 WL 55371 at *3)). "The UCC enhances confidence in commercial transactions by protecting the innocent purchaser who buys from a merchant dealing in goods of that kind, even if the merchant acts unscrupulously." *Id.; see also Interested Lloyd's Underwriters v. Ross*, No. 04 Civ. 4381, 2005 WL 2840330, at *5 (S.D.N.Y. Oct. 28, 2005) ("Unlike a thief, an entrustee has voidable, as opposed to void, title, and therefore can pass good title to a third party.").

### B. Ramus's Unlawful Conduct Does Not Defeat the Fact of Entrustment

As noted, an entrustee can pass valid title even "if his disposition of the goods has been such as to be larcenous under the criminal law." UCC § 2-403(3). The *Graffman* Court held succinctly that "[t]he U.C.C. "defines 'entrusting' as including everything short of armed robbery (larceny is expressly approved)." *Graffman*, 1998 WL 55371 at n.1 (quoting Gilmore, *The Good Faith Purchase Idea and The Uniform Commercial Code: Confessions of a Repentant Draftsman,* 15 GA. L. REV. 605, 618 (1981)). There is no serious question that Ramus's conduct, although allegedly unlawful as to Galin, did not take the sale to the Coe Kerr

Gallery outside the statute. Lawrence Salander engaged in substantially identical misconduct (selling entrusted art without telling the owners and keeping the sale proceeds), albeit on a much larger scale, and there is no question that his sales were within the scope of the statute. *See, e.g.*, *Joseph P. Carroll Ltd. v. Baker*, 889 F. Supp.2d 593, 595 (S.D.N.Y. 2012); *Frelinghuysen Morris Foundation v. AXA Art Ins. Corp.*, Index No. 603015/09 (Sup. Ct. N.Y. County Oct. 18, 2013), unreported decision dated Oct. 18, 2013 at 15-17 (annexed as **Exhibit C** to the Cahill Declaration).

### C. The Complaint Fails to Allege Any Plausible "Red Flags" that Would Have Alerted the Coe Kerr Gallery About Ramus or the Painting

Pursuant to UCC § 2-403(2), a purchaser in the position of the Coe Kerr Gallery can only rely on the entrustment doctrine if it is a "buyer in the ordinary course of business." For merchants like the Coe Kerr Gallery, a duty of inquiry arises when they knew or reasonably should have known about the existence of certain "red flags" concerning the potential sale. *Brown*, 2009 WL 1108526, at *7. Failure to make plausible factual allegations about the existence of "red flags" warrants dismissal where, as here, the remaining elements of the entrustment doctrine apply. *Id.*

The Complaint alleges in relevant part that "[b]ecause of the fraudulent nature of the transaction, the Painting was never actually sold to the Coe Kerr Gallery, and in fact that the Coe Kerr Gallery committed its own fraud in the transaction, by failing to investigate either the provenance or plaintiff's contractual rights." (Complaint ¶ 39.)[9] The reference to a problem with

---

[9] As an aside, the baseless assertion that the Coe Kerr Gallery committed an affirmative fraud is indicative of the Complaint's reliance on empty and inflammatory language. Presumably, it is claiming that the Coe Kerr Gallery somehow defrauded Galin, but fails to even hint at the material false statement or, in the alternative, the basis of a legal duty to ascertain Galin's existence and then seek him out.

the "provenance" of the Painting is specious. The Complaint does not even assert that there was a problem with the provenance ***at the time Ramus sold the Painting to the Coe Kerr Gallery.*** Even under the Complaint's own strained and implausible theory, there was no problem with the "provenance" until ***after*** Ramus allegedly failed to pay Galin the money he was owed from the sale. Galin, Ramus's long-time friend and intimate and aware of a criminal indictment of Ramus, maintained until the end of ***1995*** that Ramus did nothing criminal. *See* n.5, *supra*.

The claim that the Coe Kerr Gallery ignored red flags about Galin's "contractual rights" is equally specious. Even when the sale violates a contract between the seller and the entrusted agent, the buyer is under no duty to demand to see the contract absent a clear indication that the agent has exceeded his authority. *Brown*, 2009 WL 1108526, at *7; *see also Zaretsky v. William Goldberg Diamond Corp.*, 69 F. Supp. 3d 386, 387 (S.D.N.Y. 2014). In the *Brown* and *Zaretsky* cases the agent did clearly exceed its authority, but the Court nevertheless dismissed the seller's complaint. Here, in contrast, the Complaint readily acknowledges that Ramus had the contractual right to sell the Painting to the Coe Kerr Gallery. The only contractual "provision" at issue was Galin's future right to payment. A hypothetical duty of inquiry in that respect would have required a red flag concerning Ramus's honesty and integrity, but the Complaint acknowledges that there was no such red flag until more than five years after the transaction.

In recent years, Courts in this District dealing with sales of art have focused on four potential red flags:

> (1) whether the sale price is "obviously below market," (2) whether the "negotiations or procedure of the sale differed" from previous transactions between buyer and seller, (3) whether the buyer was aware of the seller's "financial difficulties," or (4) whether the buyer would have "reason to doubt" the seller's ownership of the artwork.

*Joseph P. Carroll v. Baker*, 889 F. Supp. 2d at 604; *see also Davis v. Carroll*, 937 F. Supp. 2d 390, 426 (S.D.N.Y. 2013) (citing *Baker* with approval). Only the first potential red flag is even arguably relevant in this case: there were no known prior transactions between Ramus and the Coe Kerr Gallery, there was no way that the Gallery reasonably could have known that Ramus was having financial difficulties, and there was no reason to doubt either that the sellers of the Painting (including Ramus) owned it or that Ramus lacked the authority to sell it on their behalf. With respect to the first red flag, there is no question that a "'bargain basement price'" is a concern that almost certainly raises the duty to investigate further. *Davis v. Carroll*, 937 F. Supp. 2d at 426 (citation omitted). In contrast, a painting that is sold at or near fair market value raises no suspicions in that regard. *Brown*, 2009 WL 1108526, at *7. Here, the Complaint alleges that the Coe Kerr Gallery transferred a ***more***-valuable painting for the Painting. (Complaint ¶ 36.) Of course, Ramus's conduct after the transaction was clearly unlawful as to Galin (and Sentell), but the Complaint offers no plausible basis under the governing law for its assertion that the transaction itself did not validly transfer title to the Coe Kerr Gallery.

## II.     THERE IS NO BASIS IN BANKRUPTCY LAW FOR PLAINTIFF'S CLAIMS

For the reasons discussed in the previous section, Galin's contention that that his one-third interest in the Painting not only survived the 1997-98 bankruptcy proceedings, but somehow transformed into 100% ownership is absurd. The Painting was duly sold to the Coe Kerr Gallery many years earlier and therefore none of the three owners prior to that sale had any interest in it at the time the bankruptcy proceedings were commenced, let alone thereafter. However, even if it is assumed for the sake of argument that Galin, Ramus and Sentell continued to own the Painting through 1997, the Complaint's assertions about its post-bankruptcy status are meritless.

Galin was a general unsecured creditor in the bankruptcy. (Complaint ¶ 41.) He therefore, *ipso facto*, never perfected a security interest in the Painting by means of a UCC-1 Statement or otherwise. Pursuant to 11 U.S.C. § 544(a), an unsecured interest in property consigned to the debtor can be turned over to the estate over the objection of the unsecured creditor. *In re Salander-O'Reilly Galleries*, 453 B.R. 106, 120 (Bankr. S.D.N.Y. 2011), *aff'd*, 475 B.R. 9 (S.D.N.Y. 2012). The determination of whether property is or is not part of the bankruptcy estate is a "core" bankruptcy matter. *In re Salander-O'Reilly Galleries*, 475 B.R. at 29. The issue is purely hypothetical in this case, and there is no indication that either the trustee or the bankruptcy court concerned themselves with the status of property that had been sold years before the case was filed. It is addressed briefly here simply to show that as a general unsecured creditor, Galin exited the Ramus bankruptcy with any his one-third interest that may have remained intact.

The contention that Galin was awarded Sentell's and Ramus's hypothetical interests is, if anything, even more absurd. As noted, Galin was a general unsecured creditor. "Generally, unsecured creditors are claimants of equal rank, entitled to share, *pro rata*, in the values remaining after the payment of secured and priority claims." *In re One Times Square Assocs. L.P.*, 159 B.R. 693, 703 (Bankr. S.D.N.Y. 1993). The notion that Galin could profit at the expense of his fellow unsecured creditors by obtaining Ramus's and Sentell's interests without consideration is alien to this principle, and Galin offers no basis in law or fact for departing from that principle in this case.

### III. NEITHER CAUSE OF ACTION ASSERTED BY PLAINTIFF HAS ANY MERIT

#### A. Equitable Lien

"New York law permits the imposition of an equitable lien on property [only] if there is an express or implied contract, meeting certain requirements, concerning the property." *Security Pac. Mortgage & Real Estate Servs., Inc. v. Republic of Philippines*, 962 F.2d 204, 208 (2d Cir. 1992). Among other requirements, the contract must "clearly state the parties' intention that the identified property be 'held, given or transferred as security for [an] obligation.'" *Id.* at 209 (citation omitted). "Thus, in establishing an equitable lien, plaintiff must show a particular agreement by defendant to confer a security interest in the property at issue." *Id.*; *see also Scivoletti v. Marsala*, 61 N.Y.2d 806, 809 (1984) ("[P]laintiff's mere expectation [of payment], however sincere, is insufficient to establish an equitable lien."). As is evident from the Complaint, neither the Defendant nor Ramus had any sort of agreement by which Plaintiff received a security interest or equitable lien in the Painting. Rather, Plaintiff had a right to certain proceeds from the sale of the Painting by Ramus, a right which Plaintiff concedes was extinguished in bankruptcy. (*See* Complaint at ¶ 53.)

#### B. Unjust Enrichment

To establish an unjust enrichment claim, a party must prove "that (1) the other party was enriched, (2) at that party's expense, and (3) that 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered.'" *Mandarin Trading Ltd. v Wildenstein*, 16 N.Y.3d 173, 182 (2011) (citations omitted). Further, Plaintiff must establish that there was a relationship between the parties that could have caused reliance or inducement. *Id.* at 1111 (affirming motion to dismiss where there existed a "lack of allegations that would indicate a relationship between the parties, or at least an awareness by [defendant] of [plaintiff's]

existence"). Similarly, there is no basis or reason to expect that either the Coe Kerr Gallery or Hamada would know of Galin's existence or the fact that Ramus failed to make payment to Galin of his share of the sale proceeds. Further, having paid full value, it is not against equity or good conscience to allow Hamada to retain the sale proceeds from the recent sale of the Painting. Indeed, it is precisely the result mandated by UCC § 2-403.

**CONCLUSION**

For all of the foregoing reasons, Hamada respectfully submits that the Court should

dismiss the Complaint with prejudice.

Dated:   New York, New York
         September 25, 2015

                              **CAHILL PARTNERS LLP**


                    By:       _____*s/ John R. Cahill*_____
                              John R. Cahill
                              Ronald W. Adelman
                              Paul S. Cossu
                              70 West 40th Street
                              New York, NY 10018
                              212-719-4400

                              *Attorneys for Defendant*
                              *Kunitake Hamada*