G6F9GALC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
 3    REED GALIN,
 4                    Plaintiff,
 5              v.                            15 CV 6992 (JMF)
 6    KUNITAKE HAMADA,
 7                    Defendant.
 8    ------------------------------x
                                             New York, N.Y.
 9                                           June 15, 2016
                                             3:31 p.m.
10
      Before:
11
                          HON. JESSE M. FURMAN
12
                                                  District Judge
13
                              APPEARANCES
14
      RICHARD ALLEN ALTMAN
15         Attorney for Plaintiff
16    JOHN CAHILL
      PAUL COSSU
17         Attorneys for Defendant
18
19
20
21
22
23
24
25
```

G6F9GALC

1          (In open court; case called)

2          MR. ALTMAN:  For the plaintiff Reed Galin, Richard

3     Altman.

4          MR. CAHILL:  John Cahill from Cahill LLP for the

5     defendant, Mr. Hamada.  With me is Paul Cossu of our firm in

6     case I have to run out.  Also, with your Honor's permission, is

7     a summer associate Shieva Salehnia, if she may be permitted,

8     even though she's not technically admitted to the bar.  Some

9     day she will.

10          THE COURT:  I have confident she will.  She is granted

11     permission to sit at counsel table.  So welcome and good luck

12     to you this summer.

13          We have here for the initial pretrial conference.

14     Obviously, have some familiarity with the case from the motion

15     to dismiss and my decision in connection with that motion.

16          I've read your joint letter of June 9.

17          Mr. Altman, tell me your views on whether discovery

18     should be limited in the first instance to the circumstances

19     surrounding the transfer of the painting to the Coe-Kerr

20     Gallery if that's how it's pronounced.

21          MR. ALTMAN:  Coe-Kerr Gallery.

22          My position is it should not be so limited.  The

23     circumstances of the transaction that Mr. Hamada engaged in are

24     very much material to any decision on the case.  He is claiming

25     essentially to be a good faith purchaser.  And so the question

G6F9GALC

1   is a matter of fact and a matter of expert opinion as to what's

2   an appropriate amount of diligence under the circumstances.

3          If your Honor will recall, in the catalog, the auction

4   catalog entry, reference is made to the fact that Mr. Ramus was

5   the prior owner.  And certainly anybody who is about to invest

6   money in the art world at this time would have known or should

7   have known of Mr. Ramus's reputation and activities and

8   criminal convictions.

9          THE COURT:  Can I interrupt for a second.

10         MR. ALTMAN:  Please.

11         THE COURT:  Because to my knowledge, I have already

12  rejected the argument that the transfer to Mr. Hamada has any

13  bearing on whether the entrustment provision applies.  In my

14  view, as articulated in my opinion, that turns entirely on the

15  circumstances surrounding the transfer from Mr. Ramus to the

16  Coe-Kerr Gallery at which point, as I understand it, the world

17  didn't get note about Mr. Ramus's notoriousness and nefarious

18  dealings.

19         MR. ALTMAN:  That's not been established either.

20         THE COURT:  Maybe so.  But that's why I've denied the

21  motion to dismiss, because it's a defense and it wasn't clear

22  on the face of the complaint.

23         But my point is that as a legal matter I think if the

24  entrustment provision applies, it applies because of the

25  transfer from Mr. Ramus to Coe-Kerr Gallery.  And then all

G6F9GALC

subsequent purchasers thereafter have good title or stand in

the shoes essentially of the Coe-Kerr Gallery.  And it doesn't

matter whether Mr. Hamada, at the point that he bought it, had

reason to believe that Mr. Ramus may have not had the rights to

sell it.

So I think I have rejected that argument.  You have

preserved your rights to appeal it if you ultimately think it's

wrong, but I don't see that as an argument or a basis to have

broader discovery.

So the next argument.

MR. ALTMAN:  The next argument for further discovery?

THE COURT:  Yes.

In other words, my view -- I mean I think it was a

pretty close call whether I could grant the motion on the basis

of the entrustment provision.  I didn't think I could for the

reasons that I articulated in my opinion.  But my intuition

tells me that it may well ultimately prevail after discovery.

But I think for that reason, although I'm not usually

a fan of limiting discovery because in my experience -- well,

it depends.  I like to be careful about it.  Here I think it

probably is appropriate because it may well dispose of the

case, obviously subject to whatever appellate rights you want

to pursue if it turns out that I'm wrong about what I've just

said.  And if I'm wrong, then we can proceed to broader

discovery with respect to the rest of the matter.  But it

G6F9GALC

1    strikes me that that's the way to go here.

2            Tell me another reason why you think it's not;

3    otherwise, let's talk about a schedule.

4            MR. ALTMAN:  Your Honor, I have made my point.  I

5    believe that I should have discovery from the defendant as to

6    the circumstances of this transaction.  You are, by cutting off

7    any discovery rights against him or from him, you are

8    essentially reaching the conclusion that he's an innocent

9    party.  I have no idea whether he's an innocent party or not.

10   I don't know what the circumstances were of the transaction and

11   you cannot automatically assume, I believe, that just

12   because -- even if -- even if this was an entrustment and even

13   if the Coe-Kerr Gallery knew nothing, that somehow that's the

14   end of the story.  I don't believe that's the case.  But if

15   you're going to limit discovery, then I have nothing to say.

16           THE COURT:  I'm not necessarily inviting reargument on

17   it, but is it your position that if Coe-Kerr -- if the

18   entrustment provision applies to the transfer to the Coe-Kerr

19   Gallery and Coe-Kerr Gallery took good title from Mr. Ramus

20   because there were no red flags at that point -- and I

21   recognize that we don't yet know all the facts surrounding

22   that, so I'm just asking you to assume as a hypothetical that

23   Coe-Kerr Gallery -- there were no red flags to put them on

24   notice that Mr. Ramus didn't have the rights to sell the

25   painting.  Is it your position that if fifteen years later or

G6F9GALC

1    ten years later Mr. Hamada, when he bought the painting should

2    have -- or knew that Mr. Ramus, that there was a defect at some

3    point in the chain along the way, that that transfer -- that

4    Mr. Hamada doesn't necessarily have full rights to the painting

5    and that your client would, notwithstanding the entrustment and

6    notwithstanding the valid sale and transfer of title to

7    Coe-Kerr?

8            I guess that's the part I'm missing.  It may be

9    that -- I just don't know why if there's a valid transfer to

10   Coe-Kerr and Coe-Kerr acquires good title to the painting

11   somehow your client's interest in the painting can be restored

12   if a later buyer down the chain has reason to think that there

13   was a suspect transfer along the way.

14           MR. ALTMAN:  I think, respectfully, I think you're

15   making a circular argument.  If indeed -- if you conclude that

16   the Coe-Kerr Gallery got good title then, yes, everybody else

17   gets good title after that.  But that's -- that doesn't mean

18   that it automatically follows that Hamada had no obligation to

19   do anything to find out what the story was.  It doesn't

20   necessarily preclude some kind of -- I mean I just don't -- we

21   don't know what the story was here with Mr. Hamada.  And I

22   don't think you can automatically assume that he got good title

23   just because of -- because of the entrustment doctrine.  I'm

24   disputing that.

25           THE COURT:  I'm missing something because the first

G6F9GALC

1    thing you just said was if Coe-Kerr got good title then

2    everyone down the line also got good title.  So wouldn't that

3    apply then to Mr. Hamada?

4            MR. ALTMAN:  I'm not prepared to acknowledge that at

5    this point.  I just don't think that's accurate as a matter of

6    law, your Honor.  I mean we have -- we have a different set of

7    rules under New York state law about the difficulty and

8    possibility of somebody acquiring title to stolen property and

9    about when the Guggenheim case very clearly says that the time

10   doesn't run, the time never stops running, and that someone who

11   acquires with knowledge cannot acquire -- cannot necessarily

12   acquire good title.  So I don't believe it's automatic.

13           THE COURT:  But my question is --

14           MR. ALTMAN:  I understand your question, your Honor.

15           THE COURT:  A. has ownership of a painting and

16   entrusts it to B who is a dealer in painting.  B sells it to C

17   who has no red flags to think that there's anything untoward

18   about it but it turns out B was not actually authorized to cell

19   it to C.  So that's a breach, if you will, with respect to A.

20   C later sells it to D who, because of interim publicity, now

21   knows that B had sold it to C improperly.  It's your position

22   that D cannot acquire good title from C even though C had good

23   title?  And more to the point it's your position that A can

24   then sue D?  Do you follow?

25           MR. ALTMAN:  I follow what your saying.

G6F9GALC

1      I cannot answer the question without knowledge of the

2  facts as to whether D could or could not acquire good title.

3      THE COURT:  Right.  But my question is are A's

4  rights -- so A, in our hypothetical, has no rights in interest

5  with respect to C because C has acquired good title pursuant to

6  the entrustment provision under the UCC, correct?

7      MR. ALTMAN:  Yes.  That's what it means to assume that

8  the entrustment provision applies, yes.

9      THE COURT:  But it's your position that if D then buys

10  the painting from C and knows that the initial sale from the

11  dealer from B to C was improper, that all of a sudden A's

12  rights are restored and can pursue a claim against D?  That is

13  the position you're taking in this lawsuit.  Am I wrong?

14      MR. ALTMAN:  No.  That's correct.

15      THE COURT:  Okay.  And do you have any authority that

16  would support that, that A's interests here, Mr. Galin's

17  interests, are essentially revived if it turns out the

18  entruster provision would have applied and did apply to the

19  transfer to the Coe-Kerr Gallery?  Do you have any authority

20  that would support that?

21      MR. ALTMAN:  Not in front of me.  But that was not the

22  issue raised or litigated in the motion to dismiss either.

23      THE COURT:  Actually I think it was --

24      MR. ALTMAN:  No.

25      THE COURT:  -- very much the issue.

G6F9GALC

1          MR. ALTMAN:  The argument was whether the entrustment

2     provision applied or didn't apply; and if it did apply, as

3     you've said in the decision, whether that was an affirmative

4     defense or part of my case in chief.

5          THE COURT:  All right.  Thank you.

6          Mr. Cahill, anything you want to say?

7          MR. CAHILL:  No, your Honor.  As we said in our

8     letter, we do think that discovery should be limited.  Our

9     client -- it's is an expensive case for our client who is

10    located in Japan and who is not an English speaker.  And he has

11    nothing to add to what we think the court has correctly

12    identified as the central issue, which is whether there is any

13    evidence that Coe-Kerr Gallery, B in the hypothetical, was a

14    good faith purchaser.  We think that the facts have already

15    been pled that show that he must have been because even the

16    plaintiff, his best friend, didn't know.  But we understand and

17    respect the court's decision that there are -- that the

18    plaintiff has an opportunity to offer that evidence and we want

19    to give him what we think should be a very brief time for us to

20    find out what evidence he has and for him to uncover evidence

21    we were thinking in the neighborhood of 60 days ought to be

22    enough because that -- this is really a pure issue of law that

23    can be decided, we think quickly, once these few relative facts

24    are ascertained.

25          We don't know of any.  We've done our best on our own

G6F9GALC

1    to try and learn of any evidence that could be out there.  We

2    don't think there is any.  But we certainly -- the court has

3    given the plaintiff an opportunity.  We think 60 days ought to

4    be enough time to do that.

5              THE COURT:  All right.  I think for the record

6    Coe-Kerr was C in my hypothetical.

7              MR. CAHILL:  I apologize.  That's right.  Coe-Kerr was

8    C.

9              THE COURT:  I agree and I'm going to limit discovery

10   in the first instance to the circumstances surrounding the

11   transfer to Coe-Kerr Gallery.

12             It is my view, for the reasons I articulated in my

13   opinion and as just discussed with Mr. Altman, that if the

14   entruster provision does apply to that transfer and Coe-Kerr

15   Gallery acquired good title, that Mr. Galin as no valid claim

16   with respect to Mr. Hamada notwithstanding Mr. Hamada's

17   knowledge or lack thereof of the earlier circumstances

18   surrounding Mr. Ramus.  So I will limit it to that.

19             Let's talk about what that would involve.  As I

20   understand it, Coe-Kerr Gallery is no longer in business but

21   all of its papers have been entrusted, no pun intended, to some

22   other entity.  Am I correct in recalling that?

23             MR. CAHILL:  Yes, your Honor.  Our understanding is, I

24   don't know if it's all of the papers, but some of the papers of

25   the Coe-Kerr Gallery are at the Frick library which has a well

G6F9GALC

1    regarded archive of fine art material.  So, while we don't

2    believe there's anything based on what we've been able to find

3    out so far, we don't think there's anything about this

4    transaction there.  We do know that there are Coe-Kerr papers

5    at the Frick.

6              MR. ALTMAN:  Your Honor.  I can speak to that.  I have

7    had it investigated.  And, yes, some of the papers of the

8    Coe-Kerr Gallery are in the Frick library.  However, this

9    particular transaction and other transactions involving Andrew

10   Wyeth paintings don't seem to be quite available.

11             There are principals of the Coe-Kerr Gallery who are

12   still alive, to my knowledge.  And so I think it's going to be

13   somewhat tedious and difficult to track these people down.

14   They are all nonparties.  And so there's quite a burden here to

15   establish what actually happened with this transaction.

16             If the documents are not in existence in the Frick,

17   frankly, I don't know where they might be so I'm going to have

18   to find out.  So I would very much ask for more than 60 days to

19   figure this out.

20             If you're limiting me to discovery, which is

21   essentially from third parties who I have no control over,

22   that's not going to be easy.  So, I would ask for a reasonable

23   amount of time.  I don't think 60 days is sufficient.

24             THE COURT:  What do you think is appropriate and what

25   do you think discovery will involve?

G6F9GALC

1          MR. ALTMAN:  Well, it may involve depositions of

2     anybody who is left no knows anything about this transaction at

3     the Coe-Kerr Gallery.  It may involve a deposition of Mr. Ramus

4     who is not in New York.  And I don't know who else it might be.

5     There are some other people that Mr. Galin has identified to me

6     and I will have to do some informal investigation and find out:

7     A, what they know; and B, if they're willing to talk to me.  So

8     if they're not I'll have to make arrangements for

9     out-of-jurisdiction subpoenas and so forth.  So I would say

10    120, 150 days, something like that.

11          THE COURT:  You're not getting 150 for sure.

12          MR. ALTMAN:  Of course, I understand.  But the summer

13    is coming too, so I don't know where people are and, you know,

14    the art world disappears during the summer.

15          THE COURT:  It's good to be in the art world, I guess.

16          Expert discovery?

17          MR. ALTMAN:  Yes.  There may also be experts as to --

18    every case that I've examined involving the entrustment

19    doctrine seems to make -- seems to suggest that the policy and

20    practice involving transactions of this sort are matters of

21    expert opinion as to whether someone acted properly, someone

22    acted with due diligence, even in the context of the

23    entrustment doctrine.  These tend to be rather fact intensive

24    and also matters of opinion as to whether someone acted

25    properly or not in the process of entering into a transaction

G6F9GALC

1    of this magnitude.

2              So, there may very well be experts is what I'm saying.

3              THE COURT:  Mr. Cahill.

4              MR. CAHILL:  Yes.  My understanding, the Coe-Kerr

5    Gallery was not very big gallery at the time and that there

6    would be only one or perhaps two people; and even if they were

7    an element time memory would not have the records of the

8    Coe-Kerr Gallery because they weren't owners, they were the

9    employees and are likely to say that they have no recollection

10   of what -- although I'm not sneering at, you know, just prices

11   speaking, but it was not even then a blockbuster transaction

12   for an art gallery in New York.

13             So as far as I know, there would not be a lot of

14   people.  And what Mr. Ramus would have to say would likely be

15   inadmissible and hearsay.

16             So I think -- I just don't think there is going to be

17   that much discovery.

18             As far as expert discovery, there are cases in which

19   experts would have to opine.  But here we have, in the

20   pleading, that there was -- that the main issue that experts

21   opine on is whether value was paid.  And that's been pled that

22   value was properly pled here.  And it is possible, in one of

23   the cases cited in the court's decision which we'd be happy to

24   evolve, Judge Scheindlin discouraged us from doing expert

25   discovery even though there were valuation opinions.  And,

G6F9GALC

1   again, if there really -- as there's been no discovery, and

2   there's been nothing proffered about what could even be the

3   evidence of wrongdoing by Coe-Kerr Gallery, we think that it's

4   premature to ask the parties to get experts.  And the timing,

5   again, we leave it to the court's discretion.  But we would

6   argue that the investigation that's being talked about should

7   have been done frankly not only before this conference but

8   before the pleading to determine that there was some kind of

9   bad faith on the part of the Coe-Kerr Gallery.

10          THE COURT:  Is Mr. Altman not correct that most of

11  these cases do delve into what the industry norms are; that is

12  to say, to the extent that Coe-Kerr is a dealer that the

13  industry norms did require them to do some due diligence and

14  figure out Mr. Ramus's rights or lack thereof to sell the

15  painting, then he might have a valid argument that there were

16  sufficient red flags to deny the entruster provisions

17  application.

18          MR. CAHILL:  Yes, your Honor.  Indeed most of the

19  cases do involve that.  But there are facts pled that give rise

20  to a right to do that expert discovery:  The price was too low,

21  the seller was known to be in deep financial distress.

22          Here we have the plaintiff pleading that the price was

23  a fair price.  We have the plaintiff pleading that even he, his

24  best friend, had no idea for years after this sale that

25  Mr. Ramus was having any difficulty.  And he told People

G6F9GALC

1    magazine even after he was indicted that he was a stellar

2    person.  So to me it puts the cart before the horse.  You have

3    to show some basis for needing an expert to opine before the

4    parties should have to incur the time and expense of retaining

5    experts.

6              If the court was inclined to allow that, we would

7    suggest that this is a case where expert discovery should

8    either be concurrent or the schedule the court set should

9    follow rapidly from the limited discovery.  The retention of

10    experts and expert depositions should be at least subject to

11    review at that time and then done either concurrently or

12    quickly thereafter.

13              THE COURT:  Here's what I'm going to do.  I'm going to

14    set a deadline for the completion of fact discovery, again

15    limited to the issues surrounding the transfer to the Coe-Kerr

16    Gallery, of September 9, which I think is an adequate amount of

17    time, given the limited scope of discovery I think frankly is

18    more time than one would really need.  If it turns out that

19    August proves that impossible or difficult, you can certainly

20    let me know that and I will try to be reasonable but you should

21    try to complete things by that date.

22              Right now I'm going to reserve judgment on whether

23    expert discovery is appropriate here.  I think what I will do

24    is if you think expert discovery is appropriate, Mr. Altman, I

25    want a letter from you by August 23.  And I will give

G6F9GALC

1    Mr. Cahill until August 26 to respond to make any arguments as

2    to why expert discovery is not appropriate.  And then I will

3    resolve the issue before the close of fact discovery and let

4    you know whether we will or won't.  But the bottomline is I

5    think you'll have to make a case for why you think, given the

6    facts that have come to light in connection with fact

7    discovery, that you think it is relevant and material and would

8    inform and be material for purposes of summary judgment

9    practices on the entruster provision.

10          I'll have you then back here shortly after the close

11   of fact discovery on September 13 at 4:15 in the afternoon at

12   which point we'll talk about what's next, presumably summary

13   judgment practice on the issues that we've been discussing, and

14   we will go from there.

15          I told you to listen earlier to my spiel about

16   deadlines and discovery disputes.  I assume you did and I don't

17   need to repeat them now.

18          MR. CAHILL:  That's correct, your Honor.

19          THE COURT:  All right.  Very good.

20          Let's talk about settlement and then we can adjourn.

21   Any discussions of settlement?  Is there anything I can do to

22   facilitate those discussions and avoid the need for any

23   discovery or expensive discovery and motion practice here?

24          MR. CAHILL:  Your Honor, Mr. Altman and I are not

25   strangers.  We are colleagues as well as we are adversaries and

G6F9GALC

1    we know each other well.  It's a small art law bar, if you

2    will.  So we've had a number of discussions and it's my view --

3    of course, he's welcome to share his -- that we've done as well

4    as we're likely to do on our own and that involving either a

5    magistrate or a court mediator and the, even the limited

6    expense that goes along with that would probably not be

7    productive in our view given the settlement discussions we have

8    had.

9              THE COURT:  So it would not be productive?

10             MR. CAHILL:  It would not be productive mediation in

11   our view.

12             THE COURT:  All right.

13             MR. CAHILL:  Generally I'm a big fan of mediation but

14   here I think we've tried and we -- even a terrific mediator

15   probably won't get us where we need to be.  But I'm happy to

16   listen to him and I'm not constitutionally opposed to

17   mediation; quite the contrary.

18             THE COURT:  Mr. Altman.

19             MR. ALTMAN:  I'm willing to do it.  There's been a

20   what I consider relatively nominal offer.  But I also think

21   that maybe we don't know enough at this point to be able to --

22   and that we can't -- we don't have sufficient cards to put on

23   the table to each of us try to convince the other.

24             There are a couple of other points, if I might, before

25   we close, which I'd like to bring up.

G6F9GALC

1          One is the issue of the burden of proof here.  Maybe

2     it can be discussed.  The idea here is that, where you're

3     ruling is that the entrustment doctrine is an affirmative

4     defense.  And as far as I can see that's a burden -- any

5     affirmative defense is a burden on the defendant, not on the

6     plaintiff.  Yet, I'm the one who is going to have to prove a

7     negative in the sense that the transaction was not an

8     entrustment.  So I think -- I'd like to discuss that with

9     Mr. Cahill and have your Honor react to what I'm saying.

10          THE COURT:  Why don't you discuss it and you can

11     figure it out.  But I'm certainly on record saying that the

12     weight of authority is that it is a defense and normally a

13     defendant would bear the burden of proving a defense.  I

14     haven't gotten into the particulars.  It may be that the red

15     flags component of the doctrine is one that the plaintiff would

16     bear the burden of showing that there were red flags sufficient

17     to defeat the defense.  I don't know the answer to that but why

18     don't you guys look into it, discuss it.  I think it probably

19     doesn't matter for present purposes.  But it may ultimately

20     matter, obviously, when it comes to summary judgment and it may

21     inform your settlement discussions if you have them.

22          MR. ALTMAN:  The other issue is whether there is a

23     jury right here, and maybe that's premature but I bring it up

24     because your Honor apparently -- your Honor has a rule

25     regarding summary judgment motions in bench trials, if I recall

G6F9GALC

1    correctly.

2           THE COURT:  I have a default practice.  I think

3    regardless I would deviate from it here and have summary

4    judgment practice on -- well, I don't know.  That's something

5    that we'll discuss at the September conference, I guess.

6           My general practice is to go to straight to trial in

7    bench trial situations because the submissions are quite

8    similar to summary judgment submissions.  I take direct

9    testimony by affidavit.  And going to trial, as opposed to

10   summary judgment, just tends to make things more efficient.

11   Maybe it would make sense to do that here and go directly to

12   trial on the limited issue of the entruster provision, if

13   that's a legal issue for me to decide -- or not a legal issue

14   but an issue for me to decide.  But we can discuss that.  Why

15   don't you discuss it with each other in advance of that

16   conference.  And you can come and let me know whether you think

17   it would make sense to have summary judgment practice or, if it

18   is a bench trial issue, then whether it makes sense to go

19   directly to trial.

20          MR. ALTMAN:  I should say that I am perfectly willing

21   to go to mediation.  So I do -- it does take two, but I should

22   say for the record that I'm perfectly willing to bring in a

23   third party see what they can accomplish.

24          THE COURT:  I'll tell you what.  Here's what I will do

25   on that score.

G6F9GALC

1            Mr. Cahill, did you have anything to add.

2            MR. CAHILL:  One of my principal concerns about

3    mediation is that my client is a non-English speaker who is

4    located in Japan.  To the extent -- very often magistrate

5    judges ask for in-person appearances, submissions, etc.  That's

6    my principal concern.

7            MR. ALTMAN:  So my client is in Tennessee so it sort

8    of cuts against both of us.  Maybe that makes it more

9    difficult, I don't know, because it would only be the lawyers

10   talking to each other, but I leave that to your Honor's

11   judgment.

12           THE COURT:  Why don't we do this.  I'm going to let it

13   shakeout for a little bit and leave you guys to continue

14   discussing things with one another.  I certainly think at some

15   point it will make sense to go to probably the assigned

16   magistrate judge and have settlement discussions.  Most of them

17   do have provisions that excuse the presence of principals if

18   they are not local and where a hardship would be involved.  At

19   the same time, maybe there's also a time in the next few months

20   where your principals, your clients will actually be present in

21   New York and you could have a conference more easily and you

22   should think about that and discuss it with one another.

23           The bottomline is I'll let things shakeout for a

24   little while and ask you to just update me by July 29 whether

25   you think it would be appropriate to refer the case to the

G6F9GALC

1    assigned magistrate judge or the mediation program.  I would

2    think the magistrate judge, if either, I would be inclined to

3    send you to a magistrate judge, and let me know if you agree;

4    and if so, what timing you think would be appropriate for a

5    settlement conference and that will insure that you continue to

6    discuss it with one another and that you give it some thought.

7              Anything else?

8              MR. CAHILL:  Not from defense, your Honor.

9              MR. ALTMAN:  Not from me, Judge.

10             THE COURT:  Thank you very much.  I'll enter a case

11   management plan consistent with what we have done today.  We

12   are adjourned.  Thank you.

13             (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25