UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REED GALIN,

               *Plaintiff*,

       -against-

KUNITAKE HAMADA,

               *Defendant*.

ECF CASE

15-CV-6992 (JMF)


# MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISCOVERY SANCTIONS


Dated: 2016-December-19


CAHILL PARTNERS LLP

John R. Cahill
Paul S. Cossu
70 West 40th Street, 15th Floor
New York, New York 10018
(212) 719 – 4400

*Attorneys for Defendant*
*Kunitake Hamada*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...........................................................................................ii

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ............................................................................................3

ARGUMENT .................................................................................................................7

I.      Legal Standard for Summary Judgment ..........................................................8

II.      The Coe Kerr Gallery Acquired Good Title to the Painting Under the UCC ....................8

    A.      Galin Entrusted the Painting to Ramus ..........................................................9

    B.      The Coe Kerr Gallery was a Buyer in the Ordinary Course of
         Business and There Were No Red Flags to Require a Heightened Duty for Inquiry ......11

       i.     The Sale of the Painting was Not "Obviously Below Market" .................................12

       ii.    The Transaction Did Not Differ From Previous Transactions...................................13

       iii.   There is No Evidence that Ramus was Having Financial Difficulties
           at the Time and, Even if He was, that the Coe Kerr Gallery was Aware of Them....14

       iv.   The Coe Kerr Gallery had No Reason to Doubt that Ramus
           was the Owner of a Painting of Which He Was, in Fact, a Partial Owner ...............15

    C.   Title Passed to the Coe Kerr Gallery,
         and From the Coe Kerr Gallery to All Subsequent Purchasers .........................................16

III.     Galin's Claims are Further Barred by Laches..................................................17

IV.     Defendant is Entitled to Discovery Sanctions Against Plaintiff.........................................19

    CONCLUSION..................................................................................................... 22

**TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)......................................................................................................... 8

*Bakalar v. Vavra*,
819 F. Supp. 2d 293, 303 (S.D.N.Y. 2011), *aff'd*, 500 Fed. Appx. 6 (2d Cir. 2012) .................. 17

*Brown v. Mitchell-Innes & Nash, Inc.*,
No. 06 Civ. 7871 (PAC), 2009 WL 1108526 (S.D.N.Y. Apr. 24, 2009) ..................................... 12

*Davis v. Carroll*,
937 F. Supp. 2d 390 (S.D.N.Y. 2013).................................................................................. 12, 15

*Fletcher v Atex, Inc.*,
68 F.3d 1451 (2d Cir. 1995).............................................................................................. 8

*Galin v. Hamada*,
No. 15-CV-6992 (JMF), 2016 WL 2733132 (S.D.N.Y. May 10, 2016) .................................. 9, 16

*Goodwin v. Harrison*,
98 S.E.2d 255 (S.C. 1957) ................................................................................................ 16

*Graffman v. Espel*,
No. 96 Civ. 8247, 1998 WL 55371 (S.D.N.Y. Feb. 11, 1998),
*aff'd sub nom. Graffman v. Doe*, 201 F.3d 431 (2d Cir. 1999)........................................ 10, 11, 15

*Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.*,
No. 98 Civ. 7664 (KMW), 1999 WL 673347 (S.D.N.Y. Aug. 30, 1999) .................................. 18

*Interested Lloyd's Underwriters v. Ross*,
No. 04 Civ. 4381, 2005 WL 2840330 (S.D.N.Y. Oct. 28, 2005) ............................................ 16

*Joseph P. Carroll Ltd. v. Baker*,
889 F. Supp. 2d 593 (S.D.N.Y. 2012)................................................................................. 12

*Knight v. U.S. Fire Ins. Co.*,
804 F.2d 9 (2d Cir. 1986)................................................................................................ 8

*Porter v. Wertz*,
421 N.E.2d 500 (N.Y. 1981)............................................................................................ 10, 11

*Sanchez v. Trustees of the Univ. of Pennsylvania*,
No. 04 Civ. 1253 (JSR), 2005 WL 94847 (S.D.N.Y. Jan. 18, 2004)...................................... 17, 18

*Update Art, Inc. v. Modiin Pub., Ltd.*,
843 F.2d 67 (2d Cir. 1988)........................................................................... 19

*Zaretsky v. William Goldberg Diamond Corp.*,
820 F.3d 513 (2d Cir. 2016)......................................................................... 17

**Statutes & Rules**

Fed. R. Civ. P. 11 ........................................................................................ 1

Fed. R. Civ. P. 56 .................................................................................. 9, 10

N.Y. U.C.C. § 1-201 ................................................................................. 11

N.Y. U.C.C. § 2-403 .......................................................................... *passim*

Defendant Kunitake Hamada ("Hamada" or "Defendant") respectfully submits this Memorandum of Law in support of his motion, pursuant to FED. R. CIV. P. 56, for summary judgment against Plaintiff Reed Galin ("Plaintiff" or "Galin") dismissing the remaining causes of action in Plaintiff's Complaint, and pursuant to FED. R. CIV. P. 26 & 37 for discovery sanctions.

**PRELIMINARY STATEMENT**

This motion is brought to bring closure to a proceeding that has wasted the Court's and the parties' resources and attention for over a year despite the fact that it is evident that there is no (and there never was any) factual basis to support the allegations in the Complaint. This action was brought by Plaintiff to recover funds from Hamada to which he has no entitlement or legal right. Plaintiff seeks to recover the ***entirety*** of funds from the sale a painting by Andrew Wyeth titled *Ice Storm* (the "Painting"), in which he owned a ***one-third interest*** 25 years ago.

However, discovery established that there is no merit to Plaintiff's claims because his interest in the Painting was extinguished by his entrustment of the Painting to the art dealer David Ramus ("Ramus"), who then passed good title to the Painting to Coe Kerr Gallery, Inc. (the "Coe Kerr Gallery"). Years later, it was acquired by Hamada. Despite the demonstrable falsity of the allegations in the Complaint, Plaintiff continues to seek an "angle" based on his "gut feeling" by which he can profit at the expense of Hamada—a good faith purchaser of the Painting who has incurred significant legal fees as a result of Plaintiff's lawsuit.[1]

Based on Plaintiff's allegations (namely, that he could demonstrate that the Coe Kerr Gallery had "warning signs" about Ramus), the Court allowed Plaintiff to proceed with the case

---

[1] Plaintiff's refusal to withdraw his Complaint despite the evidence developed in discovery establishing that not only are the main allegations entirely false, but that Plaintiff and Plaintiff's Counsel ***knew them to be false when making the allegation***, is the subject of a separate motion for sanctions pursuant to FED. R. CIV. P. 11(c).

solely to determine whether he could discover evidence that would overcome the dismissal required under the applicable provisions of the Uniform Commercial Code ("UCC") known as the "entrustment doctrine" (UCC § 2-403). Plaintiff did not do so. To the contrary, discovery revealed that the sale at issue was effected "to a buyer in the ordinary course of business" (i.e., the Coe Kerr Gallery) who was a "good faith purchaser for value." Discovery also established that Plaintiff's allegations to the contrary were false or utterly without any factual basis.

There is no dispute that Ramus did not fulfill his contractual obligations to Plaintiff (and that Plaintiff was, apparently, not the only such victim of Ramus). However, Plaintiff entrusted Ramus with Plaintiff's interest in the Painting with the intention that Ramus would sell the Painting. Ramus indeed did just that; he sold the Painting to the Coe Kerr Gallery. The fact that Ramus never paid the Plaintiff his share of the profits from that sale does not invalidate the transfer of good title to the Coe Kerr Gallery and from the Coe Kerr Gallery to all subsequent owners, including Hamada.

The UCC protects an innocent purchaser from claims by a prior owner who entrusted property to a merchant with whom he chose to do business. The Coe Kerr Gallery, like the Plaintiff himself, did not, **and had no reason to**, believe that Ramus would breach any separate contractual obligations that he had at the time of the Painting's sale. Further, Galin did virtually nothing for the past two decades in attempting to locate the Painting or the facts concerning the transfer of the Painting to the Coe Kerr Gallery. His failure to do so has prejudiced Hamada, as both the fog of time and the death of persons who may have had relevant information has hindered Hamada's efforts to defend this baseless action. For these, and the reasons set forth below, Hamada respectfully requests that this Court grant his motion for summary judgment and dismiss the Complaint with prejudice.

Defendant is also entitled to sanctions due to discovery violations of Plaintiff and his attorneys, who have simultaneously ignored a court order limiting the scope of discovery while withholding documents responsive to the limited discovery that was permitted. The issues raised in this motion are but the latest in a series of willful efforts to cause delay and to prevent Defendant from obtaining material information in discovery.

## STATEMENT OF FACTS

### Facts Relevant to Motion for Summary Judgment

Reed Galin and David Ramus were childhood friends. (Defendant's Rule 56.1 Statement of Facts ("Def's R. 56.1 Stmt"), at ¶ 1.) In the 1980s and early 1990s, Ramus was an art dealer operating under the name "David Ramus Fine Art" with locations in both Atlanta and New York. (*Id*., at ¶ 2.) In or about May 1989, Ramus bought the Painting at auction at Christie's Inc. ("Christie's") for $319,000. (*Id*., at ¶ 3.) In June 1989, Galin and Ramus entered into a written agreement for Galin to acquire a one-third interest in the Painting. (*Id*., at ¶ 4.) Galin paid to Ramus $106,333.33 in exchange his one-third interest in the Painting. (*Id*.) Ramus retained a one-third interest in the Painting. (*Id*., at ¶ 5.) The final one-third interest in the Painting was sold to Don Sentell.[2] (*Id*., at ¶ 6.) Under the terms of their agreement, when Ramus sold the Painting, Galin was to receive one-third of the profits of the sale. (*Id*., at ¶ 7.) Galin never took physical possession of the Painting, entrusting it to Ramus's possession for sale once it was received from Christie's. (*Id*., at ¶¶ 8-9.) Galin had previously entered into a similar arrangement with Ramus concerning a painting by Gaston de La Touche entitled *Le Pique-nique* (the "La Touche

---

[2] Notably, Mr. Sentell has not asserted any claims to title of, or any ownership interest in, the Painting. Plaintiff has claimed that Mr. Sentell's "interest [in the Painting] was extinguished by the bankruptcy proceeding (Cossu Decl., **Exhibit A**, at ¶ 57), but has not explained how that ownership interest, or Ramus's one-third interest, could lawfully transfer to Plaintiff.

Painting"). (*Id.*, at ¶ 10.) Galin had acquired and consigned the La Touche Painting to Ramus for sale, and then shared the profits from the sale of the La Touche Painting equally with Ramus. (*Id.*, at ¶ 11.)

In or about November 1989, Ramus sold the Painting to the Coe Kerr Gallery as part of a transaction by which the Painting and cash were exchanged for a more valuable painting by Frank W. Benson titled *Children in the Woods* (the "Benson Painting"). (*Id.*, at ¶ 12.) When selling artworks like the Painting, Ramus testified that he would price the artworks based on what he thought they were worth and what he thought "the market would bear." (*Id.*, at ¶ 13.) At the time of the trade, Ramus valued the Benson Painting at $819,382.15.[3] (*Id.*, at ¶ 12.) Ramus and the Coe Kerr Gallery did occasional, but not frequent business together during this time period. (*Id.*, at ¶ 14.) The practice of exchanging artworks, sometimes with an additional monetary component to balance out the varying values of the artworks, was not an unusual practice for Ramus or the Coe Kerr Gallery. (*Id.*, at ¶ 15.) At the time of the transaction, the principals of the Coe Kerr Gallery did not have any suspicions about Ramus's "honesty and integrity." (*Id.*, at ¶ 16.) Similarly, the Coe Kerr Gallery's principals did not know that Galin had a partial ownership in the Painting and Ramus never mentioned Galin to the Coe Kerr Gallery. (*Id.*, at ¶ 17.)

Ramus never paid Galin his portion of the proceeds from the sale of the Painting. (*Id.*, at ¶ 18.) Following the sale of the Painting, Ramus started to have financial difficulties. (*Id.*, at ¶ 19.) He attempted to hide the fact that he was having financial problems and that he was addicted to drugs for years after the sale of the Painting. (*Id.*, at ¶¶ 20-21.) Ramus eventually went to

---

[3] Public records demonstrate that Benson paintings remained highly valuable in the late 1980s and early 1990s, including, for instance, the $4,182,500 sale of a similarly sized Benson painting in 1995. (Declaration of Paul Cossu, dated 2016-December-19 ("Cossu Decl."), **Exhibit S**.)

prison on a variety of charges. (*Id*., at ¶ 22.) Galin claims that the first he learned of Ramus's

fraudulent activity was 1995 when he was indicted. (*Id*., at ¶ 23.) As part of a subsequent

bankruptcy proceeding, Galin received and accepted $359.00 as partial payment for the

outstanding debt owed by Ramus. (*Id*., at ¶ 24.)

In or about December 1995, Galin learned that the Painting had been sold to the Coe Kerr

Gallery. (*Id*., at ¶ 25.) Over the next 20 years, Galin claims to have sporadically contacted

museums and galleries about the Painting. (*Id*., at ¶ 26.) Galin did not, however, register the

Painting with the Art Loss Register, a database of stolen art, or post any information about the

Painting on the internet, nor did he contact any of the principals of the Coe Kerr Gallery. (*Id*., at

¶ 27.) Although Warren Adelson had been a principal of Coe Kerr Gallery and directly involved

in Ramus's bankruptcy proceeding, Galin made no effort to contact him. (*Id*., at ¶ 28.) Galin did

not take any steps to investigate the transaction between Ramus and the Coe Kerr Gallery or alert

the public at large about his supposed interest in the Painting.

After learning that the Painting would be sold at auction by Christie's in May 2015,

Plaintiff contacted Christie's and asserted an ownership interest in the Painting. (*Id*., at ¶ 29.)

After an agreement was reached that the sale of the Painting would proceed and that Christie's

would hold the sale proceeds pending a determination as to which party had good title to the

Painting at the time of its sale, Plaintiff initiated this action. (*Id*., at ¶ 30.)

**Relevant Facts Concerning the Motion for Discovery Sanctions**

Following a conference on 2016-June-15, this Court entered a Civil Case Management

Plan and Scheduling Order limiting discovery to "the transfer of the painting at issue from Mr.

Ramus to the Coe-Kerr Gallery and application of the entrustment provision." (Cossu Decl.,

**Exhibit O**.) After Plaintiff and his counsel ("Plaintiff's Counsel") initially refused to respond to

Hamada's discovery requests seeking information responsive to the limited discovery this Court permitted on the basis that Plaintiff would not submit to discovery or a deposition unless Defendant was required to as well, this Court ordered Plaintiff to respond to Hamada's requests and appear for a deposition. (*See* 2016-August-02 Order, ECF No. 32.) On 2016-August-16, Plaintiff's Counsel produced documents that purported to be the full set of documents responsive to Defendant's document requests. (Cossu Decl., at ¶ 5.) The documents produced by Plaintiff's Counsel were marked 1 to 33A. (*Id*.)

On 2016-October-25, Plaintiff's Counsel informed Defendant's counsel ("Defendant's Counsel") that Ramus had been served with a subpoena requiring his appearance at a deposition on 2016-November-01 (the date of the close of fact discovery following two prior extensions) in California. (*Id*., at ¶ 6.) Plaintiff's Counsel did not advise Defendant's counsel that he anticipated that Ramus would actually attend the noticed deposition until 10:40 p.m. of 2016-October-31, effectively preventing Defendant's Counsel from appearing at the deposition in person. (*Id*., at ¶ 7.) For the purposes of conducting the deposition of Ramus, Galin retained local Counsel (Plaintiff's California Counsel") and provided Defendant's Counsel with a dial-in number to appear telephonically. (*Id.*, **Exhibit P**, at Tr. 8:7-8:9.) Just prior to the deposition, Plaintiff's Counsel emailed Defendant's Counsel with the document production numbers of the exhibits that he intended to have introduced as exhibits during the course of the deposition. (*Id*., **Exhibit Q**.) These document production numbers included three numbers (35, 36, and 47) that had not previously been produced. (*Id*., **Exhibit Q**.) Defendant's Counsel objected to the use of such unproduced documents and demanded their immediate production prior to the deposition. (*Id*., **Exhibit Q**.) Plaintiff's Counsel did not seek to introduce documents which had previously not been disclosed at Ramus's deposition, but he also did not share those documents with

Defendant's Counsel until the next day (after Ramus's deposition had concluded and fact discovery had ended). Defendant's Counsel noted these objections again on the record during Ramus's deposition. (*Id.*, **Exhibit P**, at Tr. 5:21-8:14.)

During the course of Ramus's deposition, Plaintiff's California Counsel repeatedly asked Ramus about topics beyond the scope of this Court's Order limiting discovery over the objections of Defendant's Counsel. (*Id.*, **Exhibit P**, at Tr. 12:3-12:8; 13:4-13:13; 16:7-16:11; 16:22-17:1; 17:10-17:20; 18:2-18:5; 18:18-18:21; 19:23-20:3; 20:14-20:16; 22:23-24:4; 25:17-25:22; 27:14-27:18; 27:24-28:10; 36:2-38:8; 39:11-39:16; 41:25-42:5; 43:16-43:24; 76:19-76:24; 81:7-81:12.) Ramus further testified about insurance claims that Galin had previously made regarding the Painting. (*Id.*, **Exhibit P**, at Tr. 98:16-100:18.) However, no documents regarding these insurance claims were ever produced to Defendant despite their apparent possession by Plaintiff and his various counsel. (*Id.*, at ¶ 11.)

### ARGUMENT

The UCC is clear that, under the "entrustment doctrine," when property is entrusted to a merchant who deals in similar property and who sells the property to a good faith purchaser, the good faith purchaser acquires good title to the property, even if the person who entrusts the property is defrauded by the merchant. Here, Galin entrusted the Painting to Ramus (an art merchant) who then sold it to the Coe Kerr Gallery. Ramus's failure to remit Galin's share of the proceeds to him gave rise to a cause of action against Ramus (that now may be extinguished by the statute of limitations or the bankruptcy proceeding), but it does not give Galin any rights against Hamada, a downstream good-faith purchaser of the Painting. Accordingly, summary judgment should be granted dismissing the Complaint in its entirety.

## I. Legal Standard for Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The materiality of a fact is determined by the substantive law of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.") Further, a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fletcher v Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

## II. The Coe Kerr Gallery Acquired Good Title to the Painting Under the UCC

When the Coe Kerr Gallery purchased the Painting from Ramus, it acquired good title and passed on good title to all subsequent purchasers, including Hamada. UCC § 2-403 states:

> (1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though
>
> > (a) the transferor was deceived as to the identity of the purchaser, or
> >
> > (b) the delivery was in exchange for a check which is later dishonored, or
> >
> > (c) it was agreed that the transaction was to be a "cash sale", or
> >
> > (d) *the delivery was procured through fraud punishable as larcenous under the criminal law.*
>
> (2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster *to a buyer in ordinary course of business*.

(3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and ***regardless of whether the procurement of the entrusting or the possessor's disposition of the goods has been such as to be larcenous under the criminal law***.

N.Y. U.C.C. § 2-403(1)-(3) (emphasis added). As a consequence, and as this Court has already recognized, "if the entruster provision applies to the 1989 sale from Ramus to Coe-Kerr, Plaintiff's claims fail as a matter of law – without regard for the circumstances under which Defendant himself procured the painting." *Galin v. Hamada*, No. 15-CV-6992 (JMF), 2016 WL 2733132, at *2 (S.D.N.Y. May 10, 2016). Indeed, the entruster provision applies because, first, Galin entrusted the Painting to Ramus and, second, the Coe Kerr Gallery was a buyer in the ordinary course of business.

### A. Galin Entrusted the Painting to Ramus

There is no dispute that Galin entrusted the Painting to Ramus. (*See* Def's R. 56.1 Stmt., **Exhibit A**, at ¶¶ 20, 23). Under UCC § 2-403(2), "[a]ny entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business." N.Y. U.C.C. § 2-403(2). Nor is there a genuine dispute that Ramus was a "merchant who deals in goods of that kind." (*Id*., **Exhibit A**, ¶¶ 16, 32-33, 37, 40.) Ramus was an art dealer with locations in New York and Atlanta. (*Id*., **Exhibit B**, at Tr. 17:7-17:8; 23:3-23:13.) Ramus carried out his art business for at least several years prior to the sale of the Painting to the Coe Kerr Gallery and continued to operate his business for years after the sale as well. (*Id*., **Exhibit B**, at 23:6-23:13.) Indeed, it was because Ramus was an art dealer that Galin entered into the arrangement for Ramus to sell the Painting on Galin's behalf, as they had done with a previous painting. (*Id*., **Exhibit B**, at Tr. 28:11-33:2.)

As defined in UCC § 2-403(3), "entrusting" means "any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods has been such as to be larcenous under the criminal law." N.Y. U.C.C. § 2-403(3). Here, Ramus purchased the Painting from Christie's and Galin paid Ramus $106,333.33 for a one-third interest in the Painting. (Def's R. 56.1 Stmt, **Exhibit C**.) Galin bought this interest in the Painting with the understanding and intent that Ramus would retain possession of the Painting and later sell the Painting so that Galin would receive his portion of the proceeds from that sale. (*Id.*, **Exhibit C**.) Plaintiff's Complaint concedes that that Ramus acquired the more-valuable Benson Painting for the Painting and "some cash." (*Id.*, **Exhibit A**, at ¶ 36.) The fact that Ramus never paid Galin his portion of the proceeds from this sale does not change the fact that Ramus was authorized to, and did, transfer good title to the Painting. Accordingly, even though Ramus's subsequent conduct may have been "larcenous under criminal law," Galin's acquiescence to Ramus's possession of the Painting establishes that Galin entrusted the Painting to Ramus. N.Y. U.C.C. § 2-403(3).

These facts are entirely in line with the purpose and function of the "entrustment doctrine," namely, to protect innocent purchasers:

> [t]he 'entruster provision' of the Uniform Commercial Code is designed to enhance the reliability of commercial sales by merchants (who deal with the kind of goods sold on a regular basis) while shifting the risk of loss through fraudulent transfer to the owner of the goods, who can select the merchant to whom he entrusts his property.

*Porter v. Wertz*, 421 N.E.2d 500, 500-01 (N.Y. 1981); *see also Graffman v. Espel*, No. 96 Civ. 8247, 1998 WL 55371, at *3 (S.D.N.Y. Feb. 11, 1998) ("Under this provision, a buyer in the ordinary course of business will prevail over the claim of an owner who entrusted such items to

the merchant"), *aff'd sub nom. Graffman v. Doe*, 201 F.3d 431 (2d Cir. 1999). "When a person knowingly delivers his property into the possession of a merchant dealing in goods of that kind, that person assumes the risk of the merchant's acting unscrupulously by selling the property to an innocent purchaser." *Graffman,* 1998 WL 55371, at *3. There is little doubt that Ramus acted "unscrupulously," but as a matter of law, Galin, ***not Hamada***, bears the risk resulting from his choice to conduct business with Ramus. *Graffman,* 1998 WL 55371, at *3 ("The entrustment provision places the loss upon the party who vested the merchant with the ability to transfer the property with apparent good title.").

### B. The Coe Kerr Gallery was a Buyer in the Ordinary Course of Business and There Were No Red Flags to Require a Heightened Duty for Inquiry

The protections of the entrustment doctrine apply to a "buyer in the ordinary course of business." UCC § 2-403(2); *see, e.g., Porter v. Wertz*, 53 N.Y.2d 696, 700 (1981) (good title to a painting did not transfer when the painting was delivered to a ***delicatessen employee*** who later sold the painting). A buyer in ordinary course of business "means a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind." N.Y. U.C.C. § 1-201(9). Presently, the evidence that remains after 25 years is nonetheless clear that the Coe Kerr Gallery was a buyer in the ordinary course of Ramus's business. Both Ramus and the Coe Kerr Gallery were in the business of buying and selling art. (Def's R. 56.1 Stmt., **Exhibit B**, at Tr. 16:22-16:24; **Exhibit G**.) Ramus and the Coe Kerr Gallery had worked together previously, though not extensively, on sales. (*Id*., **Exhibit B**, at Tr. 24:23-25:16; **Exhibit H**, at Tr. 10:19-11:12.) Transactions among art dealers involving the trade of painting was not out of the ordinary for either Ramus or the Coe Kerr Gallery. (*Id*., **Exhibit B**, at Tr. 36:2-38:6; **Exhibit H**, at Tr. 13:3-13:19.)

Courts in this District have identified the aspects of a transaction that would constitute "red flags" triggering a heightened duty of inquiry of an art merchant during the ordinary course of business:

> (1) whether the sale price is "obviously below market," (2) whether the "negotiations or procedure of the sale differed" from previous transactions between buyer and seller, (3) whether the buyer was aware of the seller's "financial difficulties," or (4) whether the buyer would have "reason to doubt" the seller's ownership of the artwork.

*Joseph P. Carroll Ltd. v. Baker*, 889 F. Supp. 2d 593, 604 (S.D.N.Y. 2012); *see also Davis v. Carroll*, 937 F. Supp. 2d 390, 426 (S.D.N.Y. 2013) (citing *Baker* with approval); *Brown v. Mitchell-Innes & Nash, Inc.*, No. 06 Civ. 7871 (PAC), 2009 WL 1108526 (S.D.N.Y. Apr. 24, 2009) (a painting that is sold at or near fair market value raises no suspicions in that regard).

In this case, and as set forth below, there were none of the "red flags" surrounding the sale of the Painting to the Coe Kerr Gallery. First, the Painting was not sold at a below-market price. (Def's R. 56.1 Stmt., **Exhibit A**, at ¶ 36.) Second, the negotiation and sale did not differ from previous transactions. (*Id.*, **Exhibit B**, at Tr. 36:2-38:6; **Exhibit H**, at Tr. 13:3-13:19.) Third, the Coe Kerr Gallery's principals was not aware of Ramus's financial difficulties. (*Id.*, **Exhibit H**, at Tr. 20:18-20:21.) Fourth, the Coe Kerr Gallery had no reason to doubt Ramus's ownership of the Painting (which he did, in fact, partially own). (*Id.*, **Exhibit H**, at Tr. 25:8-25:14.)

### i. The Sale of the Painting was Not "Obviously Below Market"

First, the Painting was not sold a price that was "obviously below market." Ramus bought the Painting at Christie's earlier in 1989 for $319,000. (Def's R. 56.1 Stmt., **Exhibit A**, at ¶ 19.) The Painting was exchanged, along with a payment of $450,000, for the Benson Painting. (*Id.*, **Exhibit F**.) Ramus's own documents show that he valued the Painting at $338,395.93, as part of his calculations of the sales price for the Benson Painting. (*Id.*, **Exhibit G**.) An increase in price of

$19,395.93 from the previous public sale of the Painting, just months prior, cannot qualify as "below market value."

### ii. The Transaction Did Not Differ From Previous Transactions

Second, there is no indication that the circumstances surrounding the transfer of the Painting from Ramus to the Coe Kerr Gallery differed from any other of the sales or trades that Ramus and the Coe Kerr Gallery had done with each other, *or with any other dealer*. Ramus testified that when buying and selling paintings, some transactions were by "cash or check," some were "trade[s]," and some were "combinations" of both. (Def's R. 56.1 Stmt., **Exhibit B**, at Tr. 36:18-37:14.)

Warren Adelson ("Adelson"), who was a principal at the Coe Kerr Gallery at the time, testified that the Coe Kerr Gallery engaged in the practice of trading paintings and that these trades occasionally involved a monetary component, depending on the structure of the deal.

> Q: Do you remember whether Coe Kerr had the practice of trading pictures with other dealers?
> A: Yeah, I guess so. Sure.
> Q: Swap of paintings?
> A: Sure.
> Q: How would these transactions be structured?
> A: Again, this is a case by case. But, generally, when dealers trade pictures, it's, I'll give you two cats for a dog. That kind of thing. Unless it was a specific incidence. But I can't say more than that. Trading was trading. Sometimes it involves money -- sometimes there are all kinds of variables with situations like that.

(Def's R. 56.1 Stmt., **Exhibit H**, at Tr. 13:3-13:19.) There is no dispute that the Painting was a part of a transaction that involved the trade of one painting for another and involved a monetary component or that this was in any way out of the ordinary for either Ramus or the Coe Kerr Gallery.

### iii. There is No Evidence that Ramus was Having Financial Difficulties at the Time and, Even if He was, that the Coe Kerr Gallery was Aware of Them

Third, Ramus was not experiencing financial problems at the time of the transfer to the Coe Kerr Gallery, and even if he was, there is no indication that the Coe Kerr Gallery, or anyone other than Ramus himself, was aware that fact. Ramus testified that his business "tanked overnight" in 1990 or 1991 "when the Japanese bubble economy burst." (Def's R. 56.1 Stmt., **Exhibit B**, at Tr. 83:3-83:20.) That was after the transaction at issue here. However, to the extent that there may be a dispute as to when Ramus's financial troubles started, this is not a material fact. Even if Ramus was having financial difficulties in 1989, there is no indication that the Coe Kerr Gallery was aware of them because Ramus was trying to prevent anyone from knowing about these difficulties. As Ramus specifically testified:

> Q: And so in the universe of galleries that you spoke to in New York I assume included Coe Kerr?
> A: I feel I know you're --
> …
> -- trying to ask me did they know I was in financial distress. I feel like that's the question you're leading up to, and I'd wish you'd just ask it if that's the case.
> Q: Okay. Did they know?
> A: I would --
> …
> -- I would have done my very best for no one to know because who's going to do business with you if they know you're in distress?

(Def's R. 56.1 Stmt., **Exhibit B**, at Tr. 90:19-91:8.) Indeed, Adelson testified that while he worked at the Coe Kerr Gallery he had no "suspicions about Mr. Ramus's honesty and integrity." (*Id*., **Exhibit H**, at Tr. 20:18-20:21.) Thus, Ramus was either not in any financial distress at the time of the sale or, even if he was, the evidence is uncontroverted that he hid such distress from the Coe Kerr Gallery and others. Further, Ramus's ability to transfer an additional $450,000 to the Coe Kerr Gallery as part of the transaction only further demonstrates that the Coe Kerr Gallery would have no reason to believe that Ramus was experiencing financial difficulties.

### iv. The Coe Kerr Gallery had No Reason to Doubt that Ramus was the Owner of a Painting of Which He Was, in Fact, a Partial Owner

Fourth, the Coe Kerr Gallery had no reason to doubt Ramus's authority to sell the Painting. Adelson testified that Ramus never told him that Ramus was a partial owner of the Painting and never mentioned Galin to him. (Def's R. 56.1 Stmt., **Exhibit H**, at Tr. 25:8-25:14.) There was nothing out of the ordinary in the transaction that should have led the Coe Kerr Gallery to doubt Ramus's ownership of the Painting. *See, e.g., Davis v. Carroll*, 937 F. Supp. 2d at 429-431 (changing provenance information and drastically reduced prices should have alerted purchaser that the gallery did not have authority to sell the paintings). As the Painting was being sold at a fair market price, in a common type of transaction with unremarkable provenance (including that Ramus himself had just purchased the Painting at public auction several months before), there was no reason for the Coe Kerr Gallery to suspect that Ramus did not own or have full authority to sell the Painting. Indeed, it is unclear just what the Coe Kerr Gallery would have been required to do even if a heightened duty of inquiry existed. Ramus was not only in possession of the Painting, ***he was a partial owner of it***. (Def's R. 56.1 Stmt., **Exhibit A**, at ¶ 25.) Further inquiry would simply have alerted the Coe Kerr Gallery to the fact that the Painting was co-owned by Galin and Sentell, but that would not have affected Ramus's ability to sell the Painting despite Galin's unsupported assertion that he had an oral agreement with Ramus requiring his approval prior to any sale. *See Graffman,* 1998 WL 55371, at *3 ("Even where an agent has violated his or her instructions, Section 2–403 may operate to bind the principal such that the purchaser acquires good title from the principal's agent.")

In contrast to the documentary evidence and supporting testimony that was developed during discovery, Plaintiff testified that his continuing basis for believing that the Coe-Kerr Gallery engaged in fraudulent or criminal behavior vis-a-vis Ramus was his "gut feeling." (Def's

R. 56.1 Stmt., **Exhibit D**, at Tr. 82:12-83:10.) As addressed in-depth in Hamada's Motion for Rule 11 Sanctions, this "gut feeling" is entirely unsupported and is part of Plaintiff's wrongful conduct that has him "looking for an angle to get some money" at the expense of Hamada—a good faith purchaser of the Painting who has incurred significant legal fees as a result of Plaintiff's lawsuit. (*Id.*, **Exhibit B**, at Tr. 99:15-18.) Taking all of the above together, there is no genuine dispute that the Coe Kerr Gallery was a "buyer in the ordinary course of business."

### C. Title Passed to the Coe Kerr Gallery, and From the Coe Kerr Gallery to All Subsequent Purchasers

Ramus was able to, and did, pass good title to the Coe Kerr Gallery. "Unlike a thief, an entrustee has voidable, as opposed to void, title, and therefore can pass good title to a third party" *Interested Lloyd's Underwriters v. Ross*, No. 04 Civ. 4381, 2005 WL 2840330, at *5 (S.D.N.Y. Oct. 28, 2005); *Galin v. Hamada*, 2016 WL 2733132, at *3. As discussed above, the Coe Kerr Gallery was a good faith purchaser of the Painting and therefore acquired good title to the Painting. *See* N.Y. U.C.C. § 2-403(1). ("A person with voidable title has power to transfer a good title to a good faith purchaser for value.").

Because the Coe Kerr Gallery acquired good title to the Painting, all subsequent purchasers also took good title to the Painting. *See, e.g., Goodwin v. Harrison*, 98 S.E.2d 255, 258 (S.C. 1957) ("After property has passed into the hands of a bona fide purchaser, every subsequent purchaser stands in the shoes of such bona fide purchaser and is entitled to the same protection as the bona fide purchaser, irrespective of notice….") (internal quotation marks omitted). Consequently, Hamada had good title to the Painting when he consigned it to Christie's and is entitled to judgment in his favor as a matter of law, awarding him the full proceeds from the sale of the Painting at Christie's in 2015.

### III.    Galin's Claims are Further Barred by Laches

Even if there were facts to support Galin's claim that the Coe Kerr Gallery did not acquire good title to the Painting in 1989, and therefore could not pass on good title to subsequent purchasers, the doctrine of laches would compel the dismissal of Plaintiff's claims. Laches bars the claims because Galin: (1) was aware of his claim, (2) inexcusably delayed in taking any action; and (3) prejudiced Hamada as a result. *See Bakalar v. Vavra*, 819 F. Supp. 2d 293, 303 (S.D.N.Y. 2011), *aff'd*, 500 Fed. Appx. 6 (2d Cir. 2012). Galin's minimal efforts to locate the Painting gave no notice to potential purchasers that Galin might assert a claim against the Painting and has resulted in cloudy memories surrounding the initial transaction between Ramus and the Coe Kerr Gallery.

First, though Hamada disputes that Galin has a claim against the Painting, or the proceeds from its sale, Galin has been aware of his asserted interest in the Painting for at least 20 years. In order to have knowledge of a claim, Galin need not have known Hamada's identity as the current possessor, but merely "the circumstances giving rise to the claim." *Bakalar* at 304. In this case, Galin has known that he might have a claim against the Painting since 1995 when Ramus was indicted and he learned that the Painting had been transferred to the Coe Kerr Gallery. (Def's R. 56.1 Stmt., **Exhibit L**.)

Second, Galin has inexcusably delayed in taking any action to assert a claim against the Painting. Despite his minimal inquiries, Galin did not undertake the kind of efforts that would defeat a defense of laches. *Compare Zaretsky v. William Goldberg Diamond Corp.*, 820 F.3d 513, 526 (2d Cir. 2016) (denying laches defense where after the disappearance of a diamond, the owner "hired an investigator, notified the police, and reported the diamond stolen to the GIA"), *with Sanchez v. Trustees of the Univ. of Pennsylvania*, No. 04 Civ. 1253 (JSR), 2005 WL 94847,

at *3 (S.D.N.Y. Jan. 18, 2004) (granting laches defense where the plaintiff claimed ownership to a collection of pre-Columbia objects, but "never wrote any letters or placed any telephone calls to any museums; never hired any investigator; never consulted any experts; never reported the theft; and never even conducted any research on where the collection might be found.").

Galin testified that he never registered the Painting with the Art Loss Registry or posted information about the Painting on the internet. (Def's R. 56.1 Stmt., **Exhibit D**, at Tr. 106:24-107:25.) In his Answers to Interrogatories, Galin claimed that he had communicated with "[v]arious art industry personnel over the last 25 years (whose names [he doesn't] recall)" and provided a list of 17 galleries and museums where these persons worked. (*Id.*, **Exhibit M**, at No. 4.) In his testimony, however, Galin could not meaningfully describe any communications he had between him and any of the museums or galleries. (*Id.*, **Exhibit D**, at Tr. 102:14-106:12.) Neither did he produce any emails or other written communications. Galin claims only that for the galleries located in New York, he would have walked in and asked if anyone knew anything about the Painting. (*Id.*, **Exhibit D**, at 104:15-104:25.) Even, if true, that can hardly be said to put the public on notice of his claim.

Third, Hamada has been prejudiced by Galin's inaction because the delay and lack of diligence has resulted in faded memories and the death of relevant witnesses. *See Sanchez v. Trustees of the Univ. of Pennsylvania*, 2005 WL 94847, at *3; *see also Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.*, No. 98 Civ. 7664 (KMW), 1999 WL 673347, at *10 (S.D.N.Y. Aug. 30, 1999) ("Because the [plaintiff's] delay in bringing this action renders defendants' case much more difficult to prove, the doctrine of laches bars this action.")

The transfer of the Painting occurred over 25 years ago. The Coe Kerr Gallery has been out of business for over 20 years. (Def's R. 56.1 Stmt., **Exhibit H**, at Tr. 4:23-4:25.) Ramus's and

Adelson's memories of the transaction have faded. Adelson testified that he did not recall the transfer of the Painting to the Coe Kerr Gallery at issue. (*Id*., **Exhibit H**, at Tr. 24:5-24:10.) Other principals of the Coe Kerr Gallery have either passed away or cannot be located. (*Id*., **Exhibit H**, at Tr. 9:20-10:8.) Similarly, Galin's memories of the few communications he had regarding the Painting are incomplete. (*Id*., **Exhibit D**, at Tr. 102:14-106:12.) Galin took no action that would have alerted the public at large about his interest in the Painting, such as registering it with the Art Loss Register, reporting it to Interpol, or filing a police report. (*Id*., **Exhibit D**, at Tr. 106:13-107:25.) Had Galin registered the work with the Art Loss Register, reported the Painting to Interpol, or filed a police report asserting his interest in the Painting when he first learned about Ramus's bad deeds, this information would have been available to Hamada before he purchased the Painting (and likely would have resulted in him not purchasing the Painting due to the cloud to good title). Therefore, because of Galin's minimal efforts to locate the Painting or assert his interest in the Painting, Hamada now must defend against Galin's claim which is based on little more than Galin's own "gut feeling." (*Id*., **Exhibit D**, at Tr. 82:14-83:10.)

**IV.    Defendant is Entitled to Discovery Sanctions Against Plaintiff**

Sanctions are appropriate where a party fails to comply with a court order. Fed. R. Civ. P. 26 & 37. "[S]anctions under Rule 37 are intended to serve three purposes. First, they ensure that a party will not benefit from its own failure to comply. Second, they are specific deterrents and seek to obtain compliance with the particular order issued. Third, they are intended to serve a general deterrent effect on the case at hand and on other litigation, provided that the party against whom they are imposed was in some sense at fault." *Update Art, Inc. v. Modiin Pub., Ltd*., 843 F.2d 67, 71 (2d Cir. 1988) (awarding sanctions where appellants failed to comply with the court's discovery orders). In this case, not only did Galin's Counsel intentionally withhold

discoverable documents and then try to pass them off as having been produced, but during Ramus's deposition, Plaintiff's California Counsel routinely asked questions in defiance of the Court's Order limiting discovery, apparently due to the fact that he had never read the order.

The Civil Case Management Plan and Scheduling Order limited discovery "to the circumstances surrounding the transfer of the painting at issue from Mr. Ramus to the Coe-Kerr Gallery and application of the entrustment provision." (Cossu Decl., **Exhibit O**.) After several extensions at the request of Plaintiff's Counsel, fact discovery closed on 2016-November-01. *See* Order, dated 2016-October-05, ECF Doc 43. On that same day, Galin took the deposition of Ramus in California. (Cossu Decl., **Exhibit P**.) The Defendant's Counsel and Plaintiff's Counsel appeared telephonically, while Plaintiff's California Counsel appeared in person in California and conducted the majority of the deposition. (*Id.*, **Exhibit P**, at Tr. 5:4-5:18.)

Prior to the deposition, Plaintiff's Counsel represented to the undersigned that he intended to introduce documents as exhibits to the deposition of Ramus, which had not previously been produced during discovery. (*Id.*, **Exhibit Q**.) When this failure to produce the documents was brought to Plaintiff's Counsel's attention, he elected not to introduce them. (*Id.*, at ¶ 9.) Plaintiff's Counsel raised these issues at the start of Ramus's deposition. (*Id.*, **Exhibit P**, at Tr. 5:19-8:16.) These documents were eventually produced following the deposition of Ramus and after the close of fact discovery. (*Id.*, **Exhibit R**.) Notably, for documents numbered 35 and 36, Plaintiff's Counsel stated on 2016-November-01 that these documents were "previously turned over." (*Id.*, **Exhibit Q**.) However, just two days later, Plaintiff's Counsel claimed that he had only received these documents "early [that] morning." (*Id.*, **Exhibit R**.) How Plaintiff's Counsel could have previously produced documents before receiving would raise interesting

questions about the space-time continuum were it not so patently clear that Plaintiff's Counsel's representations were false.

During Ramus's deposition Plaintiff's California Counsel routinely asked questions beyond the scope discovery as ordered by the Court. (*Id.*, **Exhibit P**, at Tr. 12:3-12:8; 13:4-13:13; 16:7-16:11; 16:22-17:1; 17:10-17:20; 18:2-18:5; 18:18-18:21; 19:23-20:3; 20:14-20:16; 22:23-24:4; 25:17-25:22; 27:14-27:18; 27:24-28:10; 36:2-38:8; 39:11-39:16; 41:25-42:5; 43:16-43:24; 76:19-76:24; 81:7-81:12.) Plaintiff's California Counsel admitted during the deposition that he had not read the Civil Case Management Plan and Scheduling Order limiting discovery. (*Id.*, **Exhibit P**, at Tr. 28:3-35:9.)

Finally, during Ramus's deposition, it also came to light that Galin had previously "went after insurance companies 20-some years ago" regarding the Painting. (*Id.*, **Exhibit P**, at Tr. 98:16-100:18.) Galin has not produced any documents related to any previous insurance claims he may have made regarding the Painting. (*Id.*, at ¶ 11.) Documents related to any insurance claim Plaintiff may have made regarding the Painting are likely to contain relevant information since the claims would have concerned the transfer of the Painting from Ramus to the Coe Kerr Gallery. What precisely is contained in these documents, however, is unknown because they were never produced. In their absence, it was not possible to inquire of Galin about them during his deposition. Accordingly, Defendant requests this Court to dismiss Galin's action in the entirety, for attorney's fees associated with the above discovery violations or such other relief as the Court may deem appropriate.

## CONCLUSION

For all of the foregoing reasons, Hamada respectfully requests that this Court grant his motions for summary judgment and for discovery sanctions and enters a judgment in accordance with such ruling.

Dated:   New York, New York
         2016-December-19

<div style="margin-left:40%">

**CAHILL PARTNERS LLP**

By:  _____*/s/ John R. Cahill*_____
         John R. Cahill
         Paul Cossu
         70 West 40th Street, 15th Floor
         New York, NY 10018
         212-719-4400

         *Attorneys for*
         *Defendant Kunitake Hamada*

</div>