UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REED GALIN,

        *Plaintiff*,

-against-

KUNITAKE HAMADA,

        *Defendant*.

ECF CASE

15-CV-6992 (JMF)

**RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT
OF DEFENDANT KUNITAKE HAMADA'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Kunitake Hamada ("Hamada" or "Defendant") submits this statement of material facts in support of his motion for summary judgment against Reed Galin ("Galin" or "Plaintiff").

1. In or about 1989, Galin entered into an arrangement with his childhood friend David Ramus ("Ramus") for Galin to purchase an interest a painting by Andrew Wyeth titled *Ice Storm* (the "Painting"). **Exhibit A** (Complaint, ECF No. 1), at ¶ 20.

2. At that time, Ramus was an art dealer in New York and Atlanta operating as David Ramus Fine Art. **Exhibit B** (excerpts from the deposition of David Ramus, taken on 2016-November-01), at Tr. 17:7-17:8; 23:3-23:13.)

3. Ramus purchased the Painting at an auction at Christie's Inc. ("Christie's") earlier in in 1989 for $319,000. **Exhibit A**, at ¶ 19.

4. Through a Bill of Sale dated 1989-June-27, Galin acquired a one-third interest in the Painting for $106,333.33. **Exhibit C** (Bill of Sale entered into by Galin and Ramus on 1989-June-27).

5. Ramus retained a one-third interest in the Painting. **Exhibit A**, at ¶ 25.

6. The remaining one-third interest was sold to Don Sentell. **Exhibit A**, at ¶ 29.

7. Galin acquired his interest in the Painting with the knowledge and intent that Ramus would resell the Painting and that Galin would receive a portion of the proceeds from the sale. **Exhibit C**.

8. Galin never took possession of the Painting. **Exhibit D** (excerpts from the deposition of Reed Galin, taken on 2016-October-11), at Tr. 33:20-33:23.

9. Galin entrusted the Painting into Ramus's possession for the purposes of sale. **Exhibit C**.

10. Galin had previously entered into a similar arrangement with Ramus concerning a painting by Gaston de La Touche entitled *Le Pique-nique* (the "La Touche Painting"). **Exhibit E** (Settlement Statement, sent from Ramus to Galin on 1989-June-27).

11. Galin had acquired and consigned the La Touche Painting to Ramus for sale, and then shared the profits from the sale of the La Touche Painting equally with Ramus. **Exhibit D**, at Tr. 28:11-29:11.

12. On 1989-November-20, Ramus transferred the Painting and cash for a more valuable painting by Frank W. Benson titled *Children in the Woods* (the "Benson Painting") from the Coe Kerr Gallery Inc. in New York (the "Coe Kerr Gallery"). **Exhibit A**, at ¶ 36; **Exhibit F** (Coe Kerr Gallery documents recording the transfer of the Painting and $450,000 for the Benson Painting); **Exhibit G** (Ramus documents recording the transfer of the Painting and $450,000 for the Benson Painting and valuing the Benson Painting at $819,382.15.)

13. When selling artworks like the Painting, Ramus testified that he would price the artworks based on what he thought they were worth and what he thought "the market would bear." **Exhibit B**, at Tr. 82:19-83:1.

14. The Coe Kerr Gallery was a fine art gallery with which Ramus had occasionally conducted business. **Exhibit B**, at Tr. 24:23-25:16; **Exhibit H** (excerpts from the deposition of Warren Adelson ("Adelson"), taken on 2016-October-28), at Tr. 10:19-11:12.

15. Transactions involving the exchange of paintings with other art merchants was a practice of both the Coe Kerr Gallery and Ramus at the time. **Exhibit B**, at Tr. 36:2-38:6; **Exhibit H**, at Tr. 13:3-13:19.)

16. At the time of the transaction, the principals of the Coe Kerr Gallery did not have any suspicions about Ramus's "honesty and integrity." **Exhibit H**, at Tr. 20:18-20:21.

17. The Coe Kerr Gallery did not know that Galin had a partial ownership in the Painting and Ramus never mentioned Galin to the Coe Kerr Gallery. **Exhibit H**, at Tr. 25:8-25:14.

18. Ramus never paid Galin his portion of the proceeds from the sale of the Painting. **Exhibit I** (letter from Ramus to Galin regarding distribution of the proceeds from the sale of the Painting).

19. Ramus testified that he began experiencing financial difficulties in "'90, '91 when the Japanese bubble economy burst." **Exhibit B**, at Tr. 83:3-83:18.

20. Ramus testified that even after he began experiencing financial difficulties, he did his "very best" to make sure that no one at the Coe Kerr Gallery (or anywhere else) knew that he was in financial distress. **Exhibit B**, at Tr. 90:19-91:8.

21. Ramus testified that he made every attempt to hide both his finances and that he was addicted to drugs from his business associations and friends. **Exhibit B**, at Tr. 90:19-91:8; 110:8-110:15.

22. Ramus eventually went to prison on a variety of charges in 1996. **Exhibit J** (U.S. Department of Justice notification to Galin of Ramus's conviction).

23. Galin claims that the first he learned of Ramus's fraudulent activity was in 1995 when Ramus was indicted. **Exhibit D**, at Tr. 19:14-21:22.

24. As part of a subsequent bankruptcy proceeding, Galin was paid $359.00 towards his share of sale proceeds from the sale of the Painting. **Exhibit K** (documents pertaining to Ramus's bankruptcy proceeding and Galin's payment therefrom).

25. No later than December 1995, Galin learned that the Painting had been sold to the Coe Kerr Gallery. **Exhibit L** (letter sent to Galin during the bankruptcy proceedings regarding the transfer of the Painting to Coe Kerr Gallery).

26. Over the next 20 years, Galin claims to have sporadically contacted museums and galleries about the Painting. **Exhibit M** (excerpt of Galin's Answers to Defendant's Interrogatories), at No. 4.

27. Galin did not, however, register the Painting with the Art Loss Register, a database of stolen art, or post any information about the Painting on the internet. **Exhibit D**, at Tr. 106:24-107:25.

28. Galin did not contact any of the principals of the Coe Kerr Gallery, and was allegedly unaware of the fact that Warren Adelson was a previous principal of Coe Kerr Gallery, despite Mr. Adelson's involvement in Ramus's bankruptcy proceeding. **Exhibit D**, at Tr. 108:12-109:22; **Exhibit N** (excerpt of documents from Ramus's bankruptcy proceeding).

29. After learning that the Painting would be sold at auction by Christie's in May 2015, Plaintiff contacted Christie's and asserted an ownership interest in the Painting. **Exhibit A**, at ¶¶ 2-6.

30. After an agreement was reached that the sale of the Painting would proceed and that Christie's would hold the sale proceeds pending a determination as to which party had good title to the Painting at the time of its sale, Plaintiff initiated this action. **Exhibit A**, at ¶ 6.

Dated: New York, New York
       2016-December-19

                                      **CAHILL PARTNERS LLP**

                                      */s/ John R. Cahill*
                                      John R. Cahill
                                      Paul S. Cossu
                                      70 West 40th Street, 15th Floor
                                      New York, New York 10018
                                      (212) 719-4400

                                      *Attorneys for Defendant*
                                      *Kunitake Hamada*