# Exhibit B

UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| REED GALIN<br><br>Plaintiff,<br><br>v.<br><br>KUNITAKE HAMADA<br><br>Defendant. | Civil Action No.<br>15-cv-6992 (JMF) |

DEPOSITION OF DAVID S. RAMUS

LOS ANGELES, CALIFORNIA

TUESDAY, NOVEMBER 1, 2016

Reported by:
SYLVIA POLLICK
CSR No. 1826

L.A. Reporters
(800) 675-9700 www.LAReporters.com

 A **I would say --**

**MR. COSSU:** Form objection.

**THE WITNESS:** At some point in time I was quite successful as an art dealer. Reed wanted to make some money. I had a painting. I suggested that he could be my partner in it. We partnered on that painting. And, from there, that was his investment. So it wasn't a number of paintings. It was in that painting.

**BY MR. AVANZADO:**

Q Was this the --

A **That's my recollection. But you're talking 25 years ago, 30 years ago.**

Q I understand. So would you say that he became your partner in this -- well, let me ask it this way.

How many paintings did he become your partner in?

A **I never considered him a partner --**

**MR. COSSU:** Form objection.

**THE WITNESS:** -- in anything.

**BY MR. AVANZADO:**

Q So what did you consider him? I think you used the word "partner" in your last answer.

**MR. COSSU:** Form objection.

**THE WITNESS:** I'm not sure how to carry on this conversation. He put some money into a painting. We sold it -- I sold it. Made more money. Reed said, "Roll my profit into another painting." So I kept him invested in a painting or two here or there across many years.

**BY MR. AVANZADO:**

Q Okay.

A **What started -- and, again, this is my recollection -- it started out relatively small, certainly smaller than would warrant chasing it for 20 years, which is where we seem to be today, and I tried to grow it for him.**

Q Did you approach him or did he approach you?

A **Oh, God, I don't know.**

**MR. COSSU:** Objection to form.

**BY MR. AVANZADO:**

Q Did you -- I think you said the first one was relatively small; is that right?

A **To the best of my recollection, the first one was the only one he ever wrote a check for.**

Q Okay. Do you remember how much that was?

A **I don't. It wasn't a terribly --**

**MR. COSSU:** Form objection.

**BY MR. AVANZADO:**

Q I'm sorry. You didn't finish. "It wasn't a terrible" --

A **It wasn't a terribly big piece of work.**

Q I might show you a document or two later.

A **Okay.**

Q But, in any event, when he gave you money for this first painting did he do it as your friend?

A **He never gave me money --**

**MR. COSSU:** Form objection. Beyond the scope.

**THE WITNESS:** -- as a friend for a painting. He made an investment, if you will, which he knew was risky at the time, and we tried to make some money together.

So I never considered it that Reed gave me money, if we're going to be technical about this, which apparently we are.

**BY MR. AVANZADO:**

Q All right. Let me back up a little bit. It's not really where I'm going.

You operated at some point an art gallery; is that right?

A **Yes. I was an art dealer.**

**MR. COSSU:** Form objection. Beyond the

scope.

**BY MR. AVANZADO:**

Q What was the name of your art galley or art dealer business?

A **I think the --**

**MR. COSSU:** Form objection.

**THE WITNESS:** It was David S. Ramus, Ltd., doing business as David Ramus Fine Art.

**BY MR. AVANZADO:**

Q And did you have other investors besides Mr. Galin?

A **Yes.**

**MR. COSSU:** Form objection. Beyond the scope.

**BY MR. AVANZADO:**

Q Were any of them as close a personal friend as Mr. Galin?

A **Yes.**

**MR. COSSU:** Form objection. Beyond the scope.

**BY MR. AVANZADO:**

Q How many of those kinds of people that you --

A **A couple. Three.**

**MR. COSSU:** Form objection.

 Page 22

A **I couldn't give you the dates on that.**
Q Do you know where he is?
A **He's in New York, I think.**
Q Still alive and kicking?
A **Still alive and kicking.**
Q Now --
A **The last I heard. It's been awhile.**
Q Okay. And Mr. Adelson was -- did he give you any guidance or input when you first got started in the art business?
**MR. COSSU:** Form objection.
**THE WITNESS:** No.
**BY MR. AVANZADO:**
Q Did he have anything to do at all with your business?
A **No.**
**MR. COSSU:** Form objection.
**BY MR. AVANZADO:**
Q Would you consider him one of your mentors?
A **No.**
**MR. COSSU:** Form objection.
**BY MR. AVANZADO:**
Q Now, let's go back to your art gallery business. Where was it located?
A **I started out --**

Page 23

**MR. COSSU:** Form objection. Beyond the scope.
**THE WITNESS:** I started out in Atlanta, Georgia, and eventually had a space in New York.
**BY MR. AVANZADO:**
Q And how long were you in that business?
**MR. COSSU:** Form objection. Beyond the scope.
**THE WITNESS:** Oh, my God. I don't know exactly. A while.
**BY MR. AVANZADO:**
Q Certainly more than ten years?
A **Yes.**
Q Are you still in that business?
A **No.**
**MR. COSSU:** Form objection. Beyond the scope.
**BY MR. AVANZADO:**
Q Now, at some point you sold or negotiated a transaction with Coe Kerr Gallery; is that right?
**MR. COSSU:** Form objection. Beyond the scope.
**THE WITNESS:** I've done business with Coe Kerr Gallery, I'm sure, over the years.
///

Page 24

**BY MR. AVANZADO:**
Q Can you tell me about that gallery.
**MR. COSSU:** Form objection. Beyond the scope.
**THE WITNESS:** It was a gallery in New York that sold good things. That would be about all I could tell you about it.
**BY MR. AVANZADO:**
Q Who did you deal with there?
A **I don't remember.**
Q Did you deal with Mr. Adelson there?
A **I might have at some point, and I was --**
**MR. COSSU:** Form objection.
**THE WITNESS:** There was a man named Fred Woolworth there as well --
**BY MR. AVANZADO:**
Q And --
A **But I don't recall who I might have dealt with on those -- you know, because it would have been a long time ago.**
Q Okay.
A **I knew them both.**
Q How many paintings -- transactions relating to paintings or art did you do with Coe Kerr?
A **I have no idea.**

Page 25

**MR. COSSU:** Form objection.
**BY MR. AVANZADO:**
Q More than one?
A **I have no idea. At least one. More, I would think, but I'm guessing.**
Q Well, I don't want you to guess, but can you estimate it as more than, say, five?
A **I couldn't give you an estimate.**
**MR. COSSU:** Form objection.
**THE WITNESS:** It's a long time ago. Over a period of many years so -- I certainly wasn't close to Coe Kerr.
**BY MR. AVANZADO:**
Q Meaning what?
A **Meaning it wasn't somebody that I had regular business with.**
Q Okay. And which side of the deal were you on with Coe Kerr, generally?
A **I don't know.**
Q A buyer --
**MR. COSSU:** Object to form. Beyond the scope.
**BY MR. AVANZADO:**
Q A buyer or a seller, I mean.
A **I don't know.**

Page 26

Q Okay. No, I understand. This is a long time ago. I'm just trying to test your memory.
Did you maintain any documents --
**A No.**
Q -- relating to that?
**A There was an involuntary bankruptcy at the end of my art career. And at the end of the bankruptcy, by the time the forensic accountants and everyone had looked at everything, there were boxes of documents that were just incinerated. I didn't take anything.**
Q But all of those documents were available in the bankruptcy proceeding?
**A Everything that I had.**
**MR. COSSU:** Object to form.
**BY MR. AVANZADO:**
Q In other words, if you had any records with Coe Kerr, they were somehow a part or produced in the bankruptcy proceeding?
**A I don't know.**
Q Okay. Let's talk about the provenance of the "Ice Storm" painting, if you will. How did you get that painting?
**A I don't remember.**
Q Do you remember --

Page 27

**MR. COSSU:** Object to form.
**BY MR. AVANZADO:**
Q Do you remember bidding on it on some term sheet with Christie's auction in 1989?
**MR. COSSU:** Object to form.
**THE WITNESS:** I don't remember doing that, but it's entirely possible. That's -- I mean, it's one of very many -- many paintings that I've owned over the course of the decades that I was in business. So I don't remember the specifics of buying that painting. I remember owning it, and I remember the painting.
**BY MR. AVANZADO:**
Q Do you remember entering into transactions where it wasn't a straight cash purchase for paintings like "Ice Storm"?
**MR. COSSU:** Object to form. Beyond the scope.
**THE WITNESS:** I don't know what "like 'Ice Storm'" means. I did every kind of buy, sell, and trade you could do in the business, but I don't know what you mean by "like 'Ice Storm.'"
**BY MR. AVANZADO:**
Q That's a good point. Let me ask you what kinds of transactions you and your business engaged

Page 28

in to acquire a painting.
**A If you can imagine --**
**MR. COSSU:** Object to form. This is blatantly beyond the scope of what's provided for by the Court. The Court's Order was very specific if you read it and don't have it.
But move on to what the Court ordered. We're not here to have people give testimony that would call for an expert. We're here to do what the Court ordered.
**MR. ALTMAN:** Excuse me. This gentleman is my witness. He's a nonparty witness. You have no right to interfere with this deposition. You can bring up your objections at any time you choose but let us proceed --
**MR. COSSU:** Then let's call the Court, Richard. Richard, let's call the Court right now and we'll get a ruling from them on this.
**MR. ALTMAN:** No, we're not calling the Court.
**MR. COSSU:** We're not calling the Court? Then stop this line of questioning. I can read to you the Court's Order if you would like on Discovery.
But, otherwise, let's excuse the witness --

Page 29

**MR. CAHILL:** Before you read the Court's Order, does the local counsel -- do you see the Court Order of June 15, 2016 that describes what the Discovery is limited to?
**MR. AVANZADO:** I'm not sure that I have but --
**MR. CAHILL:** Okay. So why don't we excuse the witness so we can -- since you're a licensed lawyer here -- you're doing a deposition in the Southern District of New York in a case that's subject to an Order of Judge Jesse M. Furman, dated June 15, 2016 -- why don't we excuse Mr. Ramus for a moment, and it's only one sentence. We can read it in less than a minute. We believe you're violating the Order.
**MR. AVANZADO:** I don't believe --
**MR. CAHILL:** It will just take less than a minute so you have the information you need because we can tell you right now that we think this is such a violation of the Order that it violates Rule 26, and we intend to seek relief for doing it.
So you should at least have the information before you continue on with that. We're giving you that opportunity. If you don't want to take it and you want to continue, we'll continue making a

record. We're offering you the opportunity to hear directly -- we'll read it verbatim what the Court has ordered Discovery is limited to.

**MR. AVANZADO:** You're free to send --

**MR. CAHILL:** That's John Cahill speaking, by the way.

**MR. AVANZADO:** You're free to send whatever you want to the court reporter's office since you already did and sent documents here, and I will read them at a break.

Right now I'm just taking background. This is nothing but background of the witness and how he got into the art business. So I don't know of any --

**MR. COSSU:** Background --

**MR. AVANZADO:** Excuse me.

**MR. COSSU:** -- information --

**MR. AVANZADO:** Excuse me. I'm not finished.

**MR. COSSU:** You're --

**MR. AVANZADO:** Excuse me. I'm not finished.

**MR. COSSU:** You're defying a Court Order, and we're going to hold you accountable for it.

The Court Order says:

"As discussed on the record, the initial conference discovery will be limited to the circumstances surrounding the transfer of the painting at issue from" --

And then I'm not going to read the rest because it would be information that we would be putting in the witness's head that is related to those circumstances.

You should have had -- you're taking a deposition that's subject to that Order. You should have read it before this deposition. The fact that you haven't only concerns us because we think you're acting in blatant violation of the Federal Rules in a sanctionable way.

We're trying to give you an opportunity to cure that. If you don't want to take it, ask your questions. Background questions are forbidden. If you continue doing it, we're going to hold you accountable under the Federal Rules of Civil Procedure. We're going to object to every question you ask.

**MR. AVANZADO:** Go ahead.

**MR. COSSU:** I suggest you take that seriously. We're giving you the opportunity. If

you don't want to, go ahead. You're refusing to call the Court. We're going to stay on the line, and we're going to object to every question.

And we will seek relief from the Court because you're in direct violation of the Court's Order. Reread the question. And it's costing our client money, and that money is going to be recouped and sought for by the Court from you and from all corresponding parties for the plaintiff. That's all we have to say.

Ask your questions subject to that, we'll object, and we will take it up with the Court. So you can say whatever you want, but now you have the information.

**MR. AVANZADO:** Go ahead and --

**MR. COSSU:** You should have had it beforehand. And the fact that you're taking the deposition without reading the Order is a very blatant violation. That's not the way we do things in a case in the Southern District of New York.

**MR. AVANZADO:** Go ahead and send the Order --

**MR. COSSU:** You go ahead. Ask your question --

**MR. AVANZADO:** Go ahead --

**MR. COSSU:** I'm not going to give you the Court Order. You're asking for a client in a case that's subject to a Court Order. You should have read it before you asked your questions.

**MR. AVANZADO:** I'm going to hang up on you in a second if you don't --

**MR. COSSU:** Proceed with that knowledge. We're not going to waste any more of our client's money educating you about the Court's Order.

**MR. AVANZADO:** If you --

**MR. COSSU:** Proceed --

**MR. AVANZADO:** You've interrupted me numerous times. You're not here. You didn't come here. I don't care what you think --

**MR. COSSU:** You --

**MR. AVANZADO:** -- what you think of what I'm saying right now. I don't care what you think of what I'm saying right now. You are not to interrupt me again. All right? I'll tell you when I'm finished. I don't know how you practice in the Southern District. I've only had one case there. But right now this is not how we practice in the Central District of California; right? You state your objections --

**MR. COSSU:** You violate Court Orders in

the Central District of California? You take depositions without reading the Judge's limitations on Discovery? Is that how you do things in the Central District? I don't think so. I've been in that district. They follow the Federal Rules of Procedure.

**MR. AVANZADO:** Wonderful.

**MR. COSSU:** I'm not going to interrupt you --

**MR. AVANZADO:** Wonderful.

**MR. COSSU:** I'm just going to --

**MR. AVANZADO:** You're still interrupting --

**MR. COSSU:** We're going to weigh your conduct with the Federal Judge here and in the Central District of California, if that's necessary --

**MR. AVANZADO:** You're still interrupting --

**MR. COSSU:** -- because what you're doing violates the Court Order.

**MR. AVANZADO:** You're still interrupting --

**MR. COSSU:** You're not even aware of that. It's shocking, sir. Shocking. That's it. We're not going to say another word. Proceed with that knowledge.

**MR. AVANZADO:** You're still interrupting

me. I have been retained by the client yesterday to do this, and so you can go ahead and do whatever you want. I don't care. I'm acting within my boundaries that I believe is proper.

You've sent documents to this office, to this court reporter's office. Feel free to send it, and they'll give it to me at a break. So I'm just asking background questions right now. So here we go.

Q Apologize, Mr. Ramus, for all of that.

And state your objections on the record. That's fine.

So Mr. Ramus -- where was I?

(To the Court Reporter:) Can you scroll up?

**THE REPORTER:** (Complying.)

**MR. ALTMAN:** Hello?

**THE REPORTER:** Yes, we're just getting the last question. This is the court reporter.

**MR. ALTMAN:** All right.

(Record read as follows:

"Q Let me ask you what kinds of transactions you and your business engaged in to acquire a painting.")

///

**BY MR. AVANZADO:**

Q Mr. Ramus, you were interrupted by Counsel. You were going to tell me what kind of transactions you entered into in order to acquire paintings.

**A There were no specific --**

**MR. COSSU:** Form objection. Beyond the scope.

**THE WITNESS:** There were no specific types of transactions. We did any kind of transaction that I could imagine doing.

**BY MR. AVANZADO:**

Q Does that also include the sale of paintings?

**MR. COSSU:** Form objection. Beyond the scope.

**THE WITNESS:** Yes.

**BY MR. AVANZADO:**

Q So you traded paintings?

**A At times.**

Q You paid --

**MR. COSSU:** Form objection. Beyond the scope.

**BY MR. AVANZADO:**

Q You paid cash for paintings?

**MR. COSSU:** Form objection. Beyond the

scope.

**THE WITNESS:** Never cash.

**BY MR. AVANZADO:**

Q Never cash?

**A Like hundred dollar bills?**

Q Or -- I'm sorry. You paid straight in currency with check or cash for paintings?

**A Yes.**

Q And then --

**MR. COSSU:** Form objection. Beyond the scope.

**BY MR. AVANZADO:**

Q And you did combinations of that?

**A Yes.**

**MR. COSSU:** Form objection. Beyond the scope.

**BY MR. AVANZADO:**

Q Did you do that in terms of selling paintings?

**MR. COSSU:** Form objection. Beyond the scope.

**THE WITNESS:** I'm not sure I understand.

**BY MR. AVANZADO:**

Q Did you take paintings in trade and take money for paintings that you sold?

A **I did.**

**MR. COSSU:** Form objection. Beyond the scope.

**BY MR. AVANZADO:**

Q And did you do that in combination as well?

A **Not often.**

**MR. COSSU:** Form objection. Beyond the scope.

**BY MR. AVANZADO:**

Q Well, with respect to "Ice Storm," do you remember what you did and what consideration you took to acquire it?

A **No.**

**MR. COSSU:** Form objection.

**THE WITNESS:** Reed's friend, Dave Johnson, called me yesterday and was asking me the same things, and he seemed to indicate that there was some question of Summary Judgment coming up, and they wanted a very specific bit of information regarding to the transaction concerning "Ice Storm."

And he told me that Reed had had a terrible heart attack and that he didn't want to be maudlin, but he wanted very much for me to try and corroborate something, and then he fell short of asking me what it was that he was asking me to

corroborate.

And I explained to him, as I'll explain to you, I don't remember. If you put my feet in a fire I don't remember even making the transaction that he suggested I made with Coe Kerr Galleries. At that point in time I was newly recovered from a heroin addiction. The world seemed to be falling in on me, and I was dancing as fast as I could, and I don't even remember doing a deal with Coe Kerr.

**BY MR. AVANZADO:**

Q When you say at the time you were recovering from a heroin addiction, at the time of what?

A **At the time when my business collapsed.**

**MR. COSSU:** Form objection. Beyond the scope.

**BY MR. AVANZADO:**

Q So was that around the time that you had this transaction involving "Ice Storm"?

A **According to what Dave was telling me.**

**MR. COSSU:** Form objection.

**MR. ALTMAN:** Could you repeat the answer to that, please. I didn't hear it.

**THE WITNESS:** According to what Dave Johnson, who I guess is either Reed's advisor in

this case or a co-counsel or has some role in it as a lawyer -- I'm not sure what his role is -- but he indicated to me that the timing of this was towards the end -- the collapse of the business, which ended up in the bankruptcy and the subsequent criminal trial.

And I explained to him that, you know, either -- just because of all that was happening back then I don't have -- I didn't -- if you had asked me before I heard about this lawsuit if I had sold an Andrew Wyeth painting to Coe Kerr Galleries, I probably would have told you, "No."

The only reason I think I probably did is because everyone is telling me that I did. I have no picture in my head of this.

**MR. AVANZADO:** Let me mark as Ramus Exhibit 1 a document dated May 23, 1989, with attachments from Christie, Manson & Woods International Inc. to you, Mr. Ramus, and then I believe that you countersigned the exhibit as well. So Ramus Exhibit 1.

(Whereupon, the document referred to was marked Plaintiff's Exhibit No. 1 for identification by the Court Reporter, and a copy is hereto attached.)

**MR. COSSU:** We object to the introduction of this exhibit.

**BY MR. AVANZADO:**

Q First, let's to do some preliminaries.

On the second page of Exhibit 1 appears to have a signature over your name. Is that your signature?

A **I don't know.**

Q You don't remember if that's how your signature was in 1989?

A **What you're showing me is a photocopy of a document from 1989 that isn't in my possession. I have no idea where it came from, and I would hesitate to under oath, identify it.**

Q Okay. That's fair. But you don't recognize this document?

A **I don't.**

Q Do you recognize the signature under Davis (sic) Ramus Fine Art?

A **It looks like my signature, yes.**

Q And you have no recollection of receiving this or signing this document?

A **I have no recollection of receiving or signing this document.**

Q Do you remember participating in the May

Q At all?
**A None. I'm, like, surprised -- when it came up to me, it surprised me. If you had asked me a year ago -- two years ago, "Whatever happened to that painting "Ice Storm" that you owned?" I would not have been able to tell you.**
Q Okay.
**A Part of that is my own faulty memory. Part of that is probably blocking a very traumatic time of my life. I don't even know what it all is about, but I can honestly tell you I wouldn't have been able to say, "Oh, I sold that to Coe Kerr." That would never have come into my mind because Coe Kerr was never a place that I did a lot of business with. There were other galleries I did business with on a monthly basis. Coe Kerr wasn't one of them.**
Q Was Ron Hall one of them?
**A No.**
Q These various documents I have shown you, some of them have pricing on a given painting. Assuming that was something you created, how did you come up with the pricing for a painting?
**MR. COSSU:** Object to form.
**THE WITNESS:** There was no formula. Whatever I thought the painting was worth. Whatever

I thought the market would bear.
**BY MR. AVANZADO:**
Q I think I read somewhere that your business started to decline as the art business started to decline. Is that a fair statement?
**MR. COSSU:** Object to form.
**THE WITNESS:** It's not an accurate statement. It's fair.
**BY MR. AVANZADO:**
Q What's not accurate about it?
**A The business tanked overnight, as if someone had taken a light switch and turned out the lights. It just stopped in place. And that happened around '90, '91, when the Japanese bubble economy burst and all of a sudden nothing seemed to be worth anything. Nobody wanted to buy anything. It was incredibly difficult to sell, to get paintings moving.**
Q Didn't that start in '89?
**A It might have been '89.**
**MR. COSSU:** Object to form.
**BY MR. AVANZADO:**
Q Now, what motivated you to, as you put it, lie to the people who owned the paintings you sell?
**MR. COSSU:** Object to form.

**THE WITNESS:** My intent was that this slowdown, this freezing of the market could only be temporary -- how could these paintings not be worth a great deal of money? -- and if I could just keep, like a juggler, enough balls in the air, as soon as the market came back, I was such a genius with such a great eye for art that I would certainly generate tons of business and be able to pay everybody everything.
So in my mind it was not a tactic to enrich myself at the cost of others. It was desperation. Keep it open. Keep the doors open. Because if I go to people and tell them I can't pay them, I'm out of business. And I had put, as you said, well over a decade, two decades into trying to build this thing out of nothing.
Q You used the term "juggling" just now. What did you mean by that?
**A I mean just keeping everything --**
**MR. COSSU:** Object to form.
**THE WITNESS:** -- going. You know, it's a metaphor, but I don't know how clear it is. You ask why I would lie to people. A lie would be a ball up in the air, I guess.
///

**BY MR. AVANZADO:**
Q Is that similar in concept to your taking-from-Peter-paying-Paul --
**A Yes.**
Q -- analogy?
**A Yes.**
**MR. AVANZADO:** Okay. We've been going for a little bit. Let's take a break, and then I shouldn't be too much longer.
(Whereupon, a recess was taken from 2:29 p.m. to 2:35 p.m.)
**MR. AVANZADO:** All right. Let's go back on the record.
Q Mr. Ramus, thank you for your patience. I have just a couple of short subjects to go through.
When would you say your business started to get worse because of the market? '89? '90?
**A '89, '90, '91.**
**MR. COSSU:** Object to form.
**BY MR. AVANZADO:**
Q And were your troubles known by people in the art industry?
**A I don't know.**
**MR. COSSU:** Form objection.
///

Knowing me intimately? Or knowing who I was?
**BY MR. AVANZADO:**
Q Knowing you were an art dealer in Atlanta that at one point at least had a gallery in New York.
**A I would hope that New York art dealers knew who I was, yes.**
Q Would you say that the people at Coe Kerr knew who you were?
**A They knew who I was. What they knew about me I couldn't begin to testify.**
Q Of course not. When you said, I think earlier, that you were talking to people in New York in terms of your business, I take it; right? Is that correct?
**A Yes.**
**MR. COSSU:** Form objection.
**BY MR. AVANZADO:**
Q And so the universe of galleries that you spoke to in New York I assume included Coe Kerr?
**A I feel I know you're --**
**MR. COSSU:** Form objection.
**THE WITNESS:** -- trying to ask me did they know I was in financial distress. I feel like that's the question you're leading up to, and I'd

wish you'd just ask it if that's the case.
**BY MR. AVANZADO:**
Q Okay. Did they know?
**A I would --**
**MR. COSSU:** Form objection.
**THE WITNESS:** I would have done my very best for no one to know because who's going to do business with you if they know you're in distress?
**BY MR. AVANZADO:**
Q And that includes misleading people; right?
**MR. COSSU:** Form objection.
**THE WITNESS:** I don't know if it would be misleading as much as just trying to keep up a strong front. Is that misleading if you believe it to be true?
**BY MR. AVANZADO:**
Q Well, I mean --
**A Again, let's reflect back to what I told you. It was my belief that the market condition was short-term and would shortly end because it was impossible for me to believe at that point that these paintings wouldn't be worth everything to everybody.**
**So for me it was just a matter of keeping a stiff upper lip and carrying on.**

Q At some point, you said earlier, that in order to juggle your business and keep it afloat you ended up lying to people, your clients?
**A That's correct. That became a --**
**MR. COSSU:** Form objection.
**THE WITNESS:** That became something that I did.
**BY MR. AVANZADO:**
Q So in order to keep up a front to make sure that you appeared strong, would that mean that when dealing with other galleries you also misled them?
**A Yes. I would have misled --**
**MR. COSSU:** Form objection.
**THE WITNESS:** -- anybody who -- I would have tried to make them feel I was certainly competent and going to be around. But "misleading" is a little bit stronger of the term that I would use because the fact is I believed it.
**BY MR. AVANZADO:**
Q Well --
**A I believed that I was strong enough that I would weather the storm and be there.**
Q You --
**A I didn't do any of this thinking that there was an implosion about to happen and I would end up**

**in prison. All of this was predicated completely on the belief that all of this would straighten itself out and that everybody would get paid everything they were owed.**
Q Would you say that if other galleries knew the extent you had to juggle in order to keep your business afloat that they would no longer do business with you?
**A I don't know.**
**MR. COSSU:** Form objection.
**THE WITNESS:** I don't know how to answer that. They might have wanted to do more business with me and try and take advantage of it.
**BY MR. AVANZADO:**
Q Well, I guess what I'm trying to say is what would motivate you to "keep up the front," as you said, with other galleries?
**A The whole stiff upper lip and weather the storm.**
**MR. COSSU:** Form objection.
**THE WITNESS:** That would be the motivation.
**BY MR. AVANZADO:**
Q And is it your testimony that it had nothing to do with the fact that you still wanted to do business in that world and so they needed to

A **So then later that night --**
Q You didn't take his call.
A **Well, he left me a long message, which was, like, a message from a stranger. And it just seemed to me that "these guys are desperate for me to say something tomorrow. All of a sudden I'm important."**
Q So -- but let me just remind you of your prior testimony. You said you didn't take his call; right?
A **I have a message from him. He left me a long voice mail. I did not accept the call because Dave said he didn't want to talk to me. And I thought, "Okay. If we shouldn't talk before the deposition, I won't talk to him before the deposition."**
Q Now, just breaking down some things, do you know Dave Johnson?
A **I've met him many years ago probably a couple of times, more than once.**
Q Many years ago as in?
A **With Reed when we were still friendly.**
Q In the '80s and '90s?
A **He came to my gallery he told me yesterday. I don't recall it. Specifically, he told me that I gave him a primer on what paintings mean and art,**

**and he remembered all of that.**
**What I mostly remember is that during the course of the bankruptcy and the subsequent criminal trial Dave was constantly looking for a way to get Reed paid. They wanted to go after the insurance companies. They wanted to go after the other creditors.**
**There was constantly some sort of, you know, maneuvering or looking for an angle that they were doing, and I just said to them, you know, "I want Reed to be paid. Whatever you guys work out, I'll answer as honestly as I can."**
**And that was 20-some years ago, and here we are doing it again today.**
Q How do you know that he was trying to get Reed paid?
A **He said so. They made clear that they were looking for an angle to get Reed some money.**
Q When did they say so?
A **Oh, they said so -- they went after insurance companies 20-some years ago.**
Q So you're talking about a time 20 years ago --
A **During the bankruptcy.**
Q -- that Dave Johnson represented Reed

Galin?
A **It may have just been a friend advising him.**
Q Well, I'm trying to be precise.
A **I can't be more precise than that. That Dave Johnson, as an attorney, who never said to me, "Reed is my client" -- I wasn't a lawyer; he wasn't in a court of law with me -- he said, "I'm looking for a way to get Reed paid."**
Q And you remember this now?
A **No. I remembered it then. I told him then.**
Q No. You remember these conversations in the bankruptcy context now?
A **I remember talking to Dave Johnson about the insurance companies, yes.**
Q Okay. And that was 20-plus years ago?
A **Yes.**
Q But you can't remember whether these documents I've showed you were yours?
A **I do not. And I said to you that they looked like mine, but I was not going to identify a 27-year-old photocopy, and I stand by that answer.**
Q All right. So Dave Johnson, when he called you, when you talked to him yesterday --

A **Yes.**
Q -- how did he identify himself?
A **"Hey, this is a blast from the past. This is Dave Johnson. You probably remember me. I'm Reed's friend."**
Q Did he say he was Reed's lawyer?
A **No. He said specifically that in this case he's not Reed's lawyer.**
Q All right.
A **He said that he had hired you for Reed.**
Q Did he identify me?
A **Yes.**
Q Seriously?
A **He said you were a solid lawyer and that you would make sure that you didn't come in holding a stick to beat me with.**
Q What time did he call you yesterday?
A **If you want to know precisely I can look on my telephone.**
Q That's okay. Would it surprise you I wasn't hired until last night? Did you talk to him before last night?
A **If you want, I can tell you the exact times -- but he definitely told me that you were going to be the lawyer here in L.A., that you were a**

A **No.**
Q And, again, I think it was lost in what you said. Congratulations on being sober.
But did you tell anyone that you weren't sober during that period? In other words --
**MR. COSSU:** Form objection.
**BY MR. AVANZADO:**
Q -- did people -- did anyone know you weren't sober in the '80s?
A **I would be goddamn shocked --**
**MR. COSSU:** Form objection.
**THE WITNESS:** -- if people didn't know I was partying pretty hard. The extent of it, I don't know who knew what. You try and hide that sort of thing.
**BY MR. AVANZADO:**
Q And when you partied, did you party with people in the art world?
A **Sometimes.**
**MR. COSSU:** Form objection.
**BY MR. AVANZADO:**
Q Did any of those include the people from Coe Kerr?
A **No, I wouldn't think so. Not to my recollection.**



Q So what do you mean when sometimes you partied with people in the art world? Are there other dealers? Other gallery owners?
A **Antiques dealers -- it's a world -- a whole world up there. I'm sure I knew other dealers. There was plenty.**
**But by "partying," I mean being out on the town, probably drinking to excess, being foolish.**
Q What's that club in New York that was famous in the '80s?
**MR. COSSU:** Form objection.
**BY MR. AVANZADO:**
Q Did you go there and party there?
A **I don't know what club you're talking about.**
Q God, it's been so long.
A **Is this relevant to the proceeding?**
Q No. I'm just saying was your partying --
**MR. COSSU:** Form objection.
**BY MR. AVANZADO:**
Q -- public?
A **Yes.**
Q You were out in public?
A **Yes.**
Q Your addiction, however, you tried to keep



private?
A **Certainly.**
**MR. COSSU:** Form objection.
**BY MR. AVANZADO:**
Q Did you have any contact at all with members of Kunitake Hamada's team?
A **No.**
Q Do you even know who that is?
A **I think it's the name on the subpoena as the plaintiff in this suit or the defendant.**
Q He's a, I'm told -- he's an art dealer in Japan. Did you ever cross that space to Japan?
A **I did --**
**MR. COSSU:** Form objection.
**THE WITNESS:** -- but I don't know if I ever met Hamada.
**BY MR. AVANZADO:**
Q But certainly relating to this lawsuit no one talked to you from that --
A **No contact whatsoever.**
Q And other than the Johnson conversation or conversations that you have testified to and Mr. Galin's message to you, has anybody talked to you about this case at all?
A **Mr. Altman has called me a couple of times,**



**but I didn't take his call because I didn't know who he was. And I had no intention of speaking to lawyers unless Reed had asked me to speak to them.**
Q So you --
A **I called Dave Johnson -- I returned his call because I knew him and he referenced that Reed had asked him to call me.**
Q Okay. Did Mr. Altman leave you any messages?
A **Yes.**
Q What were the substance, generally, of those messages?
A **"I'm representing Reed Galin in a lawsuit, and I would like to talk to you. Please call me back," that sort of thing. That may not be verbatim.**
Q Just a preliminary introduction to see if he could talk to you?
A **Yes.**
Q Did anything in his messages suggest that he wanted you to lie for Mr. Galin?
A **Nobody has ever asked me to lie. Let me be clear on that.**
Q Or suggest that you should lie for him?
A **Nobody has suggested lie. I have been**