# Exhibit H

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ---------------------------------------X
     REED GALIN,
 4
                                 PLAINTIFF,
 5
 6         -against-          Case No.:
                              15-CV-6992
 7
 8   KUNITAKE HAMADA,
 9                             DEFENDANT.
     ---------------------------------------X
10
11              DATE:  October 28, 2016
12              TIME:  10:50 A.M.
13
14
15          DEPOSITION of a Non-Party
16   Witness, WARREN ADELSON, taken by the
17   respective parties, pursuant to a Court
18   Order and to the Federal Rules of Civil
19   Procedure, held at the offices of Adelson
20   Galleries, 730 Fifth Avenue, 7th Floor, New
21   York, New York 10019, before Jamie Bortner,
22   a Notary Public of the State of New York.
23
24
25
```

1          W. ADELSON
2     W A R R E N   A D E L S O N, called as a
3     witness, having been first duly sworn by a
4     Notary Public of the State of New York, was
5     examined and testified as follows:
6     EXAMINATION BY
7     MS. TARSIS:
8          Q.    Please state your name for the
9     record.
10         A.    Warren Adelson.
11         Q.    What is your address?
12         A.    730 5th Avenue, New York, New
13    York 10019.
14         Q.    Mr. Adelson, we have few
15    questions about your work with Coe Kerr
16    Gallery, because we're are trying to figure
17    out where Coe Kerr Gallery materials might
18    have ended up when the gallery closed.
19               Can you tell us when you worked
20    with the gallery?
21         A.    I worked from 1974 through most
22    of 1989.
23         Q.    Do you know when the gallery
24    closed?
25         A.    I believe 1993.

```
 1                    W. ADELSON
 2   Gallery when you worked there?
 3         A.    There were many partners.
 4         Q.    Do you remember their names?
 5         A.    Fred Woolworth and his
 6   brother-in-law, Clark Swanson.
 7         Q.    Do you know a man by the name
 8   of O. Kelley Anderson?
 9         A.    Kelley was one of the partners,
10   yeah.
11         Q.    What about Jerald Fessenden?
12         A.    Jerald was one of the partners
13   and I had a small equity in the company.
14         Q.    Were all four of you experts in
15   Andrew Wyeth, would you say?
16         A.    The word expert has a
17   particular meaning in the art world.  In
18   that jargon, I don't know that I would say
19   yes to that question.
20         Q.    So, there were four owners, in
21   the gallery, in different values?
22         A.    There were more -- as I was
23   saying, there are other partners too.
24         Q.    Would you be able to name all
25   of them?
```

| | |
|---|---|
| 1 | W. ADELSON |
| 2 | A. I'm doing that, you asked me |
| 3 | to, yeah. Clark Swanson is Fred's |
| 4 | brother-in-law. I think he's dead. I |
| 5 | guess that's about it. Fred had the |
| 6 | initial idea. He was the major majority |
| 7 | owner of the building. We all just owned |
| 8 | little pieces of it. |
| 9 | Q. Were all five of you experts -- |
| 10 | A. We were not experts. |
| 11 | Q. Were roles designated? Was |
| 12 | somebody business development, somebody was |
| 13 | examining artwork? |
| 14 | A. Fred was in charge of Andrew |
| 15 | Wyeth. |
| 16 | Q. Okay. Do you know if Kelley |
| 17 | Anderson knew about Andrew Wyeth's works? |
| 18 | A. We all did, to some extent. |
| 19 | Q. Was David Ramus known to the |
| 20 | entire staff of Coe Kerr or did he deal |
| 21 | with anybody in particular? |
| 22 | A. He wasn't that frequently seen. |
| 23 | So, I don't know. I mean -- |
| 24 | Q. How many times was he seen, do |
| 25 | you think? How often did he come into the |

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

```
 1                    W. ADELSON
 2          A.    I'm doing that, you asked me
 3   to, yeah.  Clark Swanson is Fred's
 4   brother-in-law.  I think he's dead.  I
 5   guess that's about it.  Fred had the
 6   initial idea.  He was the major majority
 7   owner of the building.  We all just owned
 8   little pieces of it.
 9          Q.    Were all five of you experts --
10          A.    We were not experts.
11          Q.    Were roles designated?  Was
12   somebody business development, somebody was
13   examining artwork?
14          A.    Fred was in charge of Andrew
15   Wyeth.
16          Q.    Okay.  Do you know if Kelley
17   Anderson knew about Andrew Wyeth's works?
18          A.    We all did, to some extent.
19          Q.    Was David Ramus known to the
20   entire staff of Coe Kerr or did he deal
21   with anybody in particular?
22          A.    He wasn't that frequently seen.
23   So, I don't know.  I mean --
24          Q.    How many times was he seen, do
25   you think?  How often did he come into the
```

11

     1                   W. ADELSON
     2     gallery or deal with the gallery?
     3          A.    I don't know.
     4          Q.    Frequently?
     5          A.    Not frequently, no.
     6          Q.    More than once?
     7          A.    It was perhaps more than once.
     8     I really don't --
     9          Q.    Half a dozen times?
    10          A.    We had open doors.  So, lots of
    11     people came in.  I don't remember him there
    12     much.
    13                MR. COMEN:  Can we go off the
    14          record for a second?
    15                (Whereupon, an off-the-record
    16          discussion was held.)
    17          Q.    You said you knew a man named
    18     David Ramus?
    19          A.    Yes.
    20          Q.    You met him in person?
    21          A.    Yes.  Yeah.
    22          Q.    Would you be able to describe
    23     him?
    24          A.    Yes.
    25          Q.    Would you please describe him.

                               11

| | |
|---|---|
| 1 | W. ADELSON |

2  long time ago, so, yeah.
3      Q.   Do you remember whether Coe
4  Kerr Gallery had a practice of trading
5  pictures with other dealers?
6      A.   Yeah, I guess so.  Sure.
7      Q.   Swap of paintings?
8      A.   Sure.
9      Q.   How would these transactions be
10 structured?
11     A.   Again, this is a case by case.
12 But, generally, when dealers trade
13 pictures, it's, I'll give you two cats for
14 a dog.  That kind of thing.  Unless it was
15 a specific incidence.  But, I can't say
16 more than that.  Trading was trading.
17 Sometimes it involves money, sometimes --
18 there are all kinds of variables with
19 situations like that.
20     Q.   Do you remember any special
21 transactions with David Ramus?
22     A.   I don't.  No, I don't.
23     Q.   Do you remember any
24 transactions with David Ramus?
25     A.   No.

DIAMOND REPORTING  (877) 624-3287   info@diamondreporting.com
13

```
 1                    W. ADELSON
 2   remember.  I don't remember what I said to
 3   him.
 4        Q.    Did you ever learn that
 5   Mr. Ramus was convicted and sentenced to
 6   prison?
 7              MR. COSSU:  Objection to form.
 8        A.    Of course.
 9        Q.    When did you learn that?
10        A.    When it happened.  Everybody
11   knew it.
12        Q.    Did you have any suspicions
13   that he was not acting in an honest manor
14   when you were dealing with him?
15              MR. COMEN:  You haven't made it
16         clear.  When was he first dealing
17         with him?
18        Q.    When you were at Coe Kerr, did
19   you have any suspicions about Mr. Ramus's
20   honesty and integrity?
21        A.    No.
22        Q.    What was your reaction when you
23   learned that he had been indicted?
24              MR. COSSU:  Objection to form.
25              MR. COMEN:  Please, it goes
```

```
                            24
```

1                W. ADELSON
2      Kerr?
3          A.    I don't remember.  I might
4      have.  I don't know.
5          Q.    It's your testimony that the
6      transaction with Ice Storm, when it was
7      transferred from Mr. Ramus to Coe Kerr,
8      that you knew nothing about that
9      transaction?
10         A.    I remember nothing.
11              MR. COSSU:  Objection to form.
12              MR. COMEN:  Okay.  We are good.
13              MR. COSSU:  I have about
14          literally four to five questions for
15          you.  I want to quickly regroup, if
16          that's all right?
17              (Whereupon, a short recess was
18          taken.)
19     EXAMINATION BY
20     MR. COSSU:
21         Q.    Good afternoon Mr. Adelson.  My
22     name is Paul Cossu.  I represent the
23     Defendant in this matter, Kunitake Hamada.
24     Just a couple quick questions and some
25     follow-up on the questions that you were

1        W. ADELSON
2   asked by Irina and Richard.
3        Do you recall when, in 1989,
4   you left the Coe Kerr Gallery?
5        A.   It was at the end of the year,
6   November/December.  It was towards the end
7   of the year.  I don't remember, exactly.
8        Q.   Did David Ramus ever tell you
9   he was a partial owner of the Andrew Wyeth
10  painting, Ice Storm?
11       A.   No.
12       Q.   Did Andrew ever mention a
13  person named Reed Galin, to you?
14       A.   No.
15       MR. COSSU:  I'm going to have
16       this marked as Defendant Exhibit A.
17       (Whereupon, a Copy of Receipts
18       were marked as Defendant's Exhibit A
19       for Identification as of this date by
20       the Reporter.)
21       Q.   I'm going to represent to you
22  that Defendants Exhibit A is a series of
23  documents that were produced to us by
24  Plaintiff in discovery, in the order that
25  they were produced to us by Plaintiff.