UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

REED GALIN,

      Plaintiff,                        15-CV-6992 (JMF)

  -against-

KUNITAKE HAMADA,

      Defendant.

------------------------------------------------------x

## **RESPONSE TO DEFENDANT'S LOCAL RULE 56.1 STATEMENT**

GD = Galin Declaration.

1. In or about 1989, Galin entered into an arrangement with his childhood friend David Ramus ("Ramus") for Galin to purchase an interest a painting by Andrew Wyeth titled *Ice Storm* (the "Painting").

Undisputed.

2. At that time, Ramus was an art dealer in New York and Atlanta operating as David Ramus Fine Art.

Undisputed.

3. Ramus purchased the Painting at an auction at Christie's Inc. ("Christie's") earlier in 1989 for $319,000.

Undisputed.

-1-

4. Through a Bill of Sale dated 1989-June-27, Galin acquired a one-third interest in the Painting for $106,333.33.

Undisputed.

5. Ramus retained a one-third interest in the Painting.

Undisputed.

6. The remaining one-third interest was sold to Don Sentell.

Undisputed.

7. Galin acquired his interest in the Painting with the knowledge and intent that Ramus would resell the Painting and that Galin would receive a portion of the proceeds from the sale.

Undisputed.

8. Galin never took possession of the Painting.

Undisputed.

9. Galin entrusted the Painting into Ramus's possession for the purposes of sale.

Disputed, as this is a conclusion of law, not a statement of fact. Galin never took possession of the Painting in any event.

10. Galin had previously entered into a similar arrangement with Ramus concerning a painting by Gaston de La Touche entitled *Le Pique-nique* (the "La Touche Painting").

Disputed, as to the conclusion that the previous arrangement was "similar." There is no evidence in the record as to the nature of that arrangement.

11. Galin had acquired and consigned the La Touche Painting to Ramus for sale, and then shared the profits from the sale of the La Touche Painting equally with Ramus.

Disputed as to the nature of the arrangement. Galin testified only that he made a profit, GD, ¶ 2 at 2.

12. On 1989-November-20, Ramus transferred the Painting and cash for a more valuable painting by Frank W. Benson titled *Children in the Woods* (the "Benson Painting") from the Coe Kerr Gallery Inc. in New York (the "Coe Kerr Gallery").

Undisputed as to the dates of the transfer. Disputed as to the characterization of the Benson painting as "more valuable." GD, ¶ 33 at 13.

13. When selling artworks like the Painting, Ramus testified that he would price the artworks based on what he thought they were worth and what he thought "the market would bear."

Undisputed.

14. The Coe Kerr Gallery was a fine art gallery with which Ramus had occasionally conducted business.

Undisputed.

15. Transactions involving the exchange of paintings with other art merchants was a practice of both the Coe Kerr Gallery and Ramus at the time.

Undisputed.

16. At the time of the transaction, the principals of the Coe Kerr Gallery did not have any suspicions about Ramus's "honesty and integrity."

Disputed. Adelson testified only about his own knowledge. There is no evidence in the record about the knowledge of any other person associated with Coe Kerr.

17. The Coe Kerr Gallery did not know that Galin had a partial ownership in the Painting and Ramus never mentioned Galin to the Coe Kerr Gallery.

Disputed. Adelson testified only about his own knowledge. There is no evidence in the record about the knowledge of any other person associated with Coe Kerr.

18. Ramus never paid Galin his portion of the proceeds from the sale of the Painting.

Undisputed.

19. Ramus testified that he began experiencing financial difficulties in "90, '91 when the Japanese bubble economy burst."

Undisputed that Ramus so testified. However, the indictment alleged that his financial difficulties began in the late 1980's.

20. Ramus testified that even after he began experiencing financial difficulties, he did his "very best" to make sure that no one at the Coe Kerr Gallery (or anywhere else) knew that he was in financial distress.

Undisputed that Ramus so testified.

21. Ramus testified that he made every attempt to hide both his finances and that he was addicted to drugs from his business associations and friends.

Undisputed that Ramus so testified.

22. Ramus eventually went to prison on a variety of charges in 1996.

Undisputed.

23. Galin claims that the first he learned of Ramus's fraudulent activity was in 1995 when Ramus was indicted.

Disputed. Galin's first suspicions arose in 1993. GD, ¶ 21 at 9.

24. As part of a subsequent bankruptcy proceeding, Galin was paid $359.00 towards his share of sale proceeds from the sale of the Painting.

Undisputed as to the receipt of $359, but the payment was not part of the bankruptcy proceeding. GD, ¶ 18 at 7.

25. No later than December 1995, Galin learned that the Painting had been sold to the Coe Kerr Gallery.

Undisputed.

26. Over the next 20 years, Galin claims to have sporadically contacted museums and galleries about the Painting.

Undisputed.

27. Galin did not, however, register the Painting with the Art Loss Register, a database of stolen art, or post any information about the Painting on the internet.

Undisputed.

28. Galin did not contact any of the principals of the Coe Kerr Gallery, and was allegedly unaware of the fact that Warren Adelson was a previous principal of Coe Kerr Gallery, despite Mr. Adelson's involvement in Ramus's bankruptcy proceeding.

Undisputed that Galin did not contact any of the principals of the Coe Kerr Gallery after learning that it had closed; disputed as to the balance of the statement, in part because of the lack of any dates. GD, ¶ 16 at 7. Moreover, Adelson testified that "there were many partners" but not that he was a "principal" (Adelson deposition, 9:3).

29. After learning that the Painting would be sold at auction by Christie's in May 2015, Plaintiff contacted Christie's and asserted an ownership interest in the Painting.

Undisputed.

30. After an agreement was reached that the sale of the Painting would proceed and that Christie's would hold the sale proceeds pending a determination as to which party had good title to the Painting at the time of its sale, Plaintiff initiated this action.

Undisputed.

**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS**

Plaintiff contends that there is no dispute as to the following facts:

1. Defendant Hamada has not submitted any admissible evidence that he has or ever had any interest in Ice Storm.

2. Hamada's only purported evidence is an unauthenticated document in Japanese which does not identify Ice Storm. (Mem. in opposition to Summary Judgment, Exh. A).

3. There is no evidence to suggest any due diligence on Hamada's part prior to acquiring any interest in Ice Storm.

4. There is no explanation about the discrepancy between the provenance of Ice Storm in the auction catalog, which says that the present owner acquired it in 1995, and Hamada's counsel's statement that Hamada acquired it in 2013.

5. Hamada did not submit a declaration in support of his motion for summary judgment.

Dated: New York, New York
January 17, 2017

*Richard A. Altman*

LAW OFFICE OF RICHARD A. ALTMAN
Attorneys for Plaintiff
285 West Fourth Street
New York, New York 10014
212.633.0123
altmanlaw@earthlink.net
artesq@earthlink.net