UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
:
REED GALIN,                                                    :
:
                         Plaintiff,              :            15-CV-6992 (JMF)
:
              -v-                               :            OPINION AND ORDER
:
KUMITAKE HAMADA,                                      :
:
                         Defendant.            :
:
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  09/26/2017____

JESSE M. FURMAN, United States District Judge:

       In this case, general familiarity with which is presumed, Plaintiff Reed Galin brings an

action to recover proceeds from the sale at auction of a painting by Andrew Wyeth titled "Ice

Storm," which are being held in escrow by the auctioneer, Christie's Inc.  (*See* Docket No. 5

("Compl.") ¶¶ 1, 73-80).  In a prior Opinion and Order, entered on May 10, 2016, the Court

largely denied the motion to dismiss filed by Defendant Kumitake Hamada, the alleged owner of

the painting when it was sold at auction, and allowed Galin's equitable lien claim to proceed.

*See Galin v. Hamada*, 15-CV-6992 (JMF), 2016 WL 2733132 (S.D.N.Y. May 10, 2016).  To the

extent relevant here, the Court found that, although the "entruster provision" of the Uniform

Commercial Code, *see* N.Y. U.C.C. Law § 2-403, "likely" barred Galin's claim, it was an

affirmative defense and not sufficiently "clear" on the face of the Complaint to warrant dismissal

at the pleadings stage.  *See id.* at *1-2.  Not surprisingly, Hamada now moves, pursuant to Rule

56 of the Federal Rules of Civil Procedure, for summary judgment on Galin's remaining claims,

arguing that they are barred by the entruster provision.  (Docket Nos. 52, 53 ("Def.'s Mem.")).

Hamada also moves, pursuant to Rules 11, 26, and 37 of the Federal Rules of Civil Procedure,

for sanctions against Galin. (Docket No. 47; Def.'s Mem. 19-21). For the reasons that follow, Hamada's motion for summary judgment is GRANTED, his Rule 37 motion for discovery-related sanctions is DENIED, and his Rule 11 sanctions motion is GRANTED.

## BACKGROUND

The following facts, taken from the admissible materials submitted by the parties, are, unless otherwise noted, undisputed. *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011); *see also Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").

In June 1989, Galin purchased a one-third interest in the Wyeth painting "Ice Storm" from his childhood friend, Davis Ramus, an art dealer operating in New York and Atlanta. (Compl. ¶¶ 16-19, 20, 27, 31; Docket No. 54 ("Def.'s SOF") ¶¶ 1-8; Docket No. 65 ("Pl.'s SOF") ¶¶ 1-8). The prior month, Ramus had purchased the painting at auction at Christie's for $319,000. (Pl.'s SOF ¶ 3). Galin never took physical possession of the painting; instead, Ramus retained it to resell for a profit. (*See id.* ¶¶ 7-9). Ramus did sell the painting, in November 1989, but he did not inform Galin. Ramus sold the painting to the Coe Kerr Gallery as part of a transaction in which Ramus gave the painting and $450,000 to the gallery in exchange for a painting by Frank W. Benson, which Ramus valued at $819,382.15. (*See id.* ¶ 12; Docket Nos. 54-6 ("Coe-Kerr Records") & 54-7 ("Ramus Records")). Notably, Ramus had occasionally conducted business with the Coe Kerr Gallery prior to the transaction involving "Ice Storm" (Pl.'s SOF ¶ 14), and this sort of transaction — involving the exchange of paintings by each side — was a practice of both Coe Kerr and Ramus at the time. (*Id.* ¶ 15).

Following the sale, Ramus never paid Galin his portion of the proceeds. (*Id.* ¶ 18). Perhaps relatedly, Ramus around then began to have difficulties, financial and otherwise; he was

eventually indicted, convicted of various charges, and sent to prison in 1996. (*Id.* ¶¶ 19, 22). In the meantime, no later than December 1995, Galin learned that "Ice Storm" had been sold to the Coe Kerr Gallery, which, at that point, was no longer in business. (*Id.* ¶¶ 25, 28). Galin did not contact any of the former principals of the Coe Kerr Gallery; nor did he register the painting with the Art Loss Register. (*Id.* ¶¶ 27-28). But over the past twenty years he has "sporadically" contacted museums and galleries to inquire about the painting's current location. (*Id.* ¶¶ 26-28). In May 2015, Galin learned that the painting would be sold at auction by Christie's, and he contacted Christie's to assert an ownership interest in the painting. (*Id.* ¶ 29). By agreement, the painting was sold and Christie's currently holds the sale proceeds pending a determination as to which party — Hamada or Galin — had good title to the painting at the time of the sale. (*Id.* ¶ 30). Galin alleges that the sale proceeds are rightfully his because he held title to the painting.

As noted, Hamada moved to dismiss Galin's claims, arguing — among other things — that they were barred by the entruster provision of the Uniform Commercial Code. (Docket No. 10, at 10-11). Although the Court agreed that was "likely," it refrained from dismissing on the ground that the entruster provision is an affirmative defense and that its application was not clear on the face of the Complaint. *See* 2016 WL 2733132, at *1-2. On June 15, 2016, after entry of the Court's Opinion and Order, the parties appeared for a conference to discuss the parameters of discovery. (*See* Docket No. 26 ("CMP") & 27 ("Conf. Tr.")). At the conference, the Court limited discovery "to the circumstances surrounding the transfer [of the painting] to Coe-Kerr Gallery," reasoning that, "if the entruster provision [did] apply to that transfer and Coe-Kerr Gallery acquired good title, [then] Mr. Galin [h]as no valid claim with respect to Mr. Hamada notwithstanding Mr. Hamada's knowledge or lack thereof of the earlier circumstances surrounding Mr. Ramus." (Conf. Tr. 10). The case management plan memorialized this ruling:

"As discussed on the record at the initial conference, discovery will be limited to the circumstances surrounding the transfer of the painting at issue from Mr. Ramus to the Coe-Kerr Gallery and application of the entrustment provision."  (CMP 7).

On November 1, 2016, the date discovery closed, Ramus was deposed by Galin's counsel.  (*See* Docket No. 48-9 ("Supp. Ramus Depo.")).  Right before the deposition, Galin's counsel e-mailed a list of documents that he said might be shown to Ramus during the deposition, including two documents identified as numbers 35 and 36.  (Docket No. 55-3, at 2).  Hamada's counsel responded, objecting to the use of the documents numbered 35 and 36 on the ground that he had never received any documents numbered above 33A.  (*Id.* at 3).  Galin's counsel did not use the contested documents during the Ramus deposition, but did produce them two days later.  (Docket No. 55-4).  During the deposition — which was conducted by Galin's counsel in California (with the other counsel appearing by phone) — Ramus testified that he had received a call the day before from Galin's "friend" (and former counsel), David Johnson,[1] who "seemed to indicate that there was some question of Summary Judgment coming up, and they wanted a very specific bit of information regarding to the transaction concerning 'Ice Storm.'" (Supp. Ramus Depo. 38).  Ramus testified that Johnson had told him "they just wanted to make sure there was some specific piece of information concerning the transaction with Coe Kerr Galleries that would forestall Summary Judgment," but Johnson "didn't tell [Ramus] what that piece of information was."  (*Id.* at 96).[2]

---

[1]	Johnson was Galin's former counsel.  (*See* Def.'s Sanctions Mem. 4; Galin Decl. ¶ 43).

[2]	Ramus also said that it was "clear to [him]" that Galin's lawyer's object "was to try and get [him] to say that [he] lied to Coe Kerr about the provenance of the 'Ice Storm' . . . ."  (*Id.* at 81).  But he had "no recollection" of that deal.  (*Id.*).

The day after Ramus's deposition, Hamada's counsel sent a letter to Galin's counsel advising him of Hamada's intent to seek Rule 11 sanctions "for the frivolous and unsupported allegations in the Complaint" unless the Complaint was withdrawn. (Docket No. 48-12, at 1). A few days later, Hamada's counsel also sent an e-mail to Galin's counsel asking that counsel provide the "specifics" of what "admissible evidence" was adduced during discovery in support of Galin's claims. (Docket No. 48-13). Galin's counsel did not respond. (Docket No. 49 ("Def.'s Sanctions Mem.") at 5). The present motions followed.

## THE MOTION FOR SUMMARY JUDGMENT

The Court begins with Hamada's motion for summary judgment. Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). A dispute over an issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam). In ruling on a summary judgment motion, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval*

*Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc*., 391 F.3d 77, 83 (2d Cir. 2004).

The key question in this case, as the Court noted in its prior Opinion and Order, is whether "the entruster provision applies to the 1989 sale from Ramus to Coe-Kerr" because, if it does, Galin's "claims fail as a matter of law — without regard for the circumstances under which [Hamada] himself procured the painting." *Galin*, 2016 WL 2733132, at *2. The "entruster provision" states that "[a]ny entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business." N.Y. U.C.C. Law § 2-403(2); *see also id.* § 2-403(3) (defining "entrusting" to include "any acquiescence in retention of possession regardless of any condition expressed between the parties to the . . . acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods has been such as to be larcenous under the criminal law"). The provision is meant to "enhance the reliability of commercial sales by merchants . . . by shifting the risk of resale to one who leaves his property with [a] merchant." *Overton v. Art Fin. Partners LLC*, No. 15-CV-3927 (SAS), 2016 WL 413128, at *7 (S.D.N.Y. Feb. 2, 2016) (internal quotation marks omitted). Put differently, the "theory" behind the provision "is that a person who knowingly delivers his property to a merchant dealing in goods of that kind assumes the risk of the merchant's acting unscrupulously by selling the property to an innocent purchaser." *Brown v. Mitchell-Innes & Nash, Inc.*, No. 06-CV-7871 (PAC), 2009 WL 1108526, at *4 (S.D.N.Y. Apr. 24, 2009) (internal quotation marks omitted).

In this case, there is no real dispute that the threshold requirements of the entrustment provision — "entrustment" of a good to "a merchant who deals in goods of that kind" — are

met.  First, Galin plainly entrusted the painting to Ramus.  (*See* Docket No. 64 ("Pl.'s Opp'n"), at 11-15 (making no argument regarding "entrustment")).  Galin never took physical possession of the painting.  Instead, by explicit agreement, Ramus retained possession of the painting and was granted authority to resell it, with the intention of splitting the proceeds with Galin (and a third co-owner).  (*See* Pl.'s SOF ¶¶ 7-9; Docket No. 54-3 (Galin-Ramus agreement)).  Thus, Galin expressly "acquiesce[d]" in the "retention" by Ramus of the painting for resale — and thus "entrusted" it within the meaning of the Uniform Commercial Code.  N.Y. U.C.C. Law § 2-403(3).  The fact that Ramus subsequently failed to pay Galin his portion of the resale proceeds is immaterial.  *See id.* (providing that whether the "possessor's disposition of the good[] has been such as to be larcenous under the criminal law" is irrelevant to the question of whether the good was entrusted).  Second, Ramus was concededly "a merchant who deal[t] in goods of" the same kind, as he was an art dealer at the time and certainly "deal[t]" in paintings.  (*See* Pl.'s SOF ¶ 2; Pl.'s Opp'n 11 ("It is not disputed that . . . Ramus was [an art dealer].")).

Thus, whether the entrustment provision applies here turns on whether Coe Kerr Gallery was a "buyer in ordinary course of business."  N.Y. U.C.C. § 2-403(2).  The Uniform Commercial Code defines such a buyer as one who "buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods."  *Id.* § 1-201(9).  Put another way, to be a buyer in the ordinary course, the sale must "comport[] with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices."  *Id.*  In the case of a merchant, however, the "good faith" standard is heightened to require "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."  *Id.* § 2-103(1)(b).  Thus, "a merchant might be required under the U.C.C. to take additional steps to verify the true owner of a piece of artwork.  This

heightened duty of due diligence is triggered where there are warning signs about problems in a sale." *Davis v. Carroll*, 937 F. Supp. 2d 390, 423 (S.D.N.Y. 2013) (internal quotation marks, alterations, and citations omitted). Such warning signs — or "red flags" — include: (1) whether the sale price is "obviously below market"; (2) whether the "negotiations or procedure of the sale differed" from previous transactions between buyer and seller; (3) whether the buyer was aware of the seller's "financial difficulties"; and (4) whether the buyer would have "reason to doubt" the seller's ownership of the artwork. *Joseph P. Carroll Ltd. v. Baker*, 889 F. Supp. 2d 593, 604 (S.D.N.Y. 2012) (internal quotation marks omitted); *see also Davis*, 937 F. Supp. 2d at 426.

In this case, there is no question, based on the evidence in the record, that Coe Kerr Gallery was a buyer in the ordinary course of business. First, the sale price of the painting was not "obviously below market." On May 23, 1989, Ramus purchased the painting from Christie's at public auction for the price of $319,000. (Compl. ¶¶ 16-19; Def.'s SOF ¶ 19). A few months later, in November, Ramus traded the painting and $450,000 in exchange for a Frank W. Benson painting, which Ramus valued at $819,382.15. (Def.'s SOF ¶ 12). Ramus's records from the time show that he valued the Wyeth painting at $338,395.93 at the time of sale (the $30,986.22 difference being accounted for as "additional charges"). (*See* Ramus Records 1). Thus, Ramus sold the painting for $19,395.93 more than the price at which he had purchased it at auction only months earlier — a price that cannot be said to be "obviously" below market value. Notably, if anything, Galin himself seems to concede the point, asserting that the "price paid for Ice Storm" was "high" and "grossly exaggerated." (Pl.'s Opp'n 14). But — separate and apart from the fact that Galin fails to support that assertion with admissible evidence — it is not clear how that could be the case, as Ramus purchased the painting in a public auction for only slightly less than

the resale price.[3]  At a minimum, there is no evidence in the record that Ramus resold the Wyeth painting for anything close to a "bargain" price that would have put the Coe Kerr Gallery on notice.  *See, e.g., Davis*, 937 F. Supp. 2d at 432 (finding a "red flag" where the purchaser valued the works "at markedly *higher* prices shortly after acquiring them" and where a "significant discrepancy" existed between the price paid and an art expert's fair market value appraisal (emphasis added)); *Kozar v. Christie's, Inc.*, 929 N.Y.S.2d 200, 2011 WL 1886586, at *9 (N.Y. Sup. Ct. 2011) (finding a potential "red flag" based on a "bargain price" where Christie's "set opening bids on [the] painting at $40,000" but the purchasers did not deny paying "only $1600 for the painting").

Second, there is no evidence that the transaction between Ramus and Coe Kerr Gallery deviated from their prior transactions or general practices.  In his deposition, Ramus testified that "[t]here were no specific types of transactions.  We did any kind of transaction that I could imagine doing," including trading paintings, exchanging cash, and "combinations of that." (Docket No. 54-2 ("Ramus Depo."), at 36-37).  Consistent with that testimony, Ramus exchanged the Benson painting for cash and another painting only one year later.  (*See* Ramus Records 1).  Similarly, Warren Adelson, a principal of the Coe Kerr Gallery at the time of the

_____

[3]      Relatedly, Galin asserts that the value of the Benson painting was itself inflated.  (*See* Docket No. 66 ("Galin Decl.") ¶¶ 32-36).  But Galin points to no admissible evidence in support of that assertion except the fact that Ramus resold the Benson painting one year after the Coe Kerr Gallery transaction for $300,000 cash and a "[p]ainting valuing a minimum of $100,000 at cost" — that is, less than half of what he had paid for it a year earlier.  (Ramus Records at 1-3). But Galin himself points to plausible explanations for that markdown — namely, a five-year decline in the art market prompted by a stock market downturn and Ramus's financial difficulties.  (Galin Decl. ¶¶ 28-30).  In any event, Coe Kerr Gallery would have had no knowledge of the subsequent sale (which post-dated the sale of the Wyeth painting at issue). And notably, while Galin provides no admissible evidence regarding the value of the Benson painting, Hamada provides evidence that a similarly sized Benson, estimated at $1.5 million to $2 million, sold for $4,182,500 in a Sotheby's auction in 1995 (when the art market had presumably rebounded from the earlier slump).  (Docket No. 55-5).

transaction at issue, testified that the Gallery had a practice of trading pictures with other dealers: "[G]enerally, when dealers trade pictures, it's, I'll give you two cats for a dog. That kind of thing. . . . Sometimes it involves money, sometimes — there are all kinds of variables with situations like that." (Docket No. 54-8 ("Adelson Depo."), at 13). Notably, Galin once against seems to concede the point, acknowledging that "[t]ransactions involving the exchange of paintings with other art merchants was a practice of both the Coe Kerr Galley and Ramus at the time." (Pl.'s SOF ¶ 15). Accordingly, the "Ice Storm" transaction did not differ from prior transactions in any way that did alert, or should have alerted, the Coe Kerr Gallery that Ramus lacked authority to sell the painting. *See, e.g.*, *Brown*, 2009 WL 1108526, at *7 (reaching a similar conclusion where "[t]here [was] no allegation that the negotiations or procedure of the sale differed from previous — and uncontroversial — agreements between [the parties]").

With respect to the third kind of red flag, Galin's assertion that the Coe Kerr Gallery knew about Ramus's alleged financial difficulties can be swiftly rejected. In his declaration, Galin characterizes "Ramus's own conduct" as the "primary red flag," claiming that Ramus's financial problems began as far back as October 1987. (Galin Decl. ¶¶ 28-30). Galin adds that the "art world in general . . . surely knew about" Ramus's financial issues. (Pl.'s Opp'n 15). But Galin provides no record citation or documentation to support these assertions. To the contrary, he acknowledges that Ramus, at the time, was "lying as he needed in order to keep going" (*id.*), and that he himself — despite being a lifelong friend — was in the dark as to Ramus's financial difficulties. (Docket No. 54-4 ("Galin Depo."), at 33). Ramus, meanwhile, testified that he "would have done [his] very best for no one to know because who's going to do business with [him] if they kn[e]w [he was] in distress." (Ramus Depo. 91). Indeed, he testified that he "tr[ied] to keep up a strong front" because he viewed the market downturn as short-term and

believed it "would straighten itself out and [] everybody would get paid everything they were owed." (*Id.* at 91, 93). In any event, whenever Ramus's financial difficulties began (and the record on that is not clear), there is no evidence to suggest that the Coe Kerr Gallery had any reason to believe Ramus was in trouble. In fact, Adelson testified that he did not have any suspicions about Ramus's "honesty and integrity" when he dealt during the relevant time period. (Adelson Depo. 20). And even after the sale, Ramus was able to make large cash payments to the Coe Kerr Gallery, supporting the conclusion that Ramus was not yet in financial trouble — as well as the conclusion that the Gallery would not have had any reason to suspect that he was in financial trouble. (Coe Kerr Records 2-8). Five years later, of course, Ramus was indicted and filed for bankruptcy. (Compl. ¶¶ 42, 52). But there is no evidence to suggest that the Coe Kerr Gallery had reason to know of Ramus's financial troubles at the time of the sale (if indeed he even had any at that time). *See, e.g.*, *Joseph P. Carroll Ltd.*, 889 F. Supp. 2d at 604 (finding no red flag where the purchaser thought the seller had "a good reputation" and was "unaware [at the time] of any financial or legal difficulties facing the gallery"); *cf. Davis*, 937 F. Supp. 2d at 428 (reaching the opposite outcome where, among other things, the defendant testified that he knew the seller at issue "would sell more works when he needed money," implying that the defendant had known "of [the seller's] less-than-ironclad financial position" at the time of sale).

That brings the Court to the final and "most important red flag" — whether the Coe Kerr Gallery had any indication, at the time of the sale, that Ramus "neither own[ed] the work nor enjoy[ed] authority to sell it." *Davis*, 937 F. Supp. 2d at 428. The absence of that red flag alone compels the conclusion that the Gallery was a buyer in the ordinary course for one simple reason: Ramus *was* the owner of the painting (albeit only in part) and *had* actual authority to sell it. That is, had the Gallery investigated the provenance of the painting prior to the purchase

(given the passage of time, it is not clear whether or to what extent it did), it would have discovered: that Ramus had, in fact, purchased the painting at public auction from Christie's only a few months earlier (for not much less than it was being sold); that he was, in fact, a partial owner of the painting; and that his co-owners had, in fact, granted him authority, in writing, to resell the painting (consistent with earlier arrangements for other works). (Pl.'s SOF ¶¶ 3, 5, 8; Docket Nos. 5-1, 54-5).

Galin does allege that he and Ramus had an additional oral agreement requiring his consent prior to any sale of the painting (Compl. ¶ 26), but — putting aside the absence of any evidence to support the existence of such an agreement — there is no evidence whatsoever that the Coe Kerr Gallery knew, or should have known, about it. Indeed, the only evidence in the record regarding the Gallery's knowledge — namely, Adelson's deposition testimony — supports the conclusion that the Gallery did not know about Galin or the fact that Ramus was only a partial owner of the painting. (Adelson Depo. 25; *see also* Pl.'s SOF ¶ 17). In short, there is no evidence that anything about the transaction would have given the Coe Kerr Gallery reason to believe that Ramus did not own the painting (because he did) or that he did not enjoy the right to sell it (because he did). *Cf. Davis*, 937 F. Supp. 2d at 435 (finding a red flag where the paintings were listed "as owned by SOG in the exchange paperwork — even though the provenance and cataloguing materials unmistakably identified Davis or the Davis estate as the owner"). The fact that Ramus did not follow through on his private agreement with Galin (and the other co-owner), although regrettable, does not change that fact. *See, e.g.*, *Graffman v. Espel*, No. 96-CV-8247 (SWK), 1998 WL 55371, at *3 (S.D.N.Y. Feb. 11, 1998) ("Even where an agent has violated his or her instructions, Section 2-403 may operate to bind the principal such that the purchaser acquires good title from the principal's agent."), *aff'd sub nom. Graffman v.*

*Doe*, 201 F.3d 431 (2d Cir. 1999); *Fin. Fed. Credit, Inc. v. Crane Consultants, LLC*, 21 F. Supp. 3d 264, 273 (W.D.N.Y. 2014) ("Only knowledge that the sale itself violates another person's rights (such as where the buyer knows that the seller does not hold legal title to the item being sold) prevents the buyer from being considered a [buyer in the ordinary course].").

In sum, there is no evidence in the record of a single red flag that did alert, or should have alerted, the Coe Kerr Gallery that Ramus lacked authority to sell the "Ice Storm" — a conclusion that is not surprising, as Ramus indisputably *did* have authority to sell the painting. Galin's remaining arguments against summary judgment are either irrelevant or unavailing. First, Galin argues that, because *Hamada* is an art dealer, *he* had a duty to investigate the provenance of the painting. (Pl.'s Opp'n 13-14). But, as the Court has previously noted, the circumstances of the transfer to Hamada are irrelevant to whether Galin has a valid claim against him. (CMP 7; Conf. Tr. 3). That is, whether the entrustment provision applies turns exclusively on the circumstances of the Ramus-Coe Kerr Gallery transaction; and if it does apply, then good title to the painting passed to the Coe Kerr Gallery, and Galin lost his interest in the painting (and, by extension, lacks standing to sue anyone other than Ramus). Second, Galin claims that the Coe Kerr Gallery could not be a buyer in the ordinary course of business because "Ramus owed them money at the time of the transaction," referring to a $90,000 debt noted on one of the invoices contained in the record. (Pl.'s Opp'n 14). It is true that the Uniform Commercial Code excludes from its definition of a "buyer in the ordinary course" any "transfer . . . in total or partial satisfaction of a money debt." N.Y. U.C.C. § 1-201(b)(9). But Galin's argument is premised on a (hopefully inadvertent) mischaracterization of the record, as the referenced invoice post-dates the relevant sale and appears to have been prepared by Ramus in conjunction with his resale of the *Benson* painting in 1990. (*See* Ramus Records 1 (noting that the Benson painting was acquired from the

Coe Kerr Gallery and that, as of February 1, *1991*, "$90,000 remains due to Coe Kerr Gallery")). Galin does not cite (and, unsurprisingly, the Court could not find) any authority for the proposition that a debt arising *from* a sale undermines a party's status as a buyer in the ordinary course of business with respect to *that* sale.

In the final analysis, Galin's arguments against application of the entrustment provision here boil down to nothing more than speculation and a conclusory assertion that something was amiss. Tellingly, when asked whether he had "any reason to believe that Coe Kerr Gallery acted criminally," Galin responded: "We're going back to my gut feeling." (Galin Depo. 83). But such unsupported suspicions are patently insufficient to survive a motion for summary judgment. While the Court is sympathetic to Galin's predicament, these are precisely the circumstances in which the entruster provision is meant to operate: Galin assumed the risk when he gave the painting to Ramus to resell and, unfortunately, that risk did not pay off. To the extent that Galin has a remedy at this late date, it is from Ramus, not Hamada. The Court thus concludes that Coe Kerr Gallery was a buyer in the ordinary course of business and that the entruster provision applies. Accordingly, Hamada's motion for summary judgment is GRANTED.[4]

**THE MOTIONS FOR SANCTIONS**

The Court turns, then, to Hamada's two motions for sanctions. The first, under Rules 26 and 37 of the Federal Rules of Civil Procedure, is for alleged discovery violations. (*See* Docket No. 52; Def.'s Mem 19-21). The second, under Rule 11 of the Federal Rules of Civil Procedure, seeks sanctions against Galin for having filed and maintained this action and, relatedly, for his

---

[4]  In light of that conclusion, the Court need not and does not reach the parties' alternative arguments regarding laches. (*See* Def.'s Mem 17; Pl.'s Opp'n 15).

alleged failure to conduct any preliminary investigation before filing his complaint.  (*See* Docket
No. 47; Def.'s Sanctions Mem.).  The Court will address each motion in turn.

## A.  The Discovery Sanctions Motion

Hamada's motion for discovery-related sanctions can be swiftly rejected.  Hamada's
motion is based on two alleged violations: Galin's failure to produce certain documents
(including those numbered 35 and 36) prior to the close of discovery and Galin's counsel's
alleged failure during the Ramus deposition to obey the Court's order limiting discovery to the
circumstances surrounding the sale of the painting from Ramus to the Coe Kerr Gallery.  (Def.'s
Sanctions Mem. 6-11).  With respect to the former, however, Hamada does not identify what the
documents at issue are, let alone how they are relevant to the issues in this case.  *See, e.g.*,
*Valentini v. Citigroup, Inc.*, No. 11-CV-1355 (JMF), 2013 WL 4407065, at *2 (S.D.N.Y. Aug.
16, 2013) (noting that, to warrant sanctions under Rules 26 and 37, the moving party must show,
among other things, "that the missing evidence is 'relevant' to the party's claim or defense such
that a reasonable trier of fact could find it would support that claim or defense" (internal
quotation marks omitted)).  And, in any event, given the Court's ruling on summary judgment,
any violation by Galin was plainly harmless — and thus not a basis for sanctions under Rule 37.
*See* Fed. R. Civ. P. 37(c)(1).  As for the latter, although Galin's counsel could surely have done a
better job of hewing to the line between permissible and impermissible discovery, the Court is
not persuaded that counsel went far enough over the line to warrant sanctions.  For one thing,
many of the questions flagged by Hamada as objectionable — for example, questions about the
operations of Ramus's business at the time (*see* Def.'s Mem. 16-17); about Ramus's prior
relationship, if any, with Adelson (*id.* at 22); about Ramus's prior dealings with the Coe Kerr
Gallery (*id.* at 25); and about the usual way Ramus structured his art transactions (*id.* at 27, 36)

— did, in fact, relate to the existence or non-existence of red flags surrounding the Ramus-Coe Kerr Gallery transaction. For another, as the Court noted previously, Hamada's counsel's own conduct during the Ramus deposition was not entirely praiseworthy, as he made "repeated" and unwarranted "objections as to form — unconnected to the Court's order with respect to the scope of discovery." (Docket No. 61). Accordingly, to the extent that there is any basis for sanctions under Rules 26 and 37 — and it is debatable whether there is — the Court exercises its discretion and declines to impose them here. *See, e.g.*, *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 143 (2d Cir. 2010) (holding that the decision whether to impose sanctions pursuant to Rule 37 is left to the discretion of the district court).

## B. The Rule 11 Motion

By contrast, Hamada's Rule 11 motion requires a more extended discussion. To the extent relevant here, Rule 11(b) provides that, "[b]y presenting to the court a pleading, written motion, or other paper . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(2), (b)(3). If a court determines that Rule 11(b) has been violated, Rule 11(c) authorizes the court to "impose an appropriate sanction." Fed. R. Civ. P. 11(c)(1). A sanction, however, "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4).

Rule 11 thus imposes an "affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed." *Gutierrez v. Fox*, 141 F. 3d 425, 427 (2d Cir. 1998) (internal quotation marks omitted). The standard for imposing Rule 11 sanctions, however, is purposefully high, so as not to stifle legal creativity and zealous advocacy. *See City of Perry, Iowa v. Proctor & Gamble Co.*, No. 15-CV-8051 (JMF), 2017 WL 2656250, at *2 (S.D.N.Y. June 20, 2017); *see also, e.g.*, *Park v. Seoul Broad. Sys. Co.*, No. 05-CV-8956 (BSJ) (DFE), 2008 WL 619034, at *1 (S.D.N.Y. Mar. 6. 2008) ("Courts have cautioned litigants that Rule 11 sanctions are reserved for extraordinary circumstances."). Among other things, a court must "resolve all doubts in favor of the signer" of the pleading, *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993), and may impose sanctions only where an attorney's conduct was "objective[ly] unreasonable[]," *Story v. Cello Holdings, L.L.C.*, 347 F.3d 370, 387 (2d Cir. 2003). Indeed, sanctions are appropriate only where "it should have been patently obvious to any attorney who had familiarized himself [or herself] with the law" that the action was frivolous. *Four Keys Leasing & Maint. Corp. v. Simithis*, 849 F.2d 770, 773 (2d Cir. 1988); *see also, e.g.*, *Healy v. Chelsea Res., Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991) (noting it must be "patently clear that a claim ha[d] absolutely no chance of success").

Where, as here, the viability of a plaintiff's claim turns on the applicability of an affirmative *defense*, the standard for imposing sanctions is arguably even higher. On that score, *In re Berger Industries, Inc.*, 298 B.R. 37 (Bankr. E.D.N.Y. 2003), is instructive. In *Berger Industries*, the Court confronted the question whether Bankruptcy Rule 9011 (the corollary to Rule 11) "places a duty upon a plaintiff to make inquiry into possible affirmative defenses," as the defendant there argued that — because the relevant affirmative defenses were contained in "the statute itself" — the plaintiff had a "pre-filing duty of inquiry or investigation" into the

applicability of certain defenses. *Id.* at 41. The Court rejected that requirement, noting that it would effectively "reorder[] traditional burdens of pleading" and "impermissibly change the requirement for a reasonable pre-filing inquiry into pre-filing discovery." *Id.*; *see also id.* at 41-42 (listing authority "suggesting that Bankruptcy Rule 9011 and Rule 11 do not require a plaintiff to conduct an investigation concerning the merits of any affirmative defenses before the case is filed"). Nevertheless, the *Berger Industries* Court declined to adopt a "*per se* rule negating any requirement for a pre-filing investigation of affirmative defenses," holding instead that such a duty should be "contingent upon the circumstances of the case." *Id.* at 42; *see also Matter of Excello Press, Inc.*, 967 F.2d 1109, 1112-13 (7th Cir. 1992) (declining to adopt a *per se* rule as "[t]he determination of the reasonableness of an attorney's inquiry necessarily depends upon the circumstances of the particular case"); *White v. Gen. Motors Corp.*, 908 F.2d 675, 682 (10th Cir. 1990) ("Part of a reasonable attorney's prefiling investigation must include determining whether any *obvious* affirmative defenses bar the case." (emphasis added)).

In light of these principles — and mindful of the Rule's high standard under normal circumstances — the Court concludes that that there is no basis to impose sanctions based on Galin's initial filing of the Complaint. Put simply, as the Court intimated in its earlier Opinion and Order, although it seemed "likely" based on Galin's own allegations that the entruster provision would apply to bar Galin's claims against Hamada, it could not be said — in the first instance — that application of the provision was "patently clear." *See Galin*, 2016 WL 2733132, at *2. But contrary to Galin's repeated assertions (*see* Docket No. 50, ¶ 6; *see also* Docket No. 50-1, at 5-7), that does not end the inquiry. That is because, based on amendments to Rule 11 in 1993, "a litigant's obligations with respect to the contents of . . . papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court

and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." Fed. R. Civ. P. 11, Advisory Committee Notes, 1993 Amendment, subdivisions (b) & (c). In light of those amendments, a party is not immune from sanctions merely because it "had a reasonable basis at the time" it filed its initial pleading "to believe" that its claim was valid. *Bunnell v. Haghighi*, 183 F. Supp. 3d 364, 362 (E.D.N.Y. 2016). Instead, a court may impose sanctions on a party for "refus[ing] to withdraw" an allegation or claim "even after it was shown to be inaccurate." *Id.*[5]

Given that continuing obligation, the Court concludes that Rule 11 sanctions are warranted here based on Galin's failure to drop his lawsuit upon the conclusion of discovery. As an initial matter, it could not have been clearer going into discovery that, if the entruster provision applied, Galin had no viable legal claim. *See Galin*, 2016 WL 2733132, at *2 ("The Court agrees with Defendant that, if the entruster provision applies to the 1989 sale from Ramus to Coe-Kerr, Plaintiff's claims fail as a matter of law — without regard for the circumstances under which Defendant himself procured the painting."). (*See also, e.g.*, Conf. Tr. 10 ("[F]or the reasons I articulated in my opinion . . . if the entruster provision does apply to that transfer and Coe-Kerr Gallery acquired good title, [then] Mr. Galin [h]as no valid claim with respect to Mr. Hamada . . . .); CMP 7 (limiting discovery to the circumstances surrounding the transfer of the painting from Ramus to Coe Kerr Gallery)). And, as Hamada lays out in his Rule 11 motion (*see* Def.'s Sanctions Mem. 3-5) and as the Court discussed above in connection with summary

---

[5] Notably, Galin relies entirely on cases that predated the 1993 amendments to Rule 11 or selective excerpts from more recent cases that are, in fact, quoting language from pre-1993 cases. (*See, e.g.* Pl.'s Sanctions Opp'n 6-7 (quoting cases from 1986, 1987, and 1989)). The Court notes that this reliance on outdated law could in itself provide a basis for Rule 11 sanctions, as it "should have been patently obvious to any attorney who had familiarized himself with the law" that those arguments were meritless. *Simithis*, 849 F.2d at 773.

judgment, discovery yielded no admissible evidence whatsoever to support Galin's assertion that there were red flags surrounding the transfer of the painting from Ramus to the Coe Kerr Gallery. In fact, discovery yielded quite the opposite: myriad evidence *supporting* application of the entruster provision here (namely, a fair purchase price, no knowledge of Ramus's financial difficulties, an exchange structured in a manner standard for the parties, etc.).

Notably, Galin himself acknowledged the absence of factual support for his position when he testified that, beyond his "gut feeling," he had nothing "specifically . . . to point [to]" that showed Coe Kerr acted fraudulently in connection with the painting transfer. (Galin Depo. 82-83). Yet Galin and his counsel continued to represent to the Court, both orally and in his opposition to Hamada's motion for summary judgment, that a legal and factual basis existed to support his Complaint. (*See* Docket No. 58, at 4 (counsel stating to the Court that "we have gathered some evidence from Mr. R[am]us which I think is very helpful to our cause, to our claims"); Pl.'s Opp'n 10-15). It is particularly telling that the majority of Galin's opposition to Hamada's motion for summary judgment is devoted to irrelevant issues, such as *Hamada's* procurement of the painting (*see* Pl.'s Opp'n 2-10), and that the relevant portion of the opposition lacks even one citation to the record (or, really, to any applicable case law). (*See id.* at 14-15). Quite simply, apart from conclusory statements — for example, that "there were numerous red flags" (*id.* at 15) — Galin has never once, in any manner, produced an admissible piece of evidence weighing against application of the entruster provision here.[6]

---

[6]     At best, Johnson's odd call to Ramus just before his deposition reinforces the Court's conclusion that sanctions are warranted; at worst, it would provide an independent basis for sanctions. Johnson may or may not have been trying to induce Ramus to lie on Galin's behalf, but the call certainly suggests knowledge that, as of then, Galin lacked any evidence to withstand summary judgment. As discussed above, Ramus's deposition did not alter the situation; instead, it provided additional evidence to support application of the entrustment provision.

Thus, the Court concludes that, once discovery closed, Galin and his counsel had an

obligation under Rule 11 to withdraw the Complaint because they knew — by that point if not

earlier — that their allegations on the central (and dispositive) issue in the case were "utterly

lacking in support." *StreetEasy, Inc. v. Chertok*, 752 F.3d 298, 307 (2d Cir. 2014) (internal

quotation marks omitted). Their decision not to do so — despite Hamada's explicit requests —

took their actions outside the ambit of "zealous advocacy" and into the realm of Rule 11

sanctions. *See, e.g.*, *Moazed v. First Union Mortg. Corp.*, 221 F.R.D. 28, 33 (D. Conn. 2004)

("The Court finds that Plaintiff's counsel has violated Rule 11 by presenting to the Court, in

written pleadings, memoranda of law, and affirming [the] same at oral argument, factual

allegations which do not have any evidentiary support."); *Carlton Grp., Ltd. v. Tobin*, No. 02-

CV-5065 (SAS), 2003 WL 21782650, at *6 (S.D.N.Y. July 31, 2003) ("Rule 11 sanctions are

appropriate where an attorney or party declines to withdraw a claim upon an express request by

his or her adversary after learning that [the claim] was groundless." (internal quotation marks

omitted)); *Gambello v. Time Warner Commc'ns, Inc.*, 186 F. Supp. 2d 209, 229 (E.D.N.Y. 2002)

(imposing Rule 11 sanctions where, even after being "confronted" with certain relevant facts, the

plaintiff's lawyer refused to withdraw the claim and "ma[de] arguments about what plaintiff

'thought' and 'believed,' which [were] completely contradicted by his sworn deposition

testimony"); *Bressler v. Liebman*, No. 96-CV-9310 (LAP), 1997 WL 466553, at *8 (S.D.N.Y.

Aug. 14, 1997) (applying Rule 11 where the plaintiff "continued to press the claims . . . in

conferences after information provided by opposing counsel and analysis by the court indicated

the questionable merit of those claims"); *see also, e.g.*, *Miller v. Bridgeport Bd. of Educ.*, No. 12-

CV-1287 (JAM), 2014 WL 3738057, at *10 (D. Conn. July 30, 2014) (imposing Rule 11

sanctions after discovery where, but for "fabricated" allegations, "there [was] little likelihood

that [the plaintiff's] suit would have survived defendants' motion to dismiss," especially since the earlier complaint was "just barely above the pleading bar to withstand dismissal").

Having concluded that Rule 11 sanctions are warranted, the Court must decide what sanctions are appropriate. As noted above, the Rule provides that sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). Although the purpose of sanctions is deterrence, and not reimbursement, *see, e.g.*, *Leflore v. Marvel Enter. Grp.,* 493 U.S. 120, 126 (1989), sanctions may include "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation," Fed. R. Civ. P. 11(c)(4). Here, had Galin withdrawn his claims at the close of discovery — when it was "patently clear" that there was no evidence to support them and he knew Hamada intended to seek Rule 11 sanctions — the parties would have avoided briefing the motion for summary judgment and the instant motion, preserving their own resources (not to mention the Court's). Under these circumstances, the Court finds that the appropriate sanction is requiring Galin and his counsel, jointly and severally, to reimburse Hamada for his reasonable attorney's fees and other expenses associated with briefing the motion for summary judgment and the Rule 11 motion. *See, e.g.*, *Source Vagabond Sys., Ltd. v. Hydrapak, Inc.*, No. 11-CV-5379 (CM) (JLC), 2013 WL 634510, at *1 (S.D.N.Y. Feb. 21, 2013) (awarding attorney's fees pursuant to Rule 11 for the time spent responding to a frivolous motion), *aff'd*, 753 F.3d 1291 (Fed. Cir. 2014); *Kochisarli v. Tenoso*, No. 02-CV-4320 (DRH) (MLO), 2007 WL 1017613, at *5 (E.D.N.Y. Mar. 30, 2007) (determining the amount of monetary sanctions under Rule 11 by calculating the "costs incurred in the preparation" of responding to the objectionable conduct).

**CONCLUSION**

For the foregoing reasons, Hamada's motion for summary judgment is GRANTED, and Galin's claims are dismissed in their entirety. Additionally, Hamada's motion for sanctions under Rules 26 and 37 is DENIED, but his motion for sanctions under Rule 11 is GRANTED. Specifically, Galin and his counsel are ordered to reimburse Hamada for his reasonable expenses, including attorney's fees, associated with the motion for summary judgment (Docket No. 52) and the motion for Rule 11 sanctions (Docket No. 47). Counsel shall confer in an effort to reach agreement on what constitutes such "reasonable expenses." Barring agreement, Hamada shall submit a fee application, supported by contemporaneous billing records, no later than **thirty days** from this Opinion and Order; Galin shall file any opposition within **two weeks** of any application. Absent leave of Court, Hamada may not file any reply.

The Clerk of Court is directed to terminate Docket Nos. 47 and 52.

SO ORDERED.

Date:  September 26, 2017
       New York, New York

_____
JESSE M. FURMAN
United States District Judge